# EXHIBIT A

FILED
2026 FEB 05 01:11 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
COUNTY OF KING

| | |
|---|---|
| SEUNGJAE SEONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation,<br><br>Defendant. | NO.<br><br>**CLASS ACTION COMPLAINT** |

## I. INTRODUCTION

1.1 For many Americans, their home is their financial anchor. A person's home is often the product of years of savings, a source of security and stability when times get tough, and the primary legacy they will leave to their children. For that reason, state and federal law create strong protections for homeowners in the field of mortgage lending, where people's homes are on the line. And these laws were further strengthened after the 2008 financial crisis wrought devastation across the country, exposing the dangers of increasingly complex mortgage products with risks that homeowners did not adequately understand until it was too late. These laws now include caps on interest rates, disclosure rules, licensing requirements, and the right to seek recourse in court, rather than being forced into mandatory arbitration.

1.2 These safeguards are crucial for homeowners. But some companies would prefer not to follow these rules. Unlock, a defendant here, is one such company. Unlock has designed



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

a complex mortgage product that poses greater risks than more traditional mortgages, but purports to be exempt from laws protecting homeowners.

1.3 All across the country, thousands of homeowners have been ensnared by this complex and confusing product. That is the situation for Seungjae Seong, a working father supporting his wife and two children. Several years ago, Mr. Seong lost his job in the Seattle area. After a few months of searching, he found a new job in his field, but the job was in North Carolina. Mr. Seong took the job and rented an apartment in North Carolina while the rest of his family continued to live in their Bothell home. The financial strain of job loss, maintaining two households, and travel to see his family caused Mr. Seong to worry about having sufficient cash flow to make it through this transitional period. It was at this time that Mr. Seong took a loan from Unlock in exchange for a mortgage on his home.

1.4 What Mr. Seong didn't realize is that when he later sold his home, he would need to pay Unlock far more money than he received. In 2025, Mr. Seong and his wife sold the Bothell home and moved the family to North Carolina. At the time of sale, Unlock received a payment of over $320,000 just 2.5 years after loaning Mr. Seong approximately $190,000.

1.5 While Unlock's product and business practices violate Washington state mortgage laws, Unlock claims that it doesn't have to follow any of these laws because its product is not a mortgage loan. And Unlock's contract even tries to make homeowners agree that these laws don't apply. Unlock is wrong. No matter what label Unlock affixes to its product, it is a mortgage loan. Unlock's product works by providing homeowners with an advance of money, receiving security through a mortgage on their home, and then requiring payment within 10 years or less. That is a mortgage loan.

1.6 Mr. Seong brings this lawsuit on behalf of himself and all other similarly situated Washington homeowners to vindicate his rights under Washington law.

## II. JURISDICTION AND VENUE

2.1 <u>Jurisdiction.</u> This Court has jurisdiction over this matter under RCW 2.08.010 because the demand exceeds three hundred dollars.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2.2 Venue. Venue is proper in King County under RCW 4.12.025 because Unlock transacts business in King County.

## III. PARTIES

3.1 Seungjae Seong is a natural person currently residing in North Carolina. In 2022, Mr. Seong entered into an Exchange Agreement with Unlock that was secured by a property located in Washington.

3.2 Defendant Unlock Partnership Solutions Inc. ("Unlock") is a foreign corporation doing business in Washington under UBI number 604 678 882. Unlock is incorporated in Delaware and has its principal place of business in New York.

## IV. FACTUAL ALLEGATIONS

### A. Home equity and reverse mortgage lending.

4.1 Home equity is the single largest asset for many lower and middle income families. See Jenny Schuetz, Rethinking homeownership incentives to improve household financial security and shrink the racial wealth gap, Brookings Institute, December 9, 2020, available at https://perma.cc/74E7-YKG8 ("For households in the three middle-income quintiles, home equity is the largest single financial asset, representing between 50% and 70% of net wealth.").

4.2 Homeowners can use the equity they have built up in their homes as collateral for debt. But this comes at a significant risk when the lender has the power to foreclose on the home, such that the borrower can be forced out of their home.

4.3 A reverse mortgage loan is a risky financial product that permits a homeowner to borrow against their home equity.

4.4 Reverse mortgages vary, but they typically have three core features:

a. The lender provides one or more advance payments to the borrower, calculated based on the value of their home.

b. The loan is secured by a mortgage on the home.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

c. And then when certain triggering events occur—such as sale of the home, death of the homeowner, or default—payment comes due in the form of a large balloon payment.

4.5 Reverse mortgages are also nonrecourse, meaning that the lender cannot recover more than the value of the home.

4.6 With a typical forward mortgage, the homeowner will make their mortgage payments out of their income, while the property just serves as collateral in the case of a default.

4.7 With a reverse mortgage, in contrast, the lender generally anticipates being paid not from the borrower's income, but from the future sale of the home. That is because the ultimate balloon payment will ordinarily be significantly larger than what the homeowner can pay, with borrowers often take out reverse mortgages because they were already having trouble making ends meet.

4.8 As a result, payment of a reverse mortgage will often require a sale of the home, with the borrower having to pay out a significant portion of the sale proceeds to the lender.

4.9 Experts, courts, and legislatures have overwhelmingly concluded that reverse mortgages are risky financial products. This arises from the large balloon payment, misleading advertising practices, aggressive sales tactics, complex financial structures, and a target population that is already having trouble making ends meet.

4.10 The most dangerous forms of reverse mortgages involve a single lump-sum payment up front to an individual based on the value of their home. *See, e.g.*, Nick Penzenstadler & Jeff Kelly Lowenstein, *Seniors were sold a risk-free retirement with reverse mortgages. Now they face foreclosure.*, USA Today (June 11, 2019, https://perma.cc/28FB-JSDS). This number will often seem high to cash-strapped homeowners, but the reason the number is so high is that their home is being put on the line and they will be required to pay far more on the back end—and potentially sell their home to pay it.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.11 The 2008 financial crisis was devastating for homeowners with reverse mortgages, and thousands of people lost their homes.

4.12 Subsequently, Washington and many other states, as well as the federal government, have heavily regulated reverse mortgage lending to protect consumers.

4.13 In the wake of the 2008 crisis, the Washington legislature passed an amendment to the Consumer Loan Act that regulates reverse mortgages. *See* 2009 Wash. Legis. Serv. Ch. 149 (H.B. 1311).

4.14 Any proprietary reverse mortgage product must be pre-approved by Washington's Department of Financial Institutions prior to it being sold in Washington. RCW 31.04.525(1); *see also* Wash. State Dep't Fin. Insts., *Proprietary Reverse Mortgages*, https://perma.cc/RQ4T-X74W.

4.15 Washington law requires that before a lender accepts a final application for a reverse mortgage loan, it must refer a prospective borrower to an independent housing counseling agency. RCW 31.04.515(9).

4.16 A reverse mortgage lender must receive a certification that such counseling has occurred before assessing any fees or finalizing the loan. RCW 31.04.515(10).

4.17 Reverse mortgage loans cannot be made to a Washington state resident unless the resident is at least sixty years old on the date of the execution of the loan. RCW 31.04.515(11).

4.18 Washington law also protects borrowers from unfair reverse mortgage lending practices by prohibiting lenders from requiring the purchase of insurance or any other financial product as a condition of obtaining a reverse mortgage loan. RCW 31.04.515(7); RCW 31.04.515(8)(b).

4.19 The deed of trust must conspicuously disclose that it secures a reverse mortgage. 31.04.515(6).



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.20 In addition, Washington law requires that all lenders making loans covered by the Consumer Loan Act be licensed by the state before they make such loans. RCW 31.04.035(1).

4.21 If a loan is made without proper licensing, any fees charged in connection with the origination of the loan must be refunded. RCW 31.04.035(2)(a).

4.22 Unlicensed lenders cannot charge interest at a rate exceeding 12% simple interest per annum. RCW 19.52.020(1). No licensee making loans under the Consumer Loan Act in Washington may lend money at a rate exceeding 25% simple interest per annum. RCW 31.04.105(1).

4.23 Lenders are prohibited by the Consumer Loan Act from making "any statement or representation with regard to the rates, terms, or conditions for the lending of money that is false, misleading, or deceptive." RCW 31.04.135.

4.24 Lenders are further prohibited from obtaining at the time of closing of a loan "a release of future damages for usury or other damages or penalties provided by law." RCW 31.04.027(1)(k).

**B. Unlock incorrectly claims that its product is not a residential mortgage loan.**

4.25 Unlock, however, does not follow these laws. Instead, the company claims that it is entirely exempt from any lending laws because its product is not a mortgage loan. In its contract and elsewhere, Unlock asserts that its product is "not a loan." Ex. A at 1, 37.

4.26 But no matter how Unlock labels its product, it is a mortgage loan.

4.27 Unlock provides homeowners with an advance of money, which it calls the "Investment Payment." In exchange, it receives a future payment obligation from the borrower. All of Unlock's "Settlement Events" involve a payment obligation to Unlock. When one of these events occurs (sale, death, buyout, 10-year term expires, or default), Unlock is guaranteed to receive a payout called the "Settlement Payment."

4.28 That payment obligation is secured by a deed of trust on a person's home.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.29 In other words, Unlock provides consumers with an advance of money, secures that advance by taking a mortgage on their home, and then requires payment within 10 years or less. That is a residential mortgage loan under Washington law. RCW 31.04.015(24).

4.30 Unlock's product is also a reverse mortgage under Washington law, which is a specific kind of residential mortgage loan. Unlock's product involves a lump sum advance of money, secured by a deed of trust, and a balloon payment that comes due when certain triggering conditions are met, including if the homeowner sells, dies, or defaults. RCW 31.04.505(5).

4.31 Not only does Unlock ensure that it will get a future payment, but Unlock has also ensured that this guaranteed payout will include its advance plus considerable interest. Unlock does this in significant part by advancing the homeowner a much smaller percentage of the home's value than the percentage of the home's value that Unlock will receive when payment comes due.

4.32 In this case, for example, Unlock's initial "Investment Payment" was $190,509, which was approximately 16.57% of the home's appraised value of $1,150,000. Ex. A at 2.[1]

4.33 In exchange, when payment comes due, Mr. Seong is required to pay Unlock 28.16% of the home's value.[2] *Id.* That is 1.7 times the initial advance. Unlock refers to this 1.7 multiplier as "the price of your Unlock Agreement." *Id.*

4.34 This multiplier ensures that Unlock will be repaid its advance with interest even if the house loses significantly in value. Indeed, Unlock is guaranteed to be repaid in full if the home were to drop in value by up to 41%. That is because Unlock's future payment of 28.16% of the value of Mr. Seong's home would be worth less than its initial advance payment of

---

[1] Unlock does not actually pay the homeowner the full amount of the "Investment Payment," however, as it subtracts thousands of dollars in opaque fees. Here, Unlock charged Mr. Seong $5,715.27 as an "Origination Fee." Ex. A at 2.

[2] Unlock's total return is capped by an "Annualized Cost Limit" of 21% compound interest. While Unlock claims there is no interest on its product, the formula for calculating the Annualized Cost Limit is just a formula for compound interest. Ex. A at 20–21 § 10.1.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

$190,509 only if the total value of the home were to drop to below $676,523. That would be a drop in value of approximately 41% from the initial appraised value of $1,150,000.

4.35 That is far more than average home prices have ever fallen in the Seattle area in the last half-century of Federal Reserve data. During the worst drop in this period, the 2008 financial crisis, average home prices only fell 25%.[3] Washington state as a whole experienced a similar drop of 25%.[4] And in the United States as a whole, home prices dropped only 19%.[5]

4.36 In other words, Unlock risks not being fully repaid only in the event of a catastrophic housing market crash that is far worse than the worst crash in modern history. And even then, Unlock would still receive most of its advance back because 28.16% of the home's value would still be worth a lot of money.

4.37 During such a crash many other mortgage lenders would lose money, and often even more money than Unlock. During the 2008 crash, for example, many mortgages defaulted, mortgage lenders and associated companies faced huge losses, and government bailouts were necessary. *See, e.g.*, John V. Duca, *Subprime Mortgage Crisis*, Fed. Reserve History, https://perma.cc/DZG6-XJSS.

4.38 Accordingly, Unlock has ensured that it will not share in a homeowner's losses in home value.

4.39 This is not the only way that Unlock ensures its future payment. On information and belief, Unlock also uses sophisticated models to target specific regions, areas, neighborhoods, and even homes to ensure that it picks homes that are most likely to generate significant profits for Unlock.

---

[3] Prices dropped from a peak index of 272.31 in Q4 2007 to a low of 203.59 in Q2 of 2012, a drop of 25.3%. *All-Transactions House Price Index for Seattle-Bellevue-Kent, WA (MSAD)*, Federal Reserve of St. Louis (last accessed Jan. 26, 2026), https://perma.cc/3DW6-F7G3.
[4] Prices dropped from a peak index of 501.9 in Q4 of 2007 to a low of 375.44 in Q2 of 2012, a drop of 25.2%. *All-Transactions House Price Index for Washington*, Federal Reserve of St. Louis (last accessed Jan. 26, 2026), https://perma.cc/VXY9-76TB.
[5] *See, e.g.*, *All-Transaction House Price Index for the United States*, Federal Reserve of St. Louis, (last updated accessed Jan. 26, 2026), https://perma.cc/J3FM-SGH7.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.40 Unlock also charges the homeowner an origination fee of thousands of dollars. These thousands of dollars in fees reduce the advance payment the homeowner receives and thus increase Unlock's profit upon repayment.

4.41 During the term of the loan, Unlock is not a co-owner in the property, nor is it a partner with the homeowner. Instead, the homeowner is liable for the entirety of the burdens and obligations of homeownership, including taxes, insurance, and maintaining or repairing the home. *See, e.g.*, Ex. A at 6–7 § 1.9.

4.42 In fact, even though Unlock styles its product as a "partnership" with the homeowner, its contract expressly states that "Unlock shall not be deemed a partner" of the homeowner. *Id.* at 39 § 21.14.

4.43 Unlock does not intend to be a co-owner of the property, and instead the goal of the contract is to ensure that Unlock is paid back its initial advance plus interest.

4.44 If the borrower fails to stay current on the obligation to cover all taxes, insurance, maintenance, and repairs, Unlock can foreclose on the home or make "protective advances" to pay for upkeep of the home, which Unlock can then recover with interest from the borrower. *Id.* at 30–31 § 17.12–13.

4.45 Unlock secures its future payment and the borrower's obligations through a "Performance Deed of Trust." Ex. B at 1.

4.46 Unlock records the Performance Deed of Trust on the homes of borrowers. The Deed of Trust states that "THIS INSTRUMENT CONSTITUTES A SECURITY AGREEMENT AND FIXTURE FILING WITH OWNER BEING THE DEBTOR AND BENEFICIARY BEING THE SECURED PARTY." *Id.* at 2.

4.47 Among other obligations, this deed of trust expressly states that it serves "to secure Owner's payment to [Unlock] of the Settlement Payment." *Id.* at 5.

4.48 In sum, Unlock has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus interest.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.49 And while Unlock argues in court that it faces a risk of not being paid back if there is a drop in the housing market, the company presents a different face to investors. Unlock touts that: "Embedded downside protection in [the home equity agreement] product structure allows for stable returns across various housing cycles." *Investors*, Unlock Partnership Solutions, https://perma.cc/Y9EH-Q3T9. Unlock also tells investors that its "investment returns are uncorrelated with broader markets and inflation-protected." *Id.*

**C. Seungjae Seong borrowed money from Unlock.**

4.50 Mr. Seong and his wife are two of the many Washington homeowners who have been ensnared by Unlock's product.

4.51 In 2018, Mr. Seong and his wife purchased the property located at 607 194th Pl SE, Bothell, Washington 98102. Mr. Seong, his wife, and their two minor children lived in the house. They moved to the Seattle area because Mr. Seong got a job at Amazon as a Senior Technical Designer.

4.52 In 2022, Mr. Seong ended his employment with Amazon. He looked for a new job and ultimately found one in his field, but it was located in North Carolina. After he accepted the job and began working in North Carolina, Mr. Seong's wife and children continued to live in the Bothell home full time. Mr. Seong rented an apartment in North Carolina and traveled back often to his Bothell residence to spend time with his family.

4.53 The travel and multiple residences necessitated by Mr. Seong's new job, as well as the period of unemployment between jobs, made money tight. Mr. Seong looked into options for ensuring that there was enough cash flow to support his family during this transitional time.

4.54 Mr. Seong first learned about Unlock through an online advertisement in mid-2022. The ad portrayed Unlock as a flexible alternative to a home equity loan or Home Equity Line of Credit (HELOC) without any monthly payments.

4.55 After seeing the advertisement, Mr. Seong called Unlock and spoke with sales representative Allison Bass. Following that initial conversation, on or about July 12, 2022, Ms.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Bass sent Mr. Seong a DocuSign application by email. Mr. Seong filled out the application and sent Ms. Bass required documents via email.

4.56 On July 14, 2022, Ms. Bass sent Mr. Seong an "Investment Estimate" via email. The estimate included an advance—the "Investment Payment"—of $100,000, representing 9.36% of the value of Mr. Seong's property, in exchange for a future payment of a 15.92% of the value of the property it the future.

4.57 After reviewing the "Investment Estimate," Mr. Seong asked for the maximum amount for which he would be eligible.

4.58 On July 31, 2022, Ms. Bass sent an email with updated terms, stating that Mr. Seong was approved for up to $190,509.

4.59 Under the updated terms, Unlock would provide an advance of $190,509. This was equivalent to 16.57% of the appraised value of the home. In exchange for that payment, the agreement provided that Unlock would receive 28.16% of the value of the home, or 1.7 times the value of the amount advanced. Ex. A at 2.

4.60 Mr. Seong also had to pay a $5,715 "origination fee" at the time of closing, which was deducted from the advance, such that the actual amount Mr. Seong received was over five thousand dollars less than the purported amount of $190,509. *Id.*

4.61 On August 16, 2022, Ms. Bass sent Mr. Seong and his wife the "final contract" via DocuSign. The documents included in this purported "final contract" included a closing statement, final application, 4506 C, disbursement instructions, and "sample contract documents." This "final contract" packet did not include a copy of the final Exchange Agreement or Performance Deed of Trust that Mr. Seong would later be required to sign.

4.62 Unlock did not refer Mr. Seong or his wife to an independent counseling agency prior to entering into the Exchange Agreement.

4.63 On August 30, 2022, Mr. Seong and his wife both signed the Exchange Agreement and Performance Deed of Trust. A notary brought the paperwork to Mr. Seong in



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

North Carolina, and a separate notary brought it to Mr. Seong's wife in Washington to sign on the same day.

4.64 Under the terms of the Exchange Agreement, Mr. Seong was required to grant Unlock a mortgage on his home, secured by a deed of trust, which secured his obligations under the agreement on penalty of foreclosure.

4.65 Mr. Seong did not have an opportunity to negotiate the terms of the contract.

4.66 What Mr. Seong did not realize was that he would be forced to pay Unlock far more money than he received.

4.67 The contract requires Mr. Seong to pay Unlock 28.16% of his home's value in ten years. Or, if one of several events occurs, Mr. Seong must pay Unlock even earlier: (1) if Mr. Seong sells his home; (2) if he chooses to repay early to avoid losing his home; (3) if he and his wife pass away; or (4) a default. A default would also permit Unlock to foreclose to protect its future payment.

4.68 After entering into the Exchange Agreement and receiving the funds, Mr. Seong used the money to cover his family's expenses after he left Amazon and began working in North Carolina. During this time, Mr. Seong was maintaining two households (one in Bothell, where his family lived, and one in Charlotte, North Carolina, where his new job was located) and traveling frequently back and forth.

4.69 In April 2025, Mr. Seong initiated communications with Unlock to determine what the payoff amount would be if he sold his home. Mr. Seong needed to sell because his family had decided that they would relocate to North Carolina so that they could all once again live in the same place.

4.70 On April 21, 2025, Mr. Seong received a "payoff statement" from Unlock indicating that he would owe Unlock a "Settlement Payment" of $320,324.89 if he sold his home.

4.71 Mr. Seong formally disputed the payoff amount with Unlock.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.72 Mr. Seong and his wife then sold their Bothell home for $1,140,000, with a closing date of May 16, 2025.

4.73 Unlock demanded full payment of the payoff amount from the proceeds of the sale. Mr. Seong paid Unlock under protest in order to close the sale.

**D. Unlock tries to prevent homeowners from vindicating their rights in court.**

4.74 On information and belief, Unlock has been aware for years of the risk that its products will be considered loans under federal and state laws.

4.75 Unlock's contract includes a provision that seeks to force homeowners to agree that "To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws." Ex. A at 37 § 21.5.

4.76 While such a provision is unenforceable, it serves to deter homeowners from invoking their rights.

4.77 The contract also includes a mandatory arbitration clause. Yet federal law prohibits arbitration clauses in residential mortgage loans, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e).

4.78 The contract also seeks to strip homeowners of their rights to statutory remedies, including punitive and consequential damages. Ex. A at 35 § 20.4. No matter how much harm the company causes homeowners or how many laws it violates, the contract provides that "in no event will Unlock's aggregate liability arising out of or related to the Unlock Agreement or the Property exceed the Investment Payment." *Id.* at 39 § 21.12.

4.79 The contract also seeks to immunize Unlock by stating that "Unlock may execute any of its duties under the Unlock Agreement by or through agents," yet "Unlock will not be responsible for the negligence or misconduct of any agent that Unlock selects." *Id.* at 39 § 21.23. Further, the contract purports to require homeowners to "expressly waive any claims



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

against any of Unlock's agents, assignees, affiliates, employees, directors or funding sources." *Id.*

4.80 The contract's indemnification clause also purports to put homeowners on the hook for Unlock's legal expenses for a wide range of claims, seemingly including claims brought by homeowners, independent of the outcome of the litigation. *Id.* at 38–39 § 21.12.

4.81 The contract also contains a definition of "Event of Default" that threatens to penalize homeowners for filing claims in court or challenging the enforceability of the dispute resolution terms. *Id.* at 27 § 16. And an "Event of Default" gives Unlock the power to seek damages, injunctive relief, specific performance, or force the sale of the property, among other "cumulative" remedies. *Id.* at 28–30 § 17.

4.82 These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights.

**E. Unlock's predatory business practices have allowed the company to grow rapidly.**

4.83 Unlock is a rapidly growing company, issuing hundreds if not thousands of residential mortgage loans each year. It now boasts that it has over 17,000 customers in 25 states and the District of Columbia. *About*, Unlock (last accessed Jan. 26, 2026), https://perma.cc/DF3G-BV85

4.84 Getting homeowners to sign these mortgage loans is just the first step in Unlock's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to Wall Street investors.

4.85 These offerings have sold for hundreds of millions of dollars, including most recently $303 million. *Unlock Technologies and Saluda Grade Close Their Largest Home Equity Agreement Securitization to Date*, PR Newswire, (Nov. 19, 2025), https://perma.cc/TX86-AZJW; *Unlock Technologies and Saluda Grade Announce Close of Second Rated Home Equity Agreement Securitization*, Unlock Technologies, (Apr. 5, 2024), https://perma.cc/Y9VY-UBAE; *Unlock Technologies, Saluda Grade Announce Close of First Rated Home Equity Agreement*



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Securitization,* Unlock Technologies (Oct. 5, 2023), http://perma.cc/K8ST-TXXR.

4.86 Unlock tells its Wall Street investors that there is "$9+ Trillion" in home equity that is currently "untapped"—in other words, in the hands of homeowners who paid for it. *Investors*, Unlock Partnership Solutions, https://perma.cc/Y9EH-Q3T9.

4.87 Despite Unlock's assertion that the company is not engaged in mortgage lending, its 2023 security offering was awarded the "Residential Mortgage Backed Security of the Year." *Saluda Grade Awarded both RMBS Issuer of the Year and RMBS Deal of the Year at the 2024 GlobalCapital US Securitization Awards*, Business Wire, (May 20, 2024), https://perma.cc/ZN6X-TTKY.

## V. CLASS ACTION ALLEGATIONS

5.1 Pursuant to Civil Rule 23, Mr. Seong brings this case on behalf of himself and of a proposed Class defined as follows:

> All persons who have entered into an Exchange Agreement with Unlock on a property located in Washington.

Excluded from the Class is any entity in which Unlock has a controlling interest, officers or directors of Unlock, this Court and any employees assigned to work on this case, and all employees of the law firms representing Plaintiff and the Class.

5.2 <u>Numerosity</u>: Unlock has over 15,000 contracts nationwide since 2020. *See About*, Unlock.

5.3 A non-exhaustive search of public records in King County, Washington shows approximately 187 deeds of trust recorded in favor of Unlock in King County alone.

5.4 As a result, on information and belief, there are more than 100 members of the proposed Class.

5.5 <u>Commonality and Predominance</u>: Unlock's conduct is based on its standard practices and form Exchange Agreements. As a result, Mr. Seong's claims raise common issues that predominate over individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

5.6 There exist questions of law and fact common to Mr. Seong and the proposed Class, including but not limited to:

a. Whether Unlock's Exchange Agreement creates a residential mortgage;

b. Whether Unlock's Exchange Agreement creates a reverse mortgage;

c. Whether Unlock is subject to the requirements of the Consumer Loan Act;

d. Whether Unlock's Exchange Agreement has been approved by the Department of Financial Institutions;

e. Whether the transaction fees charged by Unlock in connection with the Exchange Agreement are unlawful;

f. Whether the interest rate Unlock collects on its Exchange Agreements is unlawful;

g. Whether Unlock requires consumers to obtain insurance or other financial products as a condition of entering into an Exchange Agreement;

h. Whether requiring consumers to obtain insurance as a condition of entering into an Exchange Agreement is unlawful;

i. Whether Unlock's standard policy fails to refer applicants for Exchange Agreements to an independent housing counseling agency;

j. Whether Unlock's representation that its Exchange Agreement is "not a loan" is false, misleading, or deceptive;

k. Whether Unlock's indemnity clause in the Exchange Agreement is unenforceable;

l. Whether Unlock's fee-shifting clause in the Exchange Agreement is unenforceable;

m. Whether Unlock's Exchange Agreement constitutes an unconscionable contract under Washington law;



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

n. Whether Unlock's conduct violates the Washington Consumer Protection Act;

o. Whether Unlock's conduct violates the Washington Consumer Loan Act; and

p. The nature and extent of the injury to the Class and the measure of compensation for such injury.

5.7 Typicality: Mr. Seong has claims that are typical of the claims of the Class. Mr. Seong's claims, like the claims of the Class, arise out of the same common course of conduct, are subject to uniform policies, and are based on the same legal and remedial theories.

5.8 Adequacy of Representation: Mr. Seong is an appropriate representative for the Class and will fairly and adequately protect the interest of the Class. Mr. Seong understands and is willing to undertake the responsibilities of acting in a representative capacity on behalf of the proposed Class. Mr. Seong has no interests that directly conflict with the interests of the Class. Mr. Seong has retained competent and capable attorneys who are experienced trial lawyers with significant experience in complex and class action litigation, including specifically consumer litigation relating to hidden mortgage lending products. Mr. Seong and his counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.

5.9 Superiority: Mr. Seong and members of the Class suffered harm and damages as a result of Unlock's unlawful and wrongful conduct. Absent a class action, however, most Class members would find the cost of litigating their claims prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, and deters illegal activities. The Class members are readily identifiable from Unlock's records, and there will be no significant difficulty in the management of this case as a class action.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

5.10 Injunctive Relief: Unlock's conduct in uniform as to all members of the Class. Unlock has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## VI. FIRST CLAIM FOR RELIEF

### Per Se Violations of the Consumer Protection Act – Violation of Consumer Lending Act

6.1 Mr. Seong and Unlock are "persons" within the meaning of the Washington Consumer Protection Act. RCW 19.86.010(1).

6.2 The Consumer Loan Act provides that "[a]ny violation of this chapter is not reasonable in relation to the development and preservation of business and is an unfair and deceptive act or practice and unfair method of competition in the conduct of trade or commerce in violation of RCW 19.86.020." Accordingly, violations of the Consumer Loan Act are per se violations of the Consumer Protection Act.

6.3 The Consumer Loan Act further provides that "the practices governed" by it "are matters vitally affecting the public interest for the purpose of applying the consumer protection act, chapter 19.86 RCW."

6.4 Unlock's Exchange Agreement with Mr. Seong created a residential mortgage loan.

6.5 A residential mortgage loan is "*any* loan primarily for personal, family, or household use that is secured by a mortgage, deed of trust, or other consensual security interest on a dwelling, as defined in the truth in lending act, or residential real estate upon which is constructed or intended to be constructed a dwelling." RCW 31.04.015(24) (emphasis added).

6.6 In exchange for Unlock's advance of funds, the homeowner is required to pay Unlock at a future time.

6.7 That obligation is secured by a deed of trust on a dwelling.

6.8 Mr. Seong used the advance primarily for personal, family, or household use.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

6.9 Unlock's product is also "reverse mortgage loan," which is a specific kind of residential mortgage loan. Washington law provides the requirements for reverse mortgages. A reverse mortgage is "a nonrecourse consumer credit obligation." RCW 31.04.505(5). Reverse mortgages are secured through: "A mortgage, deed of trust, or equivalent consensual security interest securing one or more advances is created in the borrower's dwelling." This secures a payment obligation through which: "Any principal, interest, or shared appreciation or equity is due and payable, other than in the case of default, only after: (i) The consumer dies; (ii) The dwelling is transferred; or (iii) The consumer ceases to occupy the dwelling as a dwelling." *Id.* Reverse mortgage lenders must also be "licensed under Washington state law or exempt from licensing under federal law." RCW 31.04.505(5).

6.10 Unlock's product meets this definition as well. *See Olson v. Unison Agreement Corp.*, 2025 WL 2254522, at *2–5 (9th Cir. Aug. 7, 2025) (finding that a similar product meets the Washington statute's definition of a "residential mortgage loan" and a "reverse mortgage loan").

6.11 In August 2025, Unlock became licensed as a Consumer Loan Company in Washington for the first time.

6.12 As a result, Unlock violated the Consumer Loan Act by making loans to Mr. Seong and other Washington homeowners prior to August 2025 without licensing or approval.

6.13 Because Unlock was not licensed to make loans in Washington, it was not permitted to charge interest of more than 12% simple interest per annum. RCW 19.52.020(1). However, Unlock charged Mr. Seong an interest rate of over 21% compound interest. As a result, Unlock has violated the Consumer Loan Act by lending at interest rates above those permitted by law.

6.14 Unlock's Exchange Agreement required Mr. Seong to purchase and maintain homeowners' insurance as a condition of making the loan. This violated the Consumer Loan Act, RCW 31.04.515(7), (8)(b).



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

6.15 Unlock failed to refer Mr. Seong to an independent counseling agency prior to entering into the Exchange Agreement. As a result, Unlock violated the Consumer Loan Act. RCW 31.04.515(9); RCW 31.04.515(10).

6.16 Lenders are prohibited by the Consumer Loan Act from making "any statement or representation with regard to the rates, terms, or conditions for the lending of money that is false, misleading, or deceptive." RCW 31.04.135.

6.17 Unlock violated this prohibition by advertising its product to Mr. Seong as an "investment" and "not a loan."

6.18 Unlock's Exchange Agreement purports to indemnify Unlock from claims relating to the property securing the loan. This provision violates the Consumer Loan Act to the extent it is "a release of future damages for usury or other damages or penalties provided by law." RCW 31.04.027(1)(k).

6.19 Unlock loaned money to Mr. Seong through the Exchange Agreement despite the fact that Mr. Seong was only 50 at the time the loan was made. As a result, Unlock violated the Consumer Loan Act, which prohibits reverse mortgage lending to any person under the age of 60. RCW 31.04.135.

6.20 Therefore, Unlock has violated the Consumer Loan Act in numerous ways. Each violation is a per se violation of the Consumer Protection Act.

6.21 Unlock's unlawful actions caused Mr. Seong to lose money charged as unlawful "transaction fees."

6.22 Unlock's unlawful actions also caused Mr. Seong to pay a "Settlement Payment" of $320,324.89.

6.23 Mr. Seong is therefore entitled to legal relief against Unlock, including recovery of actual damages, treble damages, attorneys' fees, costs of suit, and such further relief as the Court may deem proper.

6.24 Mr. Seong is also entitled to injunctive relief in the form of an order prohibiting Unlock from selling its unfair and deceptive Exchange Agreements to Washington consumers.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

6.25 Mr. Seong is also entitled to reformation of the Exchange Agreement to comply with Washington's lending laws, and/or to rescission of the Exchange Agreement.

## VII. SECOND CLAIM FOR RELIEF

### Violation of the Consumer Protection Act – Unfair Acts or Practices

7.1 Mr. Seong and Unlock are "persons" within the meaning of the Washington Consumer Protection Act. RCW 19.86.010(1).

7.2 Unlock's conduct described above is unfair within the meaning of the Washington Consumer Protection Act.

7.3 Unlock engaged in unfair acts or practices by marketing and selling its Exchange Agreement to Mr. Seong and other Washington consumers in a manner that purposely attempts to avoid residential mortgage and reverse mortgage lending laws. Unlock's Exchange Agreements are immoral, unethical, oppressive, and/or unscrupulous.

7.4 Unlock further engaged in unfair acts or practices by drafting an unconscionable contract.

7.5 Unlock's marketing and sale of its Exchange Agreements occurred in trade or commerce within the meaning of the Washington Consumer Protection Act, and were and are capable of injuring a substantial portion of the public.

7.6 Unlock's unfair acts or practices impact the public interest because they have injured Mr. Seong, have injured at least hundreds of Washington consumers, and have the capacity to injure hundreds or thousands of other Washington residents. Moreover, Unlock continues to market and sell its Exchange Agreement in Washington and, as a result, is likely to continue to injure the public.

7.7 As a direct and proximate result of Unlock's unfair acts or practices, Mr. Seong has suffered an injury in fact and lost money. Specifically, Mr. Seong's injuries consist of the transaction fees he paid to Unlock, the Settlement Payment he made to Unlock when he sold his home, and the impairment to his property rights created by the Exchange Agreement and Unlock's deed of trust on his home.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

7.8 Mr. Seong is therefore entitled to legal relief against Unlock, including recovery of actual damages, treble damages, attorneys' fees, costs of suit, and such further relief as the Court may deem proper.

7.9 Mr. Seong is also entitled to injunctive relief in the form of an order prohibiting Unlock from selling its unfair Exchange Agreements to Washington consumers.

7.10 Mr. Seong is also entitled to reformation of the Exchange Agreement and/or to rescission of the Exchange Agreement.

## VIII. THIRD CLAIM FOR RELIEF

### Violation of the Consumer Protection Act – Deceptive Acts or Practices

8.1 Mr. Seong and Unlock are "persons" within the meaning of the Washington Consumer Protection Act.

8.2 Unlock's conduct described above is deceptive within the meaning of the Washington Consumer Protection Act.

8.3 Unlock engaged in deceptive acts or practices by marketing and selling its Exchange Agreement to Mr. Seong and other Washington consumers in a manner that purposely misrepresents the nature of the product. Unlock repeatedly represents that the product is "not a loan," but its product is a residential mortgage loan and a reverse mortgage loan. These acts or practices are deceptive within the meaning of the CPA because they have the capacity to deceive Washington consumers.

8.4 Unlock's marketing and sale of its Exchange Agreement occurred in trade or commerce within the meaning of the Washington Consumer Protection Act and were and are capable of injuring a substantial portion of the public.

8.5 Unlock's deceptive acts or practices impact the public interest because they have injured Mr. Seong, have injured at least hundreds of Washington consumers, and have the capacity to injure hundreds or thousands of other Washington residents. Moreover, Unlock continues to market and sell its Exchange Agreement and, as a result, is likely to continue to injure the public.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

8.6 As a direct and proximate result of Unlock's unfair acts or practices, Mr. Seong has suffered an injury in fact and lost money. Specifically, Mr. Seong's injuries consist of the transaction fees he paid to Unlock and the impairment to his property rights created by the Exchange Agreement and Unlock's deed of trust on his home.

8.7 Mr. Seong is therefore entitled to legal relief against Unlock, including recovery of actual damages, treble damages, attorneys' fees, costs of suit, and such further relief as the Court may deem proper.

8.8 Mr. Seong is also entitled to injunctive relief in the form of an order prohibiting Unlock from selling its deceptive Exchange Agreement to Washington consumers.

8.9 Mr. Seong is also entitled to reformation of the Exchange Agreement and/or to rescission of the Exchange Agreement.

## IX. FOURTH CLAIM FOR RELIEF

### Consumer Protection Act Injunctive Relief Claim on Behalf of Washington Consumers

9.1 Under the Washington Consumer Protection Act, "[a]ny person who is injured in his or her business or property" by a CPA violation "may bring a civil action in superior court to enjoin further violations." RCW 19.86.090.

9.2 For the reasons stated above, Unlock has violated the Washington Consumer Protection Act, and Mr. Seong has been injured in his property by those violations. As a result, Mr. Seong has standing to seek an injunction to protect the public interest from future violations. *See Hockley v. Hargitt*, 82 Wn.2d 337, 350–51 (1973).

9.3 Therefore, Mr. Seong seeks an injunction prohibiting Unlock from continuing its unfair and deceptive practices in Washington. Specifically, Mr. Seong asks the Court to enjoin the use of Unlock's Exchange Agreements in Washington.

## X. FIFTH CLAIM FOR RELIEF

### Declaratory Relief – Unconscionable Contract

10.1 Any person with an interest in a written contract "may have determined any questions of construction or validity arising under the … contract and obtain a declaration of



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

rights, status or other legal relations thereunder." RCW 7.24.020.

10.2 Unlock's Exchange Agreement is unconscionable for the following reasons:

a. Unlock is a large financial company engaged in the business of soliciting homeowners and placing them in agreements like the one entered by Mr. Seong;

b. Unlock and Mr. Seong, and other similarly situated consumers, occupy significantly unequal bargaining positions;

c. Unlock drafted all documents, amounting to over 80 pages in the funding package, and presented them as contracts of adhesion;

d. Unlock provided no meaningful explanation of the true costs of the contracts;

e. Unlock failed to provide accurate disclosures related to the transaction and cost of credit as required by law, and instead provided purported disclosures that were misleading, misstated the risks and costs of the transaction, and were confusing;

f. Unlock drafted the documents to be confusing, and the contracts are extremely lengthy, contain legalese, repeatedly cross reference other documents, and include extremely difficult to understand terms;

g. Unlock drafted and presented the documents in a manner that exploited the unequal bargaining power of the parties such that consumers like Mr. Seong would not and could not understand the full nature and consequences of the transaction;

h. Unlock required that homeowners, such as Mr. Seong, transfer wealth from themselves to Unlock by requiring the homeowners to bear all costs in order to protect and increase Unlock's profit, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

i. The actual cost of the transaction to Mr. Seong and similarly situated consumers is extremely high; and



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

j. The terms of the transaction are substantially one-sided in favor of Unlock, which drafted the documents and their terms, and guarantee a substantial rate of return to Unlock at very limited cost or risk, while placing an outsized burden of the costs and risks on Mr. Seong, and similarly situated consumers, as described above.

10.3 The unconscionable terms pervade the entire agreement.

10.4 Mr. Seong thus seeks a declaration that the entire agreement is unconscionable and thus is void and unenforceable.

## XI. SIXTH CLAIM FOR RELIEF

### Declaratory Relief – Fee Shifting Provision Unenforceable

11.1 Any person with an interest in a written contract "may have determined any questions of construction or validity arising under the … contract and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020.

11.2 The Performance Deed of Trust provides that the property owner is "obligated" to pay "all fees and expenses … incurred by Beneficiary [Unlock]." Such fees "shall include Attorneys' Fees incurred in any state, federal or bankruptcy court … of any kind in any way related to this Performance Deed of Trust, to the interpretation or enforcement of the parties' rights under this Performance Deed of Trust, or to the Property." Ex. B at 5 § 2(a)(6); *see also id.* at 14 § 20(c).

11.3 Both the Performance Deed of Trust and the Exchange Agreement further provide that "IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES." Ex. A at 33 § 20.5; Ex. B at 18 § 25(e).

11.4 Mr. Seong seeks a declaration that these fee-shifting provisions are unconscionable and unenforceable in this action because he brings claims under the Washington Consumer Protection Act. The CPA provides for fee shifting only to a prevailing *plaintiff*. The Washington Supreme Court has found that a mutual fee shifting term is substantively unconscionable and therefore unenforceable where the statute provides that


TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

only a prevailing plaintiff may recover fees. *Gandee v. LDL Freedom Enters., Inc.*, 176 Wn.2d 598, 606 (2013). The same rationale applies with even more force to a one-way fee shifting provision in favor of Unlock.

11.5 Because Mr. Seong is filing this Complaint, there is an existing dispute about whether Mr. Seong will be liable to pay Unlock's attorneys' fees in this action, either (1) as a matter of course under the Performance Deed of Trust or (2) in the event Unlock prevails in this lawsuit.

11.6 The parties have genuinely opposing and substantial interests in this dispute, as attorneys' fees for litigation can cost tens of thousands, if not hundreds of thousands, of dollars.

11.7 A judicial determination of whether Unlock will be permitted to seek to recover their attorneys' fees if they prevail will provide the parties with certainty and finality regarding their rights and the risks of continuing litigation.

## XII. PRAYER FOR RELIEF

WHEREFORE, Mr. Seong requests relief as follows:

A. An order certifying the proposed class and appointing Mr. Seong as class representative and his counsel as class counsel, as soon as practicable;

B. Declaratory relief determining that the fee-shifting provision in the Exchange Agreement is unenforceable in this action;

C. Rescission or reformation of the Exchange Agreements;

D. Actual damages;

E. Treble damages under the CPA;

F. Injunctive relief prohibiting Unlock from selling its Exchange Agreement to Washington consumers;

G. Attorneys' fees and costs of suit;

H. Prejudgment interest; and

I. Such other relief as the Court deems just and proper.



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

RESPECTFULLY SUBMITTED AND DATED this 5th day of February, 2026.


TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, WSBA #26759
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com

By: /s/ Blythe H. Chandler, WSBA #43387
Blythe H. Chandler, WSBA #43387
Email: bchandler@terrellmarshall.com

By: /s/ Elizabeth A. Adams, WSBA #49175
Elizabeth A. Adams, WSBA #49175
Email: eadams@terrellmarshall.com

By: /s/ Eleanor Eagan, WSBA #64463
Eleanor Eagan, WSBA #64463
Email: bchandler@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603

CASCADE LAW PLLC

By: /s/ Umar I. Gebril, WSBA #58227
Umar I. Gebril, WSBA #58227
Email: umar@cascade.law
2707 Colby Avenue, Suite 1420
Everett, Washington 98201
Telephone: (425) 998-8999

Thomas Scott-Railton, *PHV forthcoming*
Email: thomas@guptawessler.com
GUPTA WESSLER LLPC
2001 K Street NW, Suite 850 North
Washington, DC 20006
Telephone: (202) 888-1741

*Attorneys for Plaintiff and the Proposed Class*

FILED
2026 FEB 05 01:11 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING**

| | |
|---|---|
| SEUNGJAE SEONG<br><br>Plaintiff(s)<br>vs<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC.<br><br>Defendant(s) | No. 26-2-04910-6 SEA<br><br>**ORDER SETTING CIVIL CASE SCHEDULE**<br><br>**ASSIGNED JUDGE: Rania Rampersad, Dept. 11**<br><br>FILED DATE: 02/05/2026<br>TRIAL DATE:02/08/2027 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I. NOTICES

**NOTICE TO PLAINTIFF:**
The Plaintiff may serve a copy of this **Order Setting Case Schedule (*Schedule*)** on the Defendant(s) along with the ***Summons and Complaint/Petition*.** Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the ***Summons and Complaint/Petition*** or (2) service of the Defendant's first response to the ***Complaint/Petition***, whether that response is a ***Notice of Appearance***, a response, or a Civil Rule 12 (CR 12) motion. The ***Schedule*** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this ***Schedule***. In order to comply with the ***Schedule***, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].

**You are required to give a copy of these documents to all parties in this case.**

## I. NOTICES (continued)

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS:**
A statuary filing fee must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of all parties and claims is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of all parties and claims is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING AND TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and crossclaims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a statutory arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a statutory fee must be paid and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements and/or Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|---|---|
| | Case Filed and Schedule Issued. | 02/05/2026 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$250 arbitration fee must be paid** | 07/16/2026 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration *[See KCLCR 4.2(a) and Notices on Page 2*]. | 07/16/2026 |
| | **DEADLINE** for Hearing Motions to Change Case Assignment Area [*KCLCR 82(e)*]. | 07/30/2026 |
| | **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(k)*]. | 09/08/2026 |
| | **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(k)*]. | 10/19/2026 |
| | **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | 11/02/2026 |
| | **DEADLINE** for a Change in Trial Date [*See KCLCR 40(e)(2)*]. | 11/02/2026 |
| | **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | 12/21/2026 |
| | **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | 01/11/2027 |
| | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [*KCLCR 4(j)*]. | 01/19/2027 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(1)*] | 01/19/2027 |
| | **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | 01/25/2027 |
| * | Joint Statement of Evidence [*See KCLCR 4 (k)*] | 02/01/2027 |
| | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 02/01/2027 |
| | Trial Date [*See KCLCR 40*]. | 02/08/2027 |

*The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.*

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above. Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance. It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.

DATED: 02/05/2026

Averil Rothrock

PRESIDING JUDGE

FILED
2026 FEB 05 01:11 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**FOR THE COUNTY OF KING**

| | |
|---|---|
| SEONG<br><br>VS<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC. | No. 26-2-04910-6 SEA<br><br>**CASE INFORMATION COVER SHEET AND AREA DESIGNATION**<br><br>(CICS) |

**CAUSE OF ACTION**

MSC - Miscellaneous

**AREA OF DESIGNATION**

SEA Defined as all King County north of Interstate 90 and including all of Interstate 90 right of way, all of the cities of Seattle, Mercer Island, Issaquah, and North Bend, and all of Vashon and Maury Islands.

FILED
2026 FEB 05 01:11 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
KING COUNTY

| | |
|---|---|
| SEUNGJAE SEONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation,<br><br>Defendant. | NO.<br><br>**SUMMONS (20) DAYS** |

TO: UNLOCK PARTNERSHIP SOLUTIONS INC:

A lawsuit has been started against you in the above-entitled court by Plaintiff. The Plaintiff's claims are stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the person signing this summons within 20 days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what has been asked for because you have not responded. If you serve a notice of

appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that Plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon Plaintiff. Within fourteen (14) days after you serve the demand, Plaintiff must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

THIS SUMMONS is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

RESPECTFULLY SUBMITTED AND DATED this 5th day of February, 2026.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, WSBA #26759
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com

By: /s/ Blythe H. Chandler, WSBA #43387
Blythe H. Chandler, WSBA #43387
Email: bchandler@terrellmarshall.com

By: /s/ Elizabeth A. Adams, WSBA #49175
Elizabeth A. Adams, WSBA #49175
Email: eadams@terrellmarshall.com

By: /s/ Eleanor Eagan, WSBA #64463
Eleanor Eagan, WSBA #64463
Email: bchandler@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603

CASCADE LAW PLLC

By: /s/ Umar I. Gebril, WSBA #58227
Umar I. Gebril, WSBA #58227
Email: umar@cascade.law
2707 Colby Avenue, Suite 1420
Everett, Washington 98201
Telephone: (425) 998-8999

Thomas Scott-Railton, *PHV forthcoming*
Email: thomas@guptawessler.com
GUPTA WESSLER LLPC
2001 K Street NW, Suite 850 North
Washington, DC 20006
Telephone: (202) 888-1741

*Attorneys for Plaintiff and the Proposed Class*

FILED
2026 FEB 05 01:11 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

**KING COUNTY SUPERIOR COURT**
**CASE ASSIGNMENT AREA DESIGNATION and CASE INFORMATION COVER SHEET**
**(CICS)**

Pursuant to King County Code 4A.630.060, a faulty document fee of $15 may be assessed to new case filings missing this sheet.

**CASE NUMBER:** ______________________________
(Provided by the Clerk)

**CASE CAPTION:** **Seungjae Seong v. Unlock Partnership Solutions Inc.**
(New case: Print name of person starting case **vs.** name of person or agency you are filing against.)

Please mark one of the boxes below:

☒ **Seattle Area**, defined as:

All of King County north of Interstate 90 and including all of the Interstate 90 right-of-way; all the cities of Seattle, Mercer Island, Bellevue, Issaquah and North Bend; and all of Vashon and Maury Islands.

☐ **Kent Area,** defined as:

All of King County south of Interstate 90 except those areas included in the Seattle Case Assignment Area.

I certify that this case meets the case assignment criteria, described in King County LCR 82(e).

/s/ Elizabeth A. Adams, WSBA #49175 — February 5, 2026
Signature of Attorney — WSBA Number — Date

or

______________________________ ______________
Signature of person who is starting case — Date

______________________________
Address, City, State, Zip Code of person who is starting case if not represented by attorney

**KING COUNTY SUPERIOR COURT**
**CASE ASSIGNMENT AREA DESIGNATION and CASE INFORMATION COVER SHEET**

## CIVIL

Please check the category that best describes this case.

**APPEAL/REVIEW**

☐ Administrative Law Review (ALR 2)

(Petition to the Superior Court for review of rulings made by state administrative agencies. Examples: DSHS Child Support, Good to Go passes, denial of benefits from Employment Security, DSHS)

☐ Board of Industrial Insurance Appeals – Workers Comp (ALRLI 2)*

(Petition to the Superior Court for review of rulings made by Labor & Industries.)

☐ DOL Revocation (DOL 2)*

(Appeal of a DOL revocation Implied consent-Test refusal ONLY.) RCW 46.20.308(9)

☐ Petition to Appeal/Amend Ballot Title (BAT 2)

☐ Subdivision Election Process Review (SER 2)*

☐ Voter Election Process Law Review (VEP 2)*

(Complaint for violation of voting rights act)

**CONTRACT/COMMERCIAL**

☐ Breach of Contract (COM 2)*

(Complaint involving money dispute where a breach of contract is involved.)

☐ Commercial Contract (COM 2)*

(Complaint involving money dispute where a contract is involved.)

☐ Commercial Non-Contract (COL 2)*

(Complaint involving money dispute where no contract is involved.)

☐ Third Party Collection (COL 2)*

(Complaint involving a third party over a money dispute where no contract is involved.)

**JUDGMENT**

☐ Abstract, Judgment, Another County (ABJ 2)

(A certified copy of a judgment docket from another Superior Court within the state.)

☐ Confession of Judgment (CFJ 2)*

(The entry of a judgment when a defendant admits liability and accepts the amount of agreed-upon damages but does not pay or perform as agreed upon.)

☐ Foreign Judgment (from another State or Country) (FJU 2)

(Any judgment, decree, or order of a court of the United States, or of any state or territory, which is entitled to full faith and credit in this state.)

☐ Tax Warrant or Warrant (TAX 2)

(A notice of assessment by a state agency or self-insured company creating a judgment/lien in the county in which it is filed.)

☐ Transcript of Judgment (TRJ 2)

(A certified copy of a judgment from a court of limited jurisdiction (e.g. District or Municipal court) to a Superior Court.)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

**PROPERTY RIGHTS**

☐ Condemnation/Eminent Domain (CON 2)*

(Complaint involving governmental taking of private property with payment, but not necessarily with consent.)

☐ Foreclosure (FOR 2)*

(Complaint involving termination of ownership rights when a mortgage or tax foreclosure is involved, where ownership is not in question.)

☐ Land Use Petition (LUP 2)*

(Petition for an expedited judicial review of a land use decision made by a local jurisdiction.) RCW 36.70C.040

☐ Non-Residential Unlawful Detainer (Eviction) (UND 2)

(Commercial property eviction.)

☐ Property Fairness Act (PFA 2)*

(Complaint involving the regulation of private property or restraint of land use by a government entity brought forth by Title 64.)

☐ Quiet Title (QTI 2)*

(Complaint involving the ownership, use, or disposition of land or real estate other than foreclosure.)

☐ Residential Unlawful Detainer (Eviction) (UND 2)

(Complaint involving the unjustifiable retention of lands or attachments to land, including water and mineral rights.)

**OTHER COMPLAINT/PETITION**

☐ Action to Compel/Confirm Private Binding Arbitration (CAA 2)

(Petition to force or confirm private binding arbitration.)

☐ Application for Health & Safety Inspection (HSI 2)

☐ Assurance of Discontinuance (AOD 2)

(Filed by Attorney General's Office to prevent businesses from engaging in improper or misleading practices.)

☐ Birth Certificate Change(PBC 2)

(Petition to amend birth certificate)

☐ Bond Justification (PBJ 2)

(Bail bond company desiring to transact surety bail bonds in King County facilities.)

☐ Certificate of Rehabilitation (CRR 2)

(Petition to restore civil and political rights.)

☐ Certificate of Restoration Opportunity(CRP 2)

(Establishes eligibility requirements for certain professional licenses.)

☐ Change of Name (CHN 2)

(Petition for name change for reasons other than listed in RCW 4/24/130(5).)

☐ Confidential Change of Name (CHN 2)

(Petition for name change when domestic violence/anti-harassment issues require confidentiality under RCW 4/24/130(5).)

☐ Civil Commitment (sexual predator) (PCC 2)

(Petition to detain an individual involuntarily.)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

☐ Consumer Protection Act (CPA 2)*

(Complaint involving unfair and deceptive acts or practices.)

☐ Emancipation of Minor (EOM 2)

(Petition by a minor for a declaration of emancipation.)

☐ Employment (EMP 2)*

(Complaint regarding compliance with public employers sharing employee information with bargaining representatives.)

☐ Foreign Subpoena (OSS 2)

(To subpoena a King County resident or entity for an out of state case.)

☐ Frivolous Claim of Lien (FVL 2)

(Petition or Motion requesting a determination that a lien against a mechanic or materialman is excessive or unwarranted.)

☐ Injunction (INJ 2)*

(Complaint/petition to require a person to do or refrain from doing a particular thing.)

☐ Interpleader (IPL 2)

(Petition for the deposit of disputed earnest money from real estate, insurance proceeds, and/or other transaction(s).)

☐ Malicious Harassment (MHA 2)*

(Suit involving damages resulting from malicious harassment.) RCW 9a.36.080

☐ Minor Work Permit (MWP 2)

(Petition for a child under 14 years of age to be employed)

☐ Non-Judicial Filing (NJF 2)

(See probate section for TEDRA agreements. To file for the record document(s) unrelated to any other proceeding and where there will be no judicial review.)

☐ Notice of Deposit of Surplus Funds (DSF 2)

(Deposit of extra money from a foreclosure after payment of expenses from sale and obligation secured by the deed of trust.)

☒ Other Complaint/Petition (MSC 2)*

(Filing a Complaint/Petition for a cause of action not listed)

☐ Perpetuation of Testimony (PPT 2)

(Action filed under CR 27)

☐ Petition to Remove Restricted Covenant (RRC 2)

Declaratory judgment action to strike discriminatory provision of real property contract.

☐ Prorate Fuel Tax Subpoena (PFT 2)

(Subpoena-Actions filed under Chapt. 82.42 RCW for exparte orders for fuel tax collection violation investigation subpoenas.)

☐ Public records Act (PRA 2)*

(Action filed under RCW 42.56)

☐ Receivership (RCVR 2)

(The process of appointment by a court of a receiver to take custody of the property, business, rents and profits of a party to a lawsuit pending a final decision on disbursement or an agreement.)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

☐ Relief from Duty to Register (RDR 2)

(Petition seeking to stop the requirement to register.)

☐ Restoration of Firearm Rights (RFR 2)

(Petition seeking restoration of firearms rights under RCW 9.41.040 and 9.41.047.)

☐ School District-Required Action Plan (SDR 2)

(Petition filed requesting court selection of a required action plan proposal relating to school academic performance.)

☐ Seizure of Property from the Commission of a Crime-Seattle (SPC 2)*

(Seizure of personal property which was employed in aiding, abetting, or commission of a crime, from a defendant after conviction.)

☐ Seizure of Property Resulting from a Crime-Seattle (SPR 2)*

(Seizure of tangible or intangible property which is the direct or indirect result of a crime, from a defendant following criminal conviction. (e.g., remuneration for, or contract interest in, a depiction or account of a crime.))

☐ Structured Settlements- Seattle (TSS 2)*

(A financial or insurance arrangement whereby a claimant agrees to resolve a personal injury tort claim by receiving periodic payments on an agreed schedule rather than as a lump sum.)

☐ Vehicle Ownership (PVO 2)*

(Petition to request a judgment awarding ownership of a vehicle.)

**TORT, ASBESTOS**

☐ Personal Injury (ASP 2)*

(Complaint alleging injury resulting from asbestos exposure.)

☐ Wrongful Death (ASW 2)*

(Complaint alleging death resulting from asbestos exposure.)

**TORT, MEDICAL MALPRACTICE**

☐ Hospital (MED 2)*

(Complaint involving injury or death resulting from a hospital.)

☐ Medical Doctor (MED 2)*

(Complaint involving injury or death resulting from a medical doctor.)

☐ Other Health care Professional (MED 2)*

(Complaint involving injury or death resulting from a health care professional other than a medical doctor.)

**TORT, MOTOR VEHICLE**

☐ Death (TMV 2)*

(Complaint involving death resulting from an incident involving a motor vehicle.)

☐ Non-Death Injuries (TMV 2)*

(Complaint involving non-death injuries resulting from an incident involving a motor vehicle.)

☐ Property Damages Only (TMV 2)*

(Complaint involving only property damages resulting from an incident involving a motor vehicle.)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

☐ Victims Vehicle Theft (VVT 2)*

(Complaint filed by a victim of car theft to recover damages.) RCW 9A.56.078

**TORT, NON-MOTOR VEHICLE**

☐ Other Malpractice (MAL 2)*

(Complaint involving injury resulting from other than professional medical treatment.)

☐ Personal Injury (PIN 2)*

(Complaint involving physical injury not resulting from professional medical treatment, and where a motor vehicle is not involved.)

☐ Products Liability (TTO 2)*

(Complaint involving injury resulting from a commercial product.)

☐ Property Damages (PRP 2)*

(Complaint involving damage to real or personal property excluding motor vehicles.)

☐ Property Damages-Gang (PRG 2)*

(Complaint to recover damages to property related to gang activity.)

☐ Tort, Other (TTO 2)*

(Any other petition not specified by other codes.)

☐ Wrongful Death (WDE 2)*

(Complaint involving death resulting from other than professional medical treatment.)

**WRIT**

☐ Habeas Corpus (WHC 2)

(Petition for a writ to bring a party before the court.)

☐ Mandamus (WRM 2)**

(Petition for writ commanding performance of a particular act or duty.)

☐ Review (WRV 2)**

(Petition for review of the record or decision of a case pending in the lower court; does not include lower court appeals or administrative law reviews.)

* The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.

FILED
2026 FEB 09 12:24 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

THE HONORABLE RANIA RAMPERSAD
Department 11

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
COUNTY OF KING

| | |
|---|---|
| SEUNGJAE SEONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation,<br><br>Defendant. | NO. 26-2-04910-6 SEA<br><br>**EXHIBITS A AND B TO PLAINTIFF'S CLASS ACTION COMPLAINT** |



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

# - Exhibit A -

**THIS EXCHANGE AGREEMENT IS NOT A LOAN**

**THIS IS AN AGREEMENT PURSUANT TO WHICH UNLOCK PROVIDED OWNER A PAYMENT IN EXCHANGE FOR A RIGHT TO RECEIVE A SPECIFIED PERCENTAGE INTEREST IN THE VALUE OF THE OWNER'S HOME UPON THE OCCURRENCE OF CERTAIN EVENTS SET FORTH IN THIS EXCHANGE AGREEMENT**

## FORWARD SALE AND EXCHANGE AGREEMENT

This Unlock Forward Sale and Exchange Agreement ("Exchange Agreement") is made between the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("Owner" or "You" or "Your") and Unlock Partnership Solutions Inc., a Delaware corporation, with its principal offices at 270 Madison Ave, Suite 702, New York, NY 10016, and its successors and assigns ("Unlock").

This Exchange Agreement is made together with and incorporates the Unlock Performance Deed of Trust or Performance Mortgage, as applicable ("Security Instrument"). Together these documents are collectively referred to herein as the "Unlock Agreement."

WHEREAS, as of the Effective Date, You and Unlock each desire to enter into the Unlock Agreement and You have reviewed and agreed to: (i) the terms of the Unlock Agreement, including without limitation all of the related numerical amounts of the Starting Home Value, Investment Payment, Investment Percentage, Exchange Rate, Unlock Percentage, Origination Fee, Annualized Cost Limit, Total Home Finance Limit and Expiration Date; and (ii) pay all Appraisal Expenses, Inspection Expenses, Closing Costs and any other costs incurred in connection with the Unlock Agreement;

WHEREAS, the Unlock Agreement sets forth the representations, warranties, duties and covenants of You during the Term and in reliance upon the terms and conditions set forth in the Unlock Agreement, Unlock wishes to tender the Investment Payment and purchase the Unlock Percentage, and You wish to accept the Investment Payment and sell, grant, transfer and otherwise convey the Unlock Percentage to Unlock, as described herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, You and Unlock agree as follows:

**1. <u>Unlock Agreement Terms.</u>**

1.1 <u>Recitals.</u> The recitals set forth above are acknowledged by the parties to be true and correct and are incorporated herein by reference.

1.2 <u>Defined Terms.</u> Defined terms are capitalized throughout the Unlock Agreement. The values of certain terms appear in the following Table of Key Terms. Other terms are defined as they are used throughout the Unlock Agreement or in the Glossary attached as Exhibit F.

| TABLE OF KEY TERMS | | |
|---|---|---|
| Defined Term | Value | Notes |
| Effective Date | August 30, 2022 | |
| Expiration Date | August 29, 2032 at 11:59:59PM EDT | The maximum term is 10 years. |
| Property | 607 194th Pl SE, Bothell, WA 98012 | As further defined in the attached Exhibit A. |
| Occupancy | Principal residence | You have declared this as Your Occupancy intention as of the Effective Date. |
| Starting Home Value | $1,150,000 | The mutually agreed upon value of the Property as of the Effective Date. |
| Investment Payment | $190,509.00 | The gross amount of money you received from Unlock on the Effective Date. |
| Investment Percentage | 16.57% | The Investment Payment expressed as a percentage of Starting Home Value.<br>**Investment Payment / Starting Home Value = Investment Percentage**<br>**$190,509.00 / $1,150,000 = 16.57%** |
| Exchange Rate | 1.70x | The price of your Unlock Agreement. |
| Unlock Percentage | 28.16% | The percentage of your Property's future value that Unlock will receive when the Unlock Agreement ends upon a Settlement Event. Calculated as:<br>**Investment Percentage x Exchange Rate = Unlock Percentage**<br>**16.57% x 1.70x = 28.16%** |
| Origination Fee | $5,715.27 | A fee payable to Unlock at Closing that offsets some of the costs Unlock incurs to process and administer Your transaction. |
| Annualized Cost Limit | 21.00% | The Annualized Cost of Your Unlock Agreement will never exceed this limit. |
| Total Home Finance Limit | 80.00% | Limits the amount of financing, such as mortgage loans and the Unlock Share, that can be secured by Your Property to a specific percentage of the Appraised Value as described in Section 12, and subject to adjustment as provided in Section 14.8. |
| Maintenance Addendum | None | |

1.3 Forward Sale and Exchange.

1.3.1 On the Effective Date, Unlock agrees to pay You the Investment Payment.

1.3.2 In exchange for the Investment Payment, You hereby agree to sell, transfer and otherwise convey to Unlock on the Effective Date the right to receive the Unlock Percentage.

1.3.3 Unlock has a right to elect to convert its Unlock Percentage to an undivided fee simple ownership percentage in the Property ("Conversion") equal to the Unlock Percentage. Unlock can exercise its right to a Conversion only upon the occurrence of a Settlement Event. In the event Unlock exercises its right to a Conversion, such Conversion will be documented in a separate written agreement between You and Unlock, the form of which is set forth in Exhibit B hereto. You agree to cooperate and promptly execute all documentation necessary to complete the Conversion in the applicable form attached to the Unlock Agreement and/or the form provided by Unlock.

1.3.4 You are selling the Unlock Percentage to Unlock in consideration of (1) the Investment Payment; (2) Unlock's express waiver of its Conversion right and its right to receive the Unlock Share until the occurrence of a Settlement Event; (3) other Unlock obligations under the Unlock Agreement; and (4) Your other rights and benefits under the Unlock Agreement.

1.4 The Investment Payment is not a loan to You or indebtedness to Unlock, nor is it a principal amount which Unlock is entitled to recover at any time. You will not make any monthly interest or any other periodic payments to Unlock based upon the amount of the Investment Payment.

1.5 Closing.

1.5.1 In connection with the execution and delivery of this Unlock Agreement ("Closing"), Unlock has: (i) wired the Investment Payment to an escrow account maintained by the Escrow Agent; (ii) provided a closing statement to You and the Escrow Agent that sets forth the dollar amounts involved in the Closing and (iii) provided all required documents and closing instructions.

The Escrow Agent has conducted the Closing, at which You have:

(a) Executed and delivered to the Escrow Agent originals of the Unlock Agreement documents and any addenda or ancillary documents provided by Unlock.

(b) Provided any other documents and information reasonably requested or otherwise necessary to complete the Closing, and secure and perfect the Unlock Agreement and Unlock's lien on the Property.

(c) Provided satisfactory written evidence that Unlock has been added as a loss payee (or as Unlock otherwise directs) on all Owner insurance policies.

1.5.2 The Escrow Agent has disbursed monies from the related escrow account where the Investment Payment is being held as follows:

(a) To the appropriate third parties, all third-party expenses associated with the Closing of the Unlock Agreement, unless paid by Unlock, including Appraisal Expenses, Inspection Expenses, Closing Costs and any other costs incurred in connection with the Unlock Agreement. In any situation where Unlock had already paid an expense on Your behalf during the processing of Your application, Escrow Agent instead disbursed such amount to Unlock.

(b) To Unlock, the Origination Fee.

(c) To You, the remaining balance of the Investment Payment following the payments described above ("Net Closing Proceeds").

1.6 Term of Agreement.

1.6.1 The Term of the Unlock Agreement begins on the Effective Date and will end on the earliest to occur of: (i) the day that a Settlement Event is completed (the "Settlement Date"); and (ii) the Expiration Date, subject to extension under limited circumstances as provided herein and subject to the limited survival provisions of Section 21.27.

1.7 Property Value.

1.7.1 You and Unlock agree that the Property's value as of the Effective Date is the Starting Home Value.

1.7.2 The Property's future value, when calculated at any time during the Term, is called the "Ending Home Value". The Ending Home Value will be determined as follows:

(a) If the Property is being sold, Ending Home Value will typically equal the Gross Sale Price, subject to adjustment as set forth in Section 2.

(b) If the Property is not being sold, the Ending Home Value will be determined by obtaining a Property Appraisal in accordance with Section 8.

(c) In an Event Of Default, including a foreclosure sale, Unlock may elect to determine Ending Home Value in accordance with Section 8.4(c).

1.8 Settlement.

1.8.1 The following calculations apply when the Unlock Agreement ends upon the occurrence of a Settlement Event:

(a) The Ending Home Value will be determined depending on the applicable Settlement Event.

(b) The Ending Home Value may be subject to an Improvement Adjustment and/or a Maintenance Adjustment when calculating the Unlock Share, as set forth in Section 7. The Improvement Adjustment enables You to keep any value You have added to the Property as a result of material home improvements that were made during the Term. The Maintenance

Adjustment holds You responsible for any loss in Property value caused by Your failure to properly maintain the Property. The adjusted Ending Home Value is called Sharable Value and is calculated as follows:

***Sharable Value =***

***Ending Home Value - Improvement Adjustment + Maintenance Adjustment***

(c) The "Unlock Share" is the dollar amount that Unlock will receive for its percentage of the Property's Sharable Value, calculated as:

***Unlock Share = Sharable Value X Unlock Percentage***

The Unlock Share will be subject to the Annualized Cost Limit set forth in the Table of Key Terms, in accordance with Section 10. The Annualized Cost Limit is a cap on the amount Unlock will receive upon a Settlement Event.

(d) During the Term You may require administrative assistance from Unlock for which Unlock may charge Administration Fees, as set forth in Section 15, and Unlock may make payments or incur expenses on Your behalf to protect the value of the Property, including in connection with an Event Of Default as defined in Section 16 ("Protective Advances'). You are responsible for payment or reimbursement of any Administration Fees and Protective Advances, and any that remain outstanding at any time are called Unpaid Owner Obligations, as set forth in Section 21.4.

(e) On the Settlement Date, Unlock will receive the "Settlement Payment," calculated as:

***Settlement Payment = Unlock Share + Unpaid Owner Obligations***

1.8.2 Subject to Section 21.27, the Unlock Agreement will end and Unlock will receive the Settlement Payment on the Settlement Date upon the occurrence of one of the following "Settlement Events":

(a) Intended Settlement Events:

(i) You decide to sell the Property (see Section 2)

(ii) You decide to buy Unlock out (see Section 3)

(iii) Upon Your death, or the later of Your death or Your spouse's or domestic partner's death, if such individual has been added as a signatory to the Unlock Agreement during the Term (see Section 4)

(iv) Upon reaching the Expiration Date (see Section 5)

(b) Unintended or unusual Settlement Events:

(i) An uncured Event Of Default (see Section 16 and Section 17)

(ii) Destruction of the Property where it is not rebuilt (see Section 18)

(iii) Full condemnation of the Property (see Section 19)

(iv) Voluntary Release by Unlock (see Section 21.7)

1.8.3 You will pay all third-party transaction expenses associated with any Settlement Event, unless paid by Unlock or a buyer of the Property, including, as applicable, Property Appraisal, Property Inspection and Closing Costs.

1.8.4 In any sale of the Property, sale proceeds will be distributed in the following order of priority:

(a) First, all third-party transaction expenses are paid;

(b) Second, all liens senior to Unlock, if any, are paid in full;

(c) Third, Unlock receives the Settlement Payment, if any;

(d) Fourth, all lienholders junior to Unlock, if any, are paid in full; and

(e) Fifth, You receive the remaining balance, if any.

1.8.5 Notwithstanding anything to the contrary in the Unlock Agreement, Unlock shall have no obligation to release its lien on the Property to the extent there are insufficient amounts in escrow to pay transaction expenses and Administration Fees, release all liens senior to Unlock and pay any other expenses required in order to deliver clear title to the Property, and pay Unlock the Settlement Payment.

1.8.6 You can also request one or more partial buyouts of Your Unlock Agreement during the Term, in accordance with Section 6.

1.9 <u>Your Obligations During the Term.</u>

1.9.1 The Exchange Agreement contains various provisions that apply during the Term which are designed to protect the value of the Property and Your and Unlock's respective interests in it. Accordingly, You agree to all covenants provided under the Unlock Agreement, including, but not limited to, the following:

(a) Staying current on Your housing obligations, such as Your mortgage and property taxes, in accordance with Section 11.3.

(b) Maintaining appropriate insurance on the Property, in accordance with Section 18.

(c) Maintaining the Property in good condition, subject to normal wear and tear, in accordance with Section 13.

(d) Making sure that Your use and occupancy of the Property are fully compliant with all state, federal and local laws and abiding by the occupancy requirements of the Unlock Agreement, in accordance with Section 14.

(e) Abiding by the Total Home Finance Limit with respect to obtaining new or refinanced debt secured by the Property, in accordance with Section 12.

(f) Notifying Unlock when a non-signatory to Your Unlock Agreement becomes an owner or a principal resident of the Property or Your marriage or domestic partner status changes.

**2. <u>Settlement Event: Permitted Sale.</u>**

2.1 You may sell the Property to a buyer at any time during the Term, as long as Your sale complies with the requirements of this Section 2.1, or as otherwise agreed to in writing prior to such sale by Unlock (a "Permitted Sale").

(a) You must notify Unlock in writing of Your decision to market, sell or transfer the Property, at least 45 days prior to the proposed closing of the sale or transfer.

(b) You must timely provide Unlock with copies of all documents relating to the proposed sale or transfer of the Property, including listing agreements, offers to purchase, appraisals, inspection reports, pest reports, preliminary title reports, escrow instructions, staging agreements and any other relevant documents.

(c) If the Property is untidy or in disrepair such that its marketability is materially impaired, Unlock may offer to make one or more Protective Advances to pay for repairs, cosmetic improvements and/or staging, in support of achieving the best possible sale price. If Unlock makes cosmetic improvements and/or provides staging and You damage or destroy any such cosmetic improvements and/or staging materials, You will be responsible for the damage, and any unpaid amount will become part of Unpaid Owner Obligations.

(d) The sale must be consummated through an appropriate real property escrow account using the services of an Escrow Agent, and the sale must comply with applicable law, including that all necessary disclosures in connection with a sale of real property are made.

(e) The sale must be at arm's length, made on commercially reasonable terms and entered into in good faith, meaning without fraud or deceit carried out by unrelated or unaffiliated parties, as by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property.

(f) If the buyer obtains a standard contractor's inspection report and a standard pest report

in connection with their purchase, or if You obtained any such reports to support the marketing of the Property, Unlock may, in its discretion accept these in lieu of obtaining a Property Inspection, or Unlock may elect to obtain a Property Inspection in accordance with Section 8.

(g) Ending Home Value will be equal to the "Gross Sale Price" (subject to adjustment in accordance with Section 2.1(i)), which is the sale price to a bona fide, arms-length, third-party buyer, including the fair market value of any non-cash consideration (such as a seller concession), and not including deductions for Closing Costs, taxes, documentary fees, mortgage loans, other liens or secured loans, sales commissions, or appraisal expenses. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1.

(h) The sale should be conducted in accordance with customary local process, using a licensed listing agent or attorney and, except as described in Section 2.1(i)(i) or Section 2.1(i)(ii), by placing the Property on the open market through the Multiple Listing Service (MLS). However, You are not required to use a real estate professional to assist with Your sale.

(i) Unlock may obtain a Property Appraisal before the closing. In any sale or transfer by You where Unlock determines, in good faith, that the proposed Gross Sale Price differs materially from the market value of the Property, or from an Appraised Value, including in any:

> (i) "Sale-By-Owner Transaction," which means a sale of the Property conducted either without a public listing of it on the MLS, or where the terms and conditions of the sale have been principally negotiated by You without agency representation, or
>
> (ii) "Intrafamily Transaction," which means a purchase, sale or transfer of the Property proposed between You and any of Your family members by blood or marital relation, or
>
> (iii) Transaction where the buyer is a business entity rather than an individual person,

Unlock will have the right, in its sole discretion, to take the following actions: (a) make an offer in writing to purchase the Property from You on the same terms and conditions as the proposed offer from the third-party buyer and, if such offer is rejected by You, to obtain a written affidavit under oath from You stating the reasons for the rejection; (b) require You and the third-party buyer to execute an affidavit under oath attesting that the relationship between You and the buyer is at arm's length and that the proposed transaction is at a fair market price; and/or (c) use an Appraised Value to determine Ending Home Value in accordance with Section 8 and calculate the Unlock Share.

(j) The closing date of a Permitted Sale must be scheduled so as to allow Unlock sufficient time to obtain and review any required appraisals and inspection reports and determine the amount of any Improvement Adjustment or Maintenance Adjustment.

(k) The sale or transfer cannot convey title "subject to" the lien created by the Unlock

Agreement. You must convey title free and clear of any liens and satisfy any loans and other obligations secured by liens on the Property.

(l) You will pay all costs in connection with the Permitted Sale, including Closing Costs, any unpaid Appraisal Expenses and Inspection Expenses and any other expenses, unless paid by Unlock, and not any expenses to be paid by the third-party buyer.

(m) If the closing date scheduled for a Permitted Sale falls after the Expiration Date, the Term and the Expiration Date will, in Unlock's discretion, automatically extend for such reasonable period needed to accommodate the closing.

(n) Unlock will not be liable to You for any loss relating to any delay or postponement of the closing of a sale resulting from Unlock's reasonable inquiries and actions.

2.2 In advance of a Permitted Sale, Unlock may elect to exercise its right to a Conversion of the Unlock Percentage in accordance with Section 1.3.3, in which case Unlock will provide You notice of such election, Unlock and You will enter into a separate Conversion Agreement, and You will cooperate in promptly executing all other documentation (in the applicable form attached to the Unlock Agreement and/or the form provided by Unlock) necessary to complete the Conversion on or prior to the date of the Permitted Sale.

2.3 At the time of a Permitted Sale where Unlock has elected a Conversion:

(a) Unlock will deliver to You and to Escrow Agent a Settlement Statement containing a calculation of the Settlement Payment.

(b) You will deed Unlock its percentage interest in the Property through escrow for the Permitted Sale, as described in the Conversion Agreement.

(c) You and Unlock, as co-owners of the Property, will deed the Property to the third-party buyer through escrow; and

(d) The Escrow Agent will close the Permitted Sale, transfer title to the third-party buyer, and liquidate Unlock's and Your respective percentage interests in the Property.

(e) In accordance with local and customary practice and applicable law, Unlock will release its lien on the Property, as described in the Conversion Agreement.

2.4 As an alternative to Conversion, You can elect to settle the Unlock Agreement by tendering to Unlock, through escrow for the Permitted Sale, the Settlement Payment. Unlock will deliver to You and to Escrow Agent a Settlement Statement containing a calculation of the Settlement Payment. Following such payment, Unlock will deliver executed, notarized documents required by Escrow Agent for the Permitted Sale to affect a full release of the Unlock Agreement, including Unlock's lien on the Property.

2.5 Any attempted sale or transfer of the Property that does not comply with these Permitted

Sale requirements shall be deemed an Event Of Default and shall be conclusively deemed to prejudice Unlock's rights hereunder.

2.6 If a Permitted Sale is being undertaken by Your Estate, the words "Your Estate" will replace "You" and "Your" in this Section.

3. **Settlement Event: Owner Buyout.**

3.1 You can end the Unlock Agreement without selling Your Home, at any time during the Term, by electing an Owner Buyout in accordance with the following requirements:

(a) You must submit a Buyout Request Form to Unlock and include copies of any listings for sale or offers to purchase that may exist at least 60 days ahead of the desired Owner Buyout closing date, which must occur on or before the Expiration Date.

(b) Ending Home Value and Property condition will be determined by obtaining a Property Appraisal and a Property Inspection, at your expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1.

(c) Unlock will select an Escrow Agent who will open escrow to facilitate the Owner Buyout. Unlock will deliver to You and Escrow Agent a Settlement Statement containing a calculation of the Settlement Payment and closing instructions. In addition to the Settlement Payment, You will pay all costs in connection with the Owner Buyout, including Closing Costs, any unpaid Appraisal Expenses and Inspection Expenses and any other expenses, in accordance with the closing statement prepared by the Escrow Agent and approved by Unlock. You will deliver into escrow the amount stipulated in such closing statement. Upon Escrow Agent's delivery and Unlock's acceptance of the Settlement Payment from You, Unlock will deliver executed, notarized documents required by Escrow Agent to affect a full release of the Unlock Agreement, including Unlock's lien on the Property.

(d) If You receive or have pending a written offer for the purchase of the Property, the Unlock Share will be calculated using the greater of the then-current Appraised Value or the gross amount of such purchase offer ("Offered Value"). If You fail to disclose an Offered Value that exceeds the Appraised Value used to calculate the Unlock Share at the time of Owner Buyout or within 180 days thereafter, and the Property is sold for such Offered Value, You will be liable to Unlock for the difference in the Unlock Share had the Unlock Share been calculated based upon the Offered Value.

(e) Unlock will retain the right to reject any Owner Buyout where Unlock has not had adequate opportunity to obtain and review appraisals, inspections, pest reports or other required documents, or Unlock deems Your tender of the Settlement Payment insufficient, inadequate, or untimely.

(f) If the Owner Buyout closing date is delayed and will occur after the Expiration Date, the Term and the Expiration Date will automatically extend for such reasonable period in Unlock's

discretion needed to accommodate the closing.

3.2 If an Owner Buyout is being requested by Your Estate, the words "Your Estate" will replace "You" and "Your" in this Section.

4. **Settlement Event: Death of the Last Surviving Signatory.**

4.1 You must identify to Unlock, at all times during the Term, the person or persons who will acquire legal title to Your interest in the Property on account of your death (each such person or persons together or individually, is referred to in the Unlock Agreement as "Your Estate"). You must at all times during the Term notify Unlock immediately in writing (a) if the identity of Your Estate changes during the Term of the Unlock Agreement, and (b) of the name, postal address, e-mail address and contact telephone number of the person who will represent Your Estate in connection with the Unlock Agreement.

4.2 "Last Surviving Signatory" means the last surviving individual who is a signatory to the Unlock Agreement, including any signatory added by addendum after the Effective Date. Your Estate must notify Unlock immediately in writing of the death of the last Surviving Signatory.

4.3 Upon Unlock's receipt of notice of the death of the Last Surviving Signatory, Ending Home Value and Property condition will be determined by obtaining a Property Appraisal and Property Inspection, at Your Estate's expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1. Unlock will deliver to Your Estate a Settlement Statement containing a calculation of the Settlement Payment.

4.4 Your Estate is required to settle the Unlock Agreement upon the death of the Last Surviving Signatory, through either a Permitted Sale or an Owner Buyout, with a Settlement Date no later than 180 days following the date of death or such longer time as Unlock may agree in writing or in accordance with applicable law. Your Estate is required to notify Unlock of the chosen settlement method within 30 days following the date of death. An Owner Buyout resulting from the death of the Last Surviving Owner is not subject to the Buyout Active Date restriction.

4.5 If Unlock determines that Your Estate has commenced a good faith effort to sell the Property in a Permitted Sale within the 180-day period, Unlock, in its discretion, may extend the Settlement Date deadline for a maximum of two consecutive 90-day periods (for a maximum total of 360 days from the date of death) to permit Your Estate to complete the Permitted Sale.

4.6 If Your Estate is unable to make the Settlement Payment for an Owner Buyout, it may need to sell the property in order to settle the Unlock Agreement.

4.7 If Your Estate does not start the process to settle the Unlock Agreement through either a Permitted Sale or an Owner Buyout within 60 days following the date of death (or such longer time as Unlock may agree in writing or in accordance with applicable law), Unlock may elect a Conversion of

the Unlock Percentage in accordance with Section 1.3.3, in which case:

(a) Unlock will provide Your Estate notice of such election. Unlock and Your Estate will enter into a separate Conversion Agreement.

(b) Unlock will select an Escrow Agent who will open escrow, and Your Estate will deed Unlock its percentage interest in the Property through escrow pursuant to the Conversion Agreement.

(c) Unlock and Your Estate, as co-owners of the Property, will promptly market and sell the Property in order to liquidate their respective percentage interests. Your Estate will provide all necessary cooperation (including access to the Property) in order to promptly market and complete the sale of the Property.

(d) If needed, the Term and the Expiration Date will automatically extend for such reasonable period, in Unlock's discretion, to accommodate Unlock's Conversion and the closing of such subsequent sale.

(e) Your Estate will pay all Closing Costs owed in connection with the sale of the Property following Unlock's Conversion other than any Closing Costs which will be paid by the third-party buyer. In no event shall Unlock be liable for any Closing Costs.

4.8 Your Estate will administer and protect the Property to preserve Unlock's rights and the value of the Unlock Share following the death of the Last Surviving Signatory.

4.9 All time periods specified in this Section 4 will run from the actual date of the death of the Last Surviving Signatory. Failure of Your Estate or any other individual or entity to notify Unlock of the death of the Last Surviving Signatory will not reduce or suspend the running of the time periods and shall be deemed an Event Of Default.

**5. <u>Settlement Event: Expiration of the Unlock Agreement.</u>**

5.1 You are required to settle the Unlock Agreement on or before the Expiration Date, through either a Permitted Sale or an Owner Buyout. If You are unable to make the Settlement Payment for an Owner Buyout, You may need to sell the property prior to the Expiration Date in order to settle the Unlock Agreement.

5.2 Unlock will start the settlement process by obtaining a Property Appraisal and Property Inspection to determine Ending Home Value and Property condition, at Your expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value and the Unlock Share will be calculated in accordance with Section 1.8.1. Unlock will deliver to You a Settlement Statement containing a calculation of the Settlement Payment.

5.3 You must notify Unlock of Your intended method of settlement no later than 90 days prior to the Expiration Date.

5.4 If Unlock determines that there is a good faith effort underway to sell the Property in a Permitted Sale at the Expiration Date, Unlock, in its discretion, may extend the Expiration Date deadline for a maximum of two consecutive 90-day periods to permit You to complete the Permitted Sale.

5.5 On the Expiration Date (or if the Expiration Date falls on a Sunday or legal public holiday specified in 5 U.S.C. 6103(a), the last business day before the Expiration Date), if You have not completed a Permitted Sale or an Owner Buyout, Unlock, in its discretion, may elect a Conversion of the Unlock Percentage in accordance with Section 1.3.3, in which case:

(a) Unlock will provide you notice of such election. Unlock and You will enter into a separate Conversion Agreement.

(b) Unlock will select an Escrow Agent who will open escrow, and You will deed Unlock its percentage interest in the Property through escrow pursuant to the Conversion Agreement.

(c) Unlock and You, as co-owners of the Property, will promptly market and sell the Property. You will provide all necessary cooperation in order to promptly market and complete the sale of the Property.

(d) The Term and the Expiration Date will automatically extend for such reasonable period, in Unlock's discretion, to accommodate Unlock's Conversion and the closing of such subsequent sale.

(e) You will pay all Closing Costs owed in connection with the sale of the Property following Unlock's Conversion other than any Closing Costs which will be paid by the third-party buyer. In no event shall Unlock be liable for any Closing Costs.

6. **Partial Buyout.**

6.1 The Unlock Agreement allows you to request a Partial Buyout at any time during the Term, in accordance with this Section 6.

6.2 You must submit a Partial Buyout Request Form to Unlock, in which You will state what portion of Your Agreement You want to buy out, and include copies of any listings for sale or offers to purchase that may exist, at least 60 days ahead of the desired closing date of the Partial Buyout, which must occur at least 180 days before the Expiration Date.

6.3 Unlock will select an Escrow Agent who will open escrow to facilitate the Partial Buyout. Unlock will deliver to You and Escrow Agent a "Partial Settlement Statement" containing a calculation of the "Partial Settlement Payment" and closing instructions.

6.4 The following calculations will apply:

(a) Ending Home Value and Property condition will be determined by obtaining a Property Appraisal and a Property Inspection, at your expense. The amount of any Improvement Adjustment and/or Maintenance Adjustment will be determined in accordance with Section 7, and Sharable Value

and the Unlock Share will be calculated in accordance with Section 1.8.1.

(b) The portion of the Unlock Share You want to buy out will determine the dollar amount required (the "Partial Unlock Share").

(c) Unpaid Owner Obligations must be paid in full at the time of a Partial Buyout. Unlock will calculate the "Partial Settlement Payment" as follows:

***Partial Settlement Payment = Partial Unlock Share + Unpaid Owner Obligations***

(d) The Unlock Percentage will be reduced by the exact percentage of the Unlock Share paid in the Partial Buyout, as follows:

***Reduced Unlock Percentage =***

***(1 - (Partial Unlock Share / Unlock Share)) X original Unlock Percentage***

6.5 You will deliver the Partial Settlement Payment into escrow together with all Closing Costs, any unpaid Appraisal Expenses and Inspection Expenses and any other expenses incurred in connection with the Partial Buyout, in accordance with the closing statement prepared by the Escrow Agent and approved by Unlock. Upon Escrow Agent's delivery and Unlock's acceptance of the Partial Settlement Payment from You, Unlock and You will enter into an amendment of the Exchange Agreement to reflect the reduced Unlock Percentage as described above.

6.6 If You receive or have pending a written offer for the purchase of the Property, the Unlock Share will be calculated using the greater of the then-current Appraised Value or the Offered Value. If You fail to disclose an Offered Value that exceeds the Appraised Value used to calculate the Unlock Share at the time of the Partial Buyout or within 180 days thereafter, and the Property is sold for such Offered Value, You will be liable to Unlock for the difference in the Unlock Share had the Unlock Share been calculated based upon the Offered Value.

6.7 Unlock will retain the right to reject any Partial Buyout where Unlock has not had adequate opportunity to obtain and review appraisals, inspections, pest reports or other required documents, or Unlock deems Your tender of the Partial Settlement Payment insufficient, inadequate, or untimely. Unlock may decline a Partial Buyout request if the remaining Unlock Percentage would be less than 25% of the Unlock Percentage as of the Effective Date.

**7. <u>Adjustments to Ending Home Value.</u>**

7.1 <u>Improvement Adjustment.</u>

(a) You may make improvements to the Property without Unlock's consent during the Term of the Unlock Agreement. All improvements must comply with all applicable laws, including zoning, permitting and the use of licensed tradespeople.

(b) If You believe that any of Your improvements materially increased the value of the

Property ("Material Improvements"), You may request that an "Improvement Adjustment" be made to the Ending Home Value at the time of a Settlement Event.

(c) An improvement is a Material Improvement under the Unlock Agreement only if it adds to the value of the Property, as reasonably determined by Unlock; in contrast to ordinary and necessary maintenance and repairs, which maintain the general condition and value of the Property. Costs of ordinary and necessary maintenance and repairs to keep the Property in an efficient operating condition, as more particularly outlined in U.S. Treasury Regulation 1.162-4 (as amended from time to time), are not eligible for an Improvement Adjustment. For the avoidance of doubt, certain maintenance items, such as replacing a roof or HVAC, are considered ordinary and necessary maintenance and repair, regardless of the cost, and do not qualify for an Improvement Adjustment.

(d) An "Improvement Adjustment" is subject to these additional requirements:

(i) You must request an Improvement Adjustment in writing at least 45 days before any Settlement Event or any event that requires a determination of the Ending Home Value.

(ii) As part of the request, You must specify the Material Improvements for which an Improvement Adjustment is sought and provide Unlock with photographic and supporting evidence of the Material Improvements in accordance with subsection (iv) below.

(iii) A Property Appraisal will be obtained to determine if Your Material Improvements have increased the Ending Home Value of the Property. Specifically, the appraiser will provide two values for the Property: (i) the actual fair market value of the Property as-is (which is called the "Actual Value"); and (ii) a hypothetical amount representing what the value of the Property would be if You had not made the Material Improvements (which is called the "Hypothetical Value"). If the Property Appraisal is conducted in connection with a Permitted Sale, and the proposed Gross Sale Price is not deemed by Unlock to differ materially from the market value of the Property, the appraiser will be instructed to assume that the Gross Sale Price is the Actual Value of the Property. The difference between the Actual Value and the Hypothetical Value is the dollar amount of the Improvement Adjustment. The appraiser will be instructed to consider the age, depreciation and potential functional obsolescence of Material Improvements, and not to consider the cost of the Material Improvements.

(iv) You will maintain, and provide to Unlock upon any request for an Improvement Adjustment, photographic and other physical documentation of the Property before completion of the Material Improvements, which will be sufficient in scope, clarity, number and detail to permit the appraiser to compare the Actual Value to the Hypothetical Value, in appraiser's independent discretion.

(v) No Improvement Adjustment will be given to the extent (i) the appraiser

determines that the Material Improvements have become functionally obsolete; (ii) any Material Improvements result in a violation of the Unlock Agreement; or (iii) the photographic and other supporting evidence provided by You is not of sufficient quality to support the appraiser's calculation.

(vi) Material Improvements that in the aggregate have added less than $10,000 to the Property value do not qualify for an Improvement Adjustment unless agreed to by Unlock.

(e) The Improvement Adjustment will typically reduce the Ending Home Value when calculating the Sharable Value and the Unlock Share. If the Property Appraisal process described above determines that the Actual Value minus the Hypothetical Value yields a negative number, Unlock may apply any such decrease in value as a "Negative Improvement Adjustment" in which case the Ending Home Value would be increased by the amount of the Negative Improvement Adjustment to account for the reduction in fair market value to the Property as a result of the Material Improvements. If Unlock believes the process described above would likely result in a Negative Improvement Adjustment, then Unlock may obtain such Property Appraisal.

(f) Provided all of the conditions of this Section 7.1 are met, Unlock will apply the Improvement Adjustment to the Ending Home Value when calculating the Sharable Value and the Unlock Share.

7.2 Maintenance Adjustment.

(a) In connection with a Settlement Event Unlock determines that either:

(i) You have breached Your duties to maintain and repair the Property as required under the Unlock Agreement; or

(ii) Ending Home Value is negatively affected as the direct result of any repair items, defects or conditions, or damage to the Property or its title which either existed as of the Effective Date or which occurred or developed during the Term ("Deferred Maintenance"),

Unlock will have the right, in consultation with one or more independent, third-party appraisers, property inspectors, home repair contractors, and other experts not affiliated with Unlock, to make a commercially reasonable estimate of the dollar amount which is required, at that time, to repair or perform such Deferred Maintenance, without reference to any repair estimates that may have been obtained by Owner, and to add such dollar amount as a "Maintenance Adjustment" to Ending Home Value when calculating the Sharable Value and the Unlock Share.

(b) Unlock may also apply a Maintenance Adjustment to Ending Home Value when calculating the Sharable Value and the Unlock Share where:

(i) as of the Effective Date, Unlock identified and expressly reserved for a Maintenance Adjustment (by attaching a Maintenance Addendum to the Unlock Agreement in the form of the attached Exhibit G) any Deferred Maintenance items which, if not remedied promptly or within a reasonable time, posed clear and serious risks to the Property improvements or Property value, and You failed to correct such items during the Term; or

(ii) You knew or had reason to know of any Deferred Maintenance items as of the Effective Date or during the Term of the Unlock Agreement but failed or neglected to disclose them to Unlock.

(c) Unlock will not apply a Maintenance Adjustment unless the Property value has been negatively impacted by $10,000 or more, unless agreed to by You.

(d) Unlock will have no liability in connection with, or for Your failure to cure, any Deferred Maintenance items.

**8. <u>Property Appraisal.</u>**

8.1 A "Property Appraisal" is an independent determination of Property value obtained from a professional appraiser or appraisal management company selected by Unlock and unaffiliated with either You or Unlock, and who satisfies the requirements of Fannie Mae, Freddie Mac or FHA and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and related regulations, and any applicable state laws, as of the date of the Property Appraisal, and performed in compliance with all applicable laws and the Uniform Standards of Professional Appraisal Practice, or an alternative property valuation as specified in Section 8.7

8.2 Whenever a Property Appraisal is obtained by Unlock under the Unlock Agreement, You are required to cooperate with the appraiser by granting full access to the Property, making available any relevant documents and information in Your possession pertaining to the Property and ensuring that the Property is presented in reasonable condition to be appraised.

8.3 Property Appraisals may be used:

(a) To determine Starting Home Value and as an input to determine Property Condition and the need for a Property Inspection as of the Effective Date.

(b) To determine Property value during the Term in connection with Unlock's investor reporting needs, an Event Of Default or a calculation of Total Home Finance under Section 12.

(c) In connection with a Settlement Event or a Partial Buyout:

(i) To establish or validate the Property's market value and the Ending Home Value.

(ii) As an input to determine Property condition and the need for a Property Inspection and a possible Maintenance Adjustment.

(iii) To determine the amount of any Improvement Adjustment and/or Maintenance Adjustment and the Sharable Value.

8.4 When establishing Ending Home Value and calculating the Unlock Share:

(a) In any Settlement Event where the Property is being sold, Ending Home Value will equal the proposed Gross Sale Price as described in Section 2.1(g); provided that a Property Appraisal may be obtained to determine if the proposed Gross Sale Price differs materially from the market value of the Property, in which case the Appraised Value, as determined in Section 8.5, may be used as Ending Home Value.

(b) In any Settlement Event where the Property is not being sold, Ending Home Value will equal the Appraised Value, as determined in Section 8.5.

(c) Notwithstanding the provisions of Sections 8.4(a), 8.4(b) and 8.5, in any Event Of Default, Unlock may elect to obtain a Property Appraisal and provide instructions to the appraiser that the Property is to be appraised on a "non-distressed" basis, and to use the "non-distressed" Appraised Value as Ending Home Value.

8.5 The Appraised Value is the dollar value of the Property that Unlock will determine and You and Unlock will agree upon where a Property Appraisal has been obtained after the Effective Date. In most situations, a single Property Appraisal will establish the Appraised Value. However, if You or Unlock believes, in good faith, that the first Property Appraisal contains a material omission or material error of fact, either party, at its own cost, no later than 10 days after receipt of the Property Appraisal, may request any of all of the following:

(a) a reconsideration of the Property Appraisal by the appraiser who provided it;

(b) an additional Property Appraisal by a different appraiser;

(c) an alternative property valuation such as a Broker Price Opinion or Automated Valuation Method (AVM).

You and Unlock will then work cooperatively, expeditiously and in good faith to agree on the Appraised Value based on all available information. If You and Unlock are unable to agree, the Appraised Value will be determined by arbitration in accordance with Section 20.

8.6 In any situation under the Unlock Agreement where You are requesting an Improvement Adjustment, Unlock will obtain a Property Appraisal, at your expense, and task the appraiser with the additional requirement to determine the amount of the Improvement Adjustment, as provided in Section 7.

8.7 Alternatives. If an Appraised Value is needed under the Unlock Agreement, Unlock, in its discretion, may determine that an alternative property valuation such as a Broker Price Opinion or Automated Valuation Method (AVM) is sufficient and may obtain such valuation in lieu of a Property Appraisal. In connection with any Settlement Event where the Property is being sold, and there is a

pre-existing appraisal available that may satisfy Unlock's requirements, such as an appraisal obtained by a third-party buyer in connection with their purchase mortgage, Unlock may, in its discretion, accept or reject such existing appraisal for purposes of establishing the Appraised Value. In certain situations where Unlock determines that the Property is difficult to value, Unlock may require more than one Property Appraisal as input to a determination of Appraised Value.

8.8 Appraisal Expenses.

(a) Costs incurred in obtaining a Property Appraisal or other valuation of the Property are called "Appraisal Expenses." To the extent allowed by applicable law, and unless paid by Unlock, You will pay all Appraisal Expenses in connection with the first Property Appraisal or other valuation of the Property obtained in connection with: (i) initial valuation of the Property prior to execution of the Unlock Agreement to establish the Starting Home Value; (ii) any Settlement Event; (iii) any Partial Buyout; (iv) any Event Of Default; (v) any allocation of insurance or condemnation proceeds; (vi) any other determination of an Ending Home Value; (vii) any determination of an Improvement Adjustment or Maintenance Adjustment; or (viii) any Approved Subsequent Loan as set forth in Section 12.

(b) If there is more than one Property Appraisal or other valuation obtained in connection with any of the events described in this Section, the Appraisal Expenses will be paid by the requesting party, or if both parties agree that an additional Property Appraisal or other valuation should be obtained, by both parties divided equally. If Appraisal Expenses have not been paid by the party required to bear them, the other party may subtract them out of the party's funds from escrow at the closing of a Settlement Event, as allowed by applicable law. In the case of unpaid Appraisal Expenses by Owner, such amounts shall be considered Unpaid Owner Obligations.

8.9 All Property Appraisals and alternative valuation tools must conform to Unlock's most current requirements. A Property Appraisal or alternative valuation report may be deemed invalid by Unlock in its discretion if the report is more than 60 days old.

**9. <u>Property Inspection.</u>**

9.1 A "Property Inspection" is an independent determination of Property condition obtained from a professional inspection company selected by Unlock and unaffiliated with either You or Unlock. The property inspector and/or inspection company must have experience in the local community and be appropriately licensed, in good standing, in the jurisdiction in which the Property is located, where required. Inspections may be general in nature or specific in scope, such as a roof or pest inspection. As a result, more than one inspection may be required to determine Property condition, in which case the term Property Inspection, as used in the Unlock Agreement, may refer to multiple inspections.

9.2 Whenever Unlock obtains a Property Inspection, You are required to cooperate with the inspector(s) by granting full access to the Property, making available any relevant documents and information in Your possession pertaining to the Property and ensuring that the Property is presented in reasonable condition to be inspected.

9.3 Property Inspections may be used:

(a) To determine the Property's condition as of the Effective Date.

(b) To determine the Property's condition during the Term in connection with Unlock's investor reporting needs or an Event Of Default.

(c) To determine the Property's condition and the amount of any Improvement Adjustment or Maintenance Adjustment in connection with a Settlement Event or a Partial Buyout.

9.4 Costs incurred in obtaining a Property Inspection are called "Inspection Expenses." To the extent allowed by applicable law, and unless paid by Unlock, You will pay all Inspection Expenses in connection with the first Property Inspection of each type obtained in connection with: (i) any initial inspection of the Property prior to execution of the Unlock Agreement; (ii) any Settlement Event; (iii) any Partial Buyout; (iv) any Event Of Default; (v) any allocation of insurance or condemnation proceeds; (vi) any other determination of an Ending Home Value; and (vii) any determination of an Improvement Adjustment or Maintenance Adjustment.

9.5 If there is more than one Property Inspection of a given type obtained in connection with any of the events described in this Section, the Inspection Expenses will be paid by the requesting party, or if both parties agree that an additional Property Inspection should be obtained, by both parties divided equally. If Inspection Expenses have not been paid by the party required to bear them, the other party may subtract them out of the party's funds from escrow at the closing of a Settlement Event, as allowed by applicable law. In the case of unpaid Inspection Expenses by Owner, such amounts shall be considered Unpaid Owner Obligations.

9.6 In connection with any Settlement Event where the Property is being sold, and there is a pre-existing property inspection available that may satisfy Unlock's requirements, such as an inspection obtained by a third-party buyer in connection with their purchase, Unlock may, in its discretion, accept or reject such existing property inspection.

9.7 All Property Inspections must conform to Unlock's most current requirements.

9.8 To monitor Property condition during the Term of the Unlock Agreement, Unlock may, at its expense:

(a) Conduct reasonable inspections of the interior and exterior of the Property, including Property Inspections and inspections conducted with drone photography.

(b) Require You to provide written answers to questions regarding any conditions known to You which may affect the Property or its value.

**10. <u>Annualized Cost Limit.</u>**

10.1 The cost of Your Unlock Agreement on an annual basis ("Annualized Cost") is subject to and capped at the Annualized Cost Limit set forth in Table of Key Terms. Whenever the Unlock Share

is calculated in connection with a Settlement Event or Partial Buyout, Unlock will also determine the exact number of days that passed between the Effective Date and the Settlement Date (or closing date of the Partial Buyout). This number, called the "Term Days", will be used to calculate the Annualized Cost and the "Maximum Unlock Share", as follows:

*Annualized Cost =*

***(Unlock Share / Investment Payment) ^ (365 / Term Days) - 1***

***Maximum Unlock Share =***

***Investment Payment X (1 + Annualized Cost Limit) ^ (Term Days / 365)***

The Maximum Unlock Share is the greatest amount the Unlock Share can be when determining the Settlement Payment or Partial Settlement Payment. If the Annualized Cost exceeds the Annualized Cost Limit, the Unlock Share will be set equal to the Maximum Unlock Share when calculating the Settlement Payment or Partial Settlement Payment.

**11. Owner Representations, Warranties and Covenants.**

11.1 Owner makes the representations, warranties and covenants in this Section 11 to, and for the benefit of, Unlock. The representations, warranties and covenants of Owner in this Section 11 shall be deemed made and restated on and as of, as applicable: (a) the Effective Date; (b) the closing date of a Settlement Event; (c) an Unlock Conversion; and (d) upon the assignment of the Unlock Agreement by Unlock, as permitted hereunder. Unlock is relying on the accuracy and completeness of the representations, warranties and covenants of Owner set forth in this Section 11 in entering into the Unlock Agreement.

11.2 Title. As of the Effective Date, all Owners, individually and collectively, will appear on record title to the Property as holding fee simple title to one hundred percent (100%) of the Property. You will have good and marketable title to the Property, which will be free of any license, easement, or other encumbrance or restriction against the title to the Property, other than Approved Existing Loans and Permitted Encumbrances, which are defined below.

(a) "Approved Existing Loan" means, as of the Effective Date, any pre-existing loan secured by a lien on the Property which is (i) listed in the property title report obtained by Unlock ("Title Report") or (ii) otherwise known to and approved in writing by Unlock.

(b) "Permitted Encumbrance" means all licenses, easements, or other title restrictions to the Property that exist as of the Effective Date, and are listed in the Title Report, plus any additional licenses, easements or title restrictions agreed to in writing by Unlock after the Effective Date.

As of the Effective Date, You represent that the Title Report accurately reflects all pre-existing loans secured by a lien on the Property and all Permitted Encumbrances, and to the extent that the it does not, and there are any existing loans secured by a lien on the Property or any licenses, easements, or

other title restrictions to the Property that are not reflected in the Title Report, You have disclosed them in full detail to Unlock.

During the Term You will keep the Property free of any liens, title exceptions, and easements except for: liens securing Approved Existing Loans or Approved Subsequent Loans (as defined in Section 12.4) and Permitted Encumbrances.

11.3 Secured Obligations. A "Secured Obligation" is an obligation secured by a lien on the Property, including, but not limited to: mortgage loans, home equity lines of credit, Property taxes and assessments, homeowner association dues or assessments and mechanics liens. During the Term You will promptly pay, and at all times remain current on, all Secured Obligations and You will provide Unlock proof of payment upon request. You will provide advance written notice of Your intent to apply for any deferrals or forbearance of any Secured Obligation. If there is a default under any Secured Obligation, You will take immediate action necessary to: (i) cure the default, (ii) terminate any foreclosure or enforcement action, (iii) satisfy the Secured Obligation, and/or (iv) remove or release such lien from the Property. You, and not Unlock, are solely liable for all Secured Obligations, including in the event of an Unlock Conversion.

11.4 Litigation. You represent and warrant that there is no foreclosure, notice of default, notice of sale, condemnation, environmental, zoning, or land-use regulation proceeding; or any lawsuit, arbitration, proceeding, tax claim, or special assessment that is pending or threatened against Owner, the Property, or that arises out of the ownership of the Property or that might adversely affect the Property, the value of the Property or Owner's ability to perform its obligations under the Unlock Agreement.

11.5 Legal Use. You represent, warrant and covenant that the use and occupancy of the Property are fully compliant, and will be fully compliant during the Term, with all state, federal and local laws, zoning ordinances, and regulations, including environmental prohibitions.

11.6 Property Condition. You warrant there are no material defects or conditions on or affecting the Property or title to the Property undisclosed to Unlock, which are now known to or could reasonably have been discovered by You, which could affect the use or value of the Property. You acknowledge that evidence of misrepresentation or non-disclosure as to the condition of the Property by You raises a presumption of bad faith and is a breach of the Unlock Agreement.

11.7 Environmental Matters. There is not any violation of, or claim of violation of any federal, state, or local environmental law or regulation, including, without limitation, those relating to hazardous materials ("Environmental Laws"). In addition, there is no presence of any hazardous materials on, in, or about the Property or property in the vicinity of the Property. Owner shall not, and shall not allow others to, violate any Environmental Laws with respect to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any Environmental Law.

**11.8 Your Decision. You understand that entering into the Unlock Agreement can have significant tax, financial and estate planning consequences. You understand that Unlock will have a lien on the Property and an Event Of Default that is uncured could result in a foreclosure by Unlock in which case You could lose the Property. You understand that Unlock does not provide tax advice and makes no representations as to the tax advantages or disadvantages which may accrue to You in connection with the Property or the Unlock Agreement. You are not relying on any information or representation by Unlock, its agents, affiliates, officers, or employees regarding: (i) the value of the Property; and (ii) the advisability of You entering into the Unlock Agreement, including but not limited to tax, legal, financial, and estate planning consequences. You acknowledge that Unlock has urged You to discuss the Unlock Agreement with family members, heirs, and with independent tax, legal and financial advisors to ensure an understanding of the risks and benefits of the Unlock Agreement with respect to Your particular situation. You represent and warrant that You have had the opportunity to seek independent advice regarding such matters and by entering into the Unlock Agreement You fully understand the terms, conditions and potential consequences.**

11.9 Non-Owner Occupants. As of the Effective Date You have identified all residents of legal age who occupy the Property but who are not signatories to the Unlock Agreement ("Non-Owner Occupants") and informed them of the existence, terms and potential impact of the Unlock Agreement on (i) Your Estate and (ii) their ability to inherit or continue living in the Property. You shall promptly so inform any additional Non-Owner Occupants at all times during the Term.

11.10 Reliance. Unlock relies on information provided by You when making its investment decision. You have promptly delivered all available documentation and information requested by Unlock during the underwriting of Your application. All documentation and information You have provided to Unlock fairly and accurately reflects the condition of the Property and Your financial condition and is truthful, complete, and not misleading.

11.11 Authority. You are one or more individuals with the legal power, authority and full capacity to enter into and to consummate all transactions contemplated by the Unlock Agreement. The execution and delivery of the Unlock Agreement will not conflict with, or result in an acceleration or breach of any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which Owner is a party or by which any portion of the Property may be bound.

11.12 No Change. You warrant that there has been no material change in Your financial condition since Your application was last submitted to Unlock.

11.13 Status of Owner. You represent and warrant that You are either (a) single or unmarried and You are not in a domestic partnership, and that in each case no spouse, domestic partner or former spouse or domestic partner has any interest in the Property that you have not disclosed in writing to Unlock, (b) married or in a domestic partnership and Your spouse or domestic partner has an interest

in the Property, and such person has signed the Unlock Agreement, or (c) married or in a domestic partnership and Your spouse or domestic partner does not have an interest in the Property, and such person has signed the Consent of Spouse/Domestic Partner set forth in Exhibit D hereto.

11.14 Continuing Obligation. You warrant You have a continuing obligation to comply with the representations made in this Section 11 and to notify Unlock during the Term if any representation You have made ceases to be materially accurate or true.

**12. Total Home Finance Limit and Approved Subsequent Loans.**

12.1 During the Term of the Unlock Agreement, there is a limit on the amount of financing that can be secured by the Property ("Total Home Finance"). Total Home Finance is calculated as follows:

*Total Home Finance = (Housing Debt + Unlock Share) / Appraised Value*

***Where "Housing Debt" equals the total principal balance of loans secured by the Property, including the unused portion of any credit lines secured by the Property.***

***And where Unlock Share ignores any impact of the Annualized Cost Limit and any impact of a potential Improvement Adjustment and/or Maintenance Adjustment.***

12.2 During the Term of the Unlock Agreement, Total Home Finance cannot exceed the Total Home Finance Limit as set forth in the Table of Key Terms, subject to adjustment in accordance with Section 14.8.

12.3 The Total Home Finance Limit applies both to Approved Existing Loans, as defined in Section 11.2, and Approved Subsequent Loans, as defined below.

12.4 If, during the Term of the Unlock Agreement, You want to obtain an "Approved Subsequent Loan", You must:

(a) Provide Unlock with loan documentation related to the proposed loan as follows:

(i) Immediately upon Your receipt of the "Loan Estimate" as required under federal regulations (or equivalent disclosure if your loan does not mandate a Loan Estimate), but in no case less than seven business days prior to the proposed close of the loan, You must provide a full copy of it to Unlock.

(ii) Immediately upon Your receipt of the "Closing Disclosure" as required under federal regulations (or similar disclosure if your loan does not mandate a Closing Disclosure), but in no case less than two business days prior to the proposed close of the loan, You must provide a full copy of it to Unlock.

(b) Cooperate with Unlock to obtain a Property Appraisal, to be completed no later than 10 business days prior to the proposed close of the loan.

(c) Ensure that copies of all loan documents and all documents recorded against the Property

are delivered to Unlock immediately following the closing of the loan.

(d) Obtain Unlock's prior written consent to the loan. Unlock will not unreasonably withhold consent if:

(i) The Appraised Value of the Property is greater than or equal to the Starting Home Value and the proposed loan will not result in a breach of the Total Home Finance Limit, as possibly adjusted in accordance with Section 14.8; or

(ii) The Appraised Value of the Property is less than the Starting Home Value, the proposed loan is being used solely to refinance existing senior debt secured by the Property, and the amount of the proposed loan is less than or equal to the principal balance of the debt being refinanced, plus actual and reasonable refinancing costs.

Notwithstanding the foregoing, Unlock in its discretion may refuse to consent to any lien on the Property that could materially impair its rights, including, reverse mortgage loans, shared appreciation mortgage loans, mortgage loans with negative amortization or prepayment penalties, private or non-institutional loans, unrecorded loans secured by the Property, and certain loans with payment reset or other variable payment features.

(e) Unlock will subordinate the priority of its rights under the Unlock Agreement to the lien of any lender that extends to You an Approved Subsequent Loan, provided that: (i) the Approved Subsequent Loan satisfies the requirements of this Section 12.4; (ii) any requested subordination and loan documents contain only reasonable and customary terms common to such agreements and acceptable to Unlock in its discretion; and (iii) You pay all costs incurred by Unlock associated with the subordination.

(f) Unlock makes no representations or warranties regarding the availability or terms of any loan that You may seek during the Term of the Unlock Agreement, and Unlock will have no liability to You as a result of the unavailability or unfavorable terms of any such loan. Note that mortgage lenders may not agree to lend on a property with an Unlock Agreement to the same extent or on the same terms as they would for a property without an Unlock Agreement. It is possible that You will need to terminate Your Unlock Agreement in order to complete a future home loan.

**13. <u>Property Condition.</u>**

13.1 You will maintain the Property in good condition, and no worse than its condition as of the Effective Date, subject to normal wear and tear. You will prevent any waste, deterioration or decrease in value due to the Property's condition. You will periodically perform customary and reasonable repairs as needed or as required. You are solely responsible for all ordinary maintenance costs incurred in connection with maintaining the condition and value of the Property.

13.2 You acknowledge that Unlock will have no liability to You or to any third party for, and You hold Unlock harmless from, any loss or liability in connection with, any defect or condition on or

affecting the Property, whether known or unknown.

**14. Occupancy and Property Use.**

14.1 You will enjoy sole right of occupancy of the Property under the Unlock Agreement as an owner and not as a tenant or lessee, whether or not Unlock has elected a Conversion, subject to limited Unlock rights of entry and repair following an Event Of Default or as otherwise set forth in the Unlock Agreement.

14.2 You will (i) use the Property solely as a residential property, except for a "home office" in compliance with the Internal Revenue Code and applicable U.S. tax regulations; and (ii) occupy the Property as stated in the Table of Key Terms.

14.3 If Your Occupancy is declared as Principal Residence in the Table of Key Terms: (i) You will occupy the Property as "Principal Residence" throughout the Term, which means that You live and sleep in the Property for no less than 180 days out of any 365-day period. Unlock will not unreasonably withhold consent to a temporary lapse in occupancy if You make arrangements satisfactory to Unlock to care for the Property while You are not occupying it. (ii) You may rent part of the Property without Unlock's consent, but You cannot rent 100% of the Property.

14.4 If Your Occupancy is declared as Second Home in the Table of Key Terms: (i) You are not required to occupy the Property as "Principal Residence. (ii) You may rent part of the Property without Unlock's consent, but You cannot rent 100% of the Property.

14.5 If Your Occupancy is declared as Rental Property in Table of Key Terms: (i) You are not required to occupy the Property as "Principal Residence. (ii) You may rent all or part of the Property without Unlock's consent.

14.6 Regardless of Occupancy declaration, You cannot enter into any lease or rental agreement with a term that expires after the Expiration Date of the Unlock Agreement.

14.7 In any Settlement Event where Unlock determines that an existing rental agreement or tenant who is occupying or has rights to occupy the Property or a portion of the Property is having a negative impact on the Unlock Share, You, at Your expense, will be responsible for terminating such rental agreement or removing such tenant from the Property, or otherwise for compensating Unlock for the loss in Unlock Share, in accordance with the following process:

(a) The Settlement Payment will be calculated at the time the Settlement Event is triggered and is being delayed due to an existing rental or tenant issue.

(b) Unlock and You will monitor the situation and cooperate to complete the Settlement Event as soon as the rental or tenant issue is resolved.

(c) When the Settlement Event can proceed, the Settlement Payment will be recalculated. If the newly calculated amount is less than the previously calculated amount, the difference will be

added to the amount of the Settlement Payment.

14.8 If Your Occupancy is declared as Principal Residence in the Table of Key Terms on the Effective Date, and You begin using the Property as a Second Home or Rental Property during the Term, Unlock may, in its discretion, lower the Total Home Finance Limit to what it would have been if You had originally declared Your Occupancy as a Second Home or Rental Property.

**15. Administration Fees.**

15.1 Unlock may charge reasonable Administration Fees in connection with the handling of various events that can occur during the Term of the Unlock Agreement, including, without limitation a change to title, a subordination in connection with new or refinanced debt, a Settlement Event, an Event Of Default, a Protective Advance and a Non-Distressed Sale. The schedule of charges for Administration Fees is set forth in the attached Exhibit E.

15.2 Administration Fees are due and payable by You when incurred. However, Unlock may elect, in its discretion, to defer payment of Administration Fees until a later date, or until the occurrence of a Settlement Event ("Deferred Fees"). Unpaid Administration Fees and Deferred Fees shall be considered Unpaid Owner Obligations.

**16. Default.**

16.1 The occurrence of any of the following will constitute an "Event Of Default" under the Unlock Agreement:

(a) Failure to Perform. You breach or fail to perform in accordance with any provision of the Unlock Agreement, or You take any action to impede a Conversion or interfere with or negatively impact Unlock's rights.

(b) Misrepresentation. You (i) make any representation, (ii) provide Unlock with any information or (iii) fail to provide Unlock with any information, whether oral or written, in each case, that is false, inaccurate or misleading, including with respect to the condition or value of the Property, in connection with the amount or kind of consideration given to You in any sale or transfer of the Property, when a non-signatory to Your Unlock Agreement becomes an owner or a principal resident of the Property, or when Your marriage or domestic partner status changes; or (iv) fail to correct a representation that has become untrue within a reasonable time after learning of the new information regarding the representation.

(c) Delinquencies. You become delinquent on any obligation regarding the Property, including on any loans secured by, or with respect to any taxes or assessments owed on, the Property.

(d) Occupancy. You violate the occupancy provisions of Section 14.2 through 14.6 or the Non-Owner Occupant provisions of Section 11.9.

(e) Unauthorized Transfers. You transfer or attempt to transfer the Property, or any interest

in the Property, other than in accordance with the Unlock Agreement.

(f) Unapproved Liens. A lien attaches to the Property without Unlock's prior written approval, or You obtain any loan secured or to be secured by the Property that Unlock has not approved in writing, whether recorded or unrecorded.

(g) Financial Difficulty. You become insolvent or unable to pay Your debts, or there is a voluntary or involuntary commencement of a bankruptcy against You, or an appointment of a receiver for Your assets, or You make a general assignment for the benefit of creditors, or any similar event or proceeding.

(h) Insurance. You fail to maintain insurance on the Property, as prescribed in the Unlock Agreement.

(i) Notices. You fail to timely provide to Unlock any notice(s) required under the Unlock Agreement.

(j) Condition of Property. You fail to maintain, preserve or repair the Property in accordance with Section 13.1.

(k) Transfer of Agreement. Any assignment, attempted assignment, or other transfer of the Unlock Agreement by You in violation of the Unlock Agreement.

(l) Rental Terms. The Property becomes subject to a lease or rental agreement that extends beyond the Expiration Date.

(m) Cooperation. You fail to cooperate with Unlock or any of Unlock's agents to affect a sale of the Property in connection with a Settlement Event.

(n) Other Adverse Acts. Any other occurrence, action or inaction by You which may have an adverse effect on the Property, the legal ownership of the Property, the value of the Property, or Unlock's rights.

## 17. Unlock Rights and Remedies.

17.1 Your performance under the Unlock Agreement will be secured as a recorded lien on the Property by recording the Security Instrument in the county or local jurisdiction where the Property is located.

17.2 Upon an Event Of Default, Unlock will provide You with a Notice Of Default which will state the triggering circumstances. Except as otherwise provided in the Unlock Agreement, You will have thirty (30) days from the notice delivery date to cure the default, subject to Section 17.4 and the provisions of any laws which apply to the Unlock Agreement. If You fail to cure within thirty (30) days, Unlock may exercise any of its rights or remedies, subject to applicable law, including the following:

(a) Unlock may make Protective Advances in accordance with Section 17.12.

(b) Unlock may demand for You to promptly remedy any material defect or adverse condition on the Property.

(c) Unlock or its agents may enter the Property to (i) to conduct Property Inspections and Property Appraisals; (ii) to prevent waste of the Property; and (iii) for any other purpose reasonable to prevent continuing harm to or diminution in value of the Property.

(d) Unlock may seek monetary damages against You, including interest, attorney's fees, and costs.

(e) Unlock may be irreparably injured and will have the right to specific performance, injunctive relief, or any other equitable relief against You.

(f) Unlock may elect to exercise its right to a Conversion, then solicit and sell the entire Property, including Owner's interest therein, to one or more third parties, and receive the Settlement Payment from the proceeds of such Property sale. Upon the sale of the Property, Owner shall be entitled to receive all other proceeds after the Settlement Payment is paid to Unlock and Closing Costs have been paid to the applicable parties.

(g) Unlock may exercise its rights and remedies under the Security Instrument, including its foreclosure right. This could result in a termination and settlement of the Unlock Agreement. In the event Unlock elects to exercise the power of sale and foreclose on the Property under the Security Instrument and in this Section 17.2, Unlock may declare the Settlement Payment immediately due and payable by delivery of the notice(s) specified in the Security Instrument.

17.3 If Unlock is required to pay money pursuant to a preference claim in a bankruptcy proceeding involving You, then such amount will become an Unpaid Owner Obligation and Unlock is entitled to assert a claim against You for the same amount.

17.4 In any default situation where, in Unlock's discretion, absent immediate action there could be material damage to the Property, Unlock's interests therein or the value of the Unlock Share, Unlock may suspend the 30-day cure period and take immediate action to exercise any of its rights or remedies, subject to applicable law.

17.5 Unlock is entitled to demand immediate termination of the Unlock Agreement, the return of the Investment Payment and any other payments tendered to You, and the payment of the amount, if any, by which the Settlement Payment exceeds the Investment Payment, together with any and all attorney's fees and costs incurred by Unlock in connection with such termination in an Event Of Default related to: (i) fraud, bad faith, or misrepresentation or nondisclosure by You; or (ii) a transfer or sale, or attempted transfer or sale, of the Property by You in violation of the terms of the Unlock Agreement.

17.6 In the event of (i) fraud, bad faith, or misrepresentation or nondisclosure by You; (ii) any

transfer or sale, or attempted transfer or sale, of the Property by You in violation of the terms of the Unlock Agreement, or (iii) any other uncured default by You under the terms of the Unlock Agreement, Unlock, in its discretion, may increase the Settlement Payment by an amount equal to ten percent (10%) of the Investment Payment.

17.7 Owner and Unlock each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; provided, however, that Unlock will retain the right to seek a partition, (i) in the event of, and as part of any action arising out of an uncured Event Of Default, or (ii) in connection with any claim or action by Owner which asserts that any provision of the Unlock Agreement is against the law or unenforceable.

17.8 In an Event Of Default which has resulted in a foreclosure action by a mortgage lender, tax authority or other lien holder (and provided that You have first reasonably exhausted any loss mitigation remedies offered to You by such lienholder), Unlock, in its discretion, may offer to You the remedy of a "Non-Distressed Sale," as follows: If You accept Unlock's offer of a Non-Distressed Sale, Unlock may cure the default through one or more Protective Advances; in exchange You will give Unlock the power to exclusively and unilaterally market and sell the Property, and You will cooperate and execute all documentation required by Unlock to market the Property and complete the Non-Distressed Sale. The Non-Distressed Sale remedy is intended to prevent the Property from going to foreclosure and becoming a "distressed" property, to protect Your and Unlock's interest in the Property, and to prevent a foreclosure event from impacting Your credit.

17.9 In any Event Of Default which leads to a sale of the Property: (i) Unlock may elect to calculate the Unlock Share based on an Appraised Value in accordance with Section 8.4(c); and (ii) You will pay all costs in connection with the sale, including Closing Costs, any Appraisal Expenses and Inspection Expenses and any other expenses, unless paid by Unlock, but not any closing costs to be paid owed by the third-party buyer.

17.10 The remedies provided in the Unlock Agreement are cumulative. A party who asserts a right or seeks a remedy may also assert other rights or seek other remedies available at law, equity or otherwise.

17.11 In connection with any Event Of Default, the Expiration Date will automatically extend for whatever time is necessary to permit Unlock to exercise its rights and remedies.

17.12 Protective Advances. If You fail to protect the Property and Unlock's rights therein, Unlock may make "Protective Advances," as defined in this Section, as Unlock deems appropriate. Unlock may make Protective Advances for things such as:

(a) The placement of insurance; the payment of taxes, assessments, levies, liabilities, obligations and other charges of every nature on the Property;

(b) The making of necessary repairs;

(c) The cure of any defaulted loans secured by the Property; or

(d) The removal of a receiver appointed for the Property.

Unlock will provide 30 days' written notice to You, to correct Your default, or such longer period as may be required by applicable law. If, after the 30-day notice period, You have not cured the default, Unlock may make the payments itself. All such payments by Unlock (including attorneys' fees incurred in litigation or arbitration with parties other than You) are deemed Protective Advances. Notwithstanding the foregoing notice period, prior notice from Unlock is not required if the Unlock Agreement expressly so provides, or when Unlock determines that prompt action is necessary to protect the Property and Unlock's rights.

You consent to Unlock's unilateral authority to determine the appropriateness or necessity of making any Protective Advances in accordance with the Unlock Agreement. Unlock incurs no liability for its election not to take any action authorized under this Section 17.12.

17.13 Unlock may demand prompt reimbursement for any Protective Advances. You must reimburse Unlock no later than 10 days after demand. Protective Advances incur interest at the rate of 8% per annum, subject to applicable law, from the date of demand until paid in full. Protective Advances, plus any associated interest charges, to the extent You do not reimburse Unlock, become a component of Unpaid Owner Obligations.

**18. Insurance.**

18.1 Coverage.

18.1.1. You must maintain at Your sole expense:

(a) Insurance on the Property against fire and other hazards included in the special form (HO 3) policy (and any successor forms).

(b) Hazard insurance, including flood hazard, and any other insurance Unlock may reasonably require and which is common for similar properties in similar locations, in an amount equal to the current replacement cost of the improvements on the Property, or the maximum amount as available under applicable law, which amount will be increased not less frequently than annually as the replacement cost of the improvements increases.

(c) Liability insurance on the Property against such risks with coverage in an amount of at least one million dollars ($1,000,000) for any single occurrence, or such lesser amount as is reasonable for similar properties in Your location.

18.1.2. You hereby authorize Unlock to communicate with all insurance companies at any time to ensure the maintenance of policies, the coverage, and the reimbursement of losses.

18.1.3. Unlock must be named as an additional "named insured" and "loss payee" under all hazard and liability insurance policies obtained by You related to the Property.

18.1.4. You may obtain insurance from any insurance carrier reasonably acceptable to Unlock that has a Financial Strength Rating of "B" or better from A.M. Best (or equivalent rating from Kroll, S&P or Demotech).

18.1.5. You must provide Unlock with copies of all insurance policies related to the Property when the insurance is obtained and at any time there is a change in carrier or policy. You must provide Unlock with proof of coverage upon request.

18.1.6. If You fail to maintain or obtain the insurance coverage required by this Section 18.1, Unlock may obtain such coverage on the Property. Any such expenses paid by Unlock are Protective Advances.

18.2 Distribution of Insurance Proceeds for Losses.

18.2.1. Subject to Your obligations and the requirements in connection with any Approved Existing Loans or Approved Subsequent Loans, insurance for losses will be distributed as described in this Section 18.2.

18.2.2. You and Unlock will cooperate in the pursuit, settlement, and adjustment of any losses under any insurance policies.

18.2.3. In the event of damage to the Property where insurance claim proceeds are sufficient to restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding such destruction or damage, the Unlock Agreement will continue, and the proceeds must promptly be applied to such restoration or repair, further subject to:

(a) Unlock has the right to approve any restoration or repair plans, including the contractors or subcontractors used and the costs associated with the restoration or repair.

(b) Unlock has the right to release insurance proceeds to the individuals or entities performing the repair and restoration work in one or more progress payments as the work is completed.

(c) Unless required by law, Unlock is not required to pay You any interest or earnings on insurance proceeds.

(d) You are responsible for ensuring that any repair or restoration work is completed in a cost-effective manner that in no way impairs the structural integrity, habitability or value of the Property.

(e) You are responsible for obtaining any governmental approvals or permits that are required for such repair or restoration work.

18.2.4. Unlock has no obligation to pay any amount of the restoration or repair of the Property even if the insurance proceeds are insufficient to complete the restoration or repair. You are responsible for any shortfall. If restoration or repair is not economically feasible due to insufficient

insurance claim proceeds because the Property was underinsured, Unlock, in its discretion, may require You to pay for the restoration or repair out of Your other assets.

18.2.5. If restoration or repair is not economically feasible due to insufficient insurance claim proceeds where the Property was not underinsured, all insurance proceeds will be allocated in the following order:

(a) To payment of reasonable expenses incurred by You or Unlock in collecting and contesting with the insurers the payments under the relevant insurance policies, including attorney's fees that have been approved by Unlock;

(b) To payment of all Approved Existing Loans or Approved Subsequent Loans that have priority over the Unlock Agreement;

(c) To Unlock, in an amount equivalent to the Settlement Payment as it would have been calculated had the Unlock Agreement been settled immediately before the destruction or damage occurred; and

(d) To You, the balance of the proceeds.

The Unlock Agreement will end upon payment to Unlock of the insurance proceeds as described in Section 18.2.5(c) above.

18.2.6. In the event of loss to Unlock resulting directly from Your failure to maintain insurance, maintain insurance at the required coverage level, or obtain a claim, Unlock shall be entitled to all remedies available under the Unlock Agreement, including, without limitation, in connection with an Event Of Default, and/or available at law or in equity.

**19. <u>Condemnation.</u>**

19.1 If the Property is condemned in whole or in part during the Term, You shall immediately notify Unlock of such condemnation and all condemnation proceeds will be distributed as follows:

(a) To repay any reasonable costs and expenses incurred by You or Unlock in collecting and contesting the condemnation proceeds, including attorney's fees that have been approved by Unlock;

(b) To payments for extinguishing all Approved Existing Loans or Approved Subsequent Loans that have priority over the Unlock Agreement;

(c) To Unlock, in amount equal to the Settlement Payment;

(d) To You, the balance of the proceeds.

19.2 In the case of a full condemnation, the Unlock Agreement will end upon payment to Unlock of the condemnation proceeds as described in Section 19.1(c) above.

19.3 In the case of a partial condemnation: (i) The Unlock Agreement will continue and Unlock will retain its rights with respect to any Property that has not been condemned; and (ii) after distribution of the proceeds of the partial condemnation in accordance with Section 19.1, for all remaining calculations to be made under the Unlock Agreement, the Unlock Share will be reduced by an amount equal to any condemnation proceeds paid to Unlock under Section 19.1(c) above.

**20. Arbitration.**

20.1 In the event of any inconsistencies between the terms and conditions of the Unlock Agreement (or any of them) and the terms and conditions of this Section 20, this Section 20 shall control and be binding.

20.2 OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF BENEFICIARY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THE UNLOCK AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES OF JAMS, THE RESOLUTION EXPERTS (THE "RULES"), AND, BECAUSE THIS AGREEMENT SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE THE PARTIES AGREE THIS AGREEMENT, INCLUDING ITS ENFORCEMENT IS TO BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1 ET SEQ.

20.3 Procedure. OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS ("JAMS"), AND THAT A SINGLE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. OWNER HAS ACCEPTED JAMS RULES AND USE OF JAMS. OWNER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW, EXCEPT AS OTHERWISE SET FORTH IN THE UNLOCK AGREEMENT. OWNER UNDERSTANDS THAT UNLOCK WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

20.4 Remedy. EXCEPT AS PROVIDED BY THE RULES AND THE UNLOCK AGREEMENT,

ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND BENEFICIARY. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THE UNLOCK AGREEMENT, NEITHER THE OWNER NOR BENEFICIARY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

20.5 Availability of Injunctive Relief. BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF BENEFICIARY ALLEGES OR CLAIMS A BREACH OF THE UNLOCK AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE SETTLEMENT PAYMENT IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE UNLOCK AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

20.6 Small Claims Court. NOTWITHSTANDING THE ARBITRATION AGREEMENT ABOVE, BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION, PROVIDED THE COURT'S REQUIREMENTS ARE SATISFIED.

20.7 Class Action Waiver. ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR UNLOCK MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS.

**21. Miscellaneous.**

21.1 Multiple Owners. If You are more than one individual:

(a) The Unlock Agreement must be signed by each of You;

(b) All of You are jointly and severally liable for liabilities and obligations under the Unlock Agreement;

(c) Notice required to be given to You is adequate if given to any of You; and

(d) Unlock may treat any notice received from any one of You as notice from all of You.

21.2 Revocable Trusts. If You are the trustee of a Revocable Trust:

(a) All trustees and all trustors must be disclosed in writing to Unlock prior to the Effective Date and must sign the Unlock Agreement;

(b) All rights and powers specified for, and all actions required of, You in the Unlock Agreement that are exercised by a trustee are deemed approved and exercised by all trustees unanimously;

(c) All trustees and all trustors, in their capacities as individuals, are jointly and severally liable with You for Your liabilities and obligations under the Unlock Agreement;

(d) All representations and warranties by You in the Unlock Agreement are made by all trustees on behalf of the Revocable Trust and by all trustees and all trustors in their capacities as individuals;

(e) Notice required to be given to You is adequate if given to any of the trustees;

(f) Unlock may treat any notice received from any trustee as notice from all trustees and from You.

21.3 Notices.

21.3.1. You will immediately provide Unlock with written notice of any event that may have a material effect upon the Property, the value of the Property, or Unlock's rights, including but not limited to (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property, or (v) the occurrence of an Event Of Default.

21.3.2. All required notices must be in writing and will be considered given when delivered (i) personally, (ii) to the mailing address set forth in the attached Exhibit C by overnight delivery by a nationally recognized courier service, or (iii) by email to the email address specified for You or Unlock, as applicable, set forth in Exhibit C.

21.3.3. The following notices are deemed not given by You (or Your Estate) to Unlock until Unlock makes written confirmation of receipt to You: notices of default and notices of sale in connection with secured liens on the Property; notices of delinquency in tax or insurance payments on the Property; notices of Your death; and notices of the commencement of legal or other action concerning the Property, or of Your bankruptcy proceedings.

21.3.4. During the term, You and Unlock will each provide the other with prompt notice regarding any changes to Exhibit C. Notice to You shall also be effective when delivered to any other individual whom You have designated in writing to Unlock as authorized to receive notices under the Unlock Agreement.

21.4 Unpaid Owner Obligations. Unpaid Owner Obligations, in total, are the sum of (i) any

unreimbursed Protective Advances plus any associated unpaid interest, fees and other charges; (ii) any unpaid Administration Fees; (iii) any Deferred Fees; (iv) any unpaid Appraisal Expenses and Inspection Expenses; and (v) any other amounts expended by Unlock to protect its rights or the value of the Property in an Event Of Default.

21.5 Not A Loan. Unlock and Owner agree that the Unlock Agreement and the transaction contemplated thereunder, including payment of the Investment Payment and the sale of the Unlock Percentage, is not a loan or extension of credit. Owner does not have an obligation to repay the Investment Payment, and there are not any required periodic payments of principal, interest or any other finance charges. As set forth herein, Unlock may lose all or a portion of the Investment Payment. The Security Instrument secures Owner's performance and obligations under the Unlock Agreement and not in connection with a promissory note, loan or extension of credit. The Annualized Cost Limit is not an annual percentage rate limit, but rather a limit on Unlock's investment return. To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws.

21.6 Tax Benefits. Unlock is not entitled to any tax advantages that You benefit from relating to the Property, including, without limitation, all available deductions for taxes and mortgage interest paid by You.

21.7 Voluntary Release by Unlock. Unlock may voluntarily rescind its rights under the Unlock Agreement in writing at any time, in which case Unlock will affect a full release of the Unlock Agreement, and You may keep the Investment Payment and have no further obligation to Unlock.

21.8 Release of Security Instrument. The Exchange Agreement shall remain in full force and effect subject to the terms and conditions herein in the event Unlock voluntarily releases the Security Instrument on the Owner's Property.

21.9 Successors and Assignees.

21.9.1. Unlock may assign, participate, hypothecate, securitize or sell, in whole or in part, the Unlock Percentage and/or Unlock's right and title to, and interest in the Unlock Agreement at any time and to any person or entity without prior notice to, or consent of, Owner. In connection with any such transaction, Owner agrees and consents that Unlock may in its discretion disclose any and all documents and information in its possession relating to Owner and the Property, including without limitation, "return information" information as such term is defined under the Internal Revenue Code (Title 26 of the United State Code), such as tax transcripts, subject to its assignee's agreement to continue to observe Unlock's policies regarding privacy and disclosure of personal and financial information and applicable privacy laws. Upon such assignment, Unlock's assignee, such other future assignee, shall automatically have all the rights and remedies of Unlock under the Unlock Agreement. Unlock and Owner shall execute and deliver in recordable form, if requested, at Unlock's expense, such other documents as are appropriate to reflect the assignment of the Unlock Agreement. Owner

agrees to cooperate with such assignee and execute such additional documents as may be necessary to ensure assignee's interest in the Unlock Agreement. Unlock, or its successors and assigns, shall notify Owner no later than 60 days after the effective date of any such assignment.

21.9.2. Absent Unlock's prior written consent, which consent may be withheld in Unlock's discretion, Owner may not assign or otherwise transfer the Unlock Agreement. In the event of an assignment of the Unlock Agreement pursuant to this paragraph the original Owner, jointly and severally with the additional Owner, shall continue to remain liable under the Unlock Agreement, and such assignment will not trigger a Settlement Event. You shall be liable for all costs and expense incurred by Unlock related to such assignment.

21.9.3. The Unlock Agreement shall be binding upon and insure to the benefit of Owner and Unlock and their respective heirs, successors and assignees. If Owner dies, then the Unlock Agreement shall be binding on Owner's estate. The death of Owner shall not terminate the Unlock Agreement. Nothing in this provision shall permit assignment by Owner or Owner's estate of the Unlock Agreement contrary to the express provisions of the Unlock Agreement.

21.10 Right to Obtain or Disclose Certain Information. Subject to applicable laws, Unlock may obtain certain personal and financial information as necessary to maintain the Unlock Agreement, including Your credit report histories, or current balances and payoff amounts of loans secured by the Property. Subject to applicable laws, Unlock may share certain personal and financial information about the Unlock Agreement with affiliates, subsidiaries, investors, assignees and those with which it intends to conduct business. This information includes, without limitation, the address and general location of the Property, Property Appraisal reports and other valuations of the Property, and the financial terms of the Unlock Agreement.

21.11 Covenants to Run with Land. The provisions of the Unlock Agreement are deemed to be covenants running with the land as reflected in the Security Instrument. The interpretation of the phrase "covenants running with the land" shall be within the meaning of the applicable law of the state where the Property is located so as to give it the broadest possible application.

21.12 Indemnification. You hereby agree to indemnify, defend and hold Unlock, its affiliates and their respective directors, officers, agents and employees harmless from, and against, any and all claims, damages, liabilities, actions and expenses (including, without limitation, attorneys' fees and costs) (collectively "Losses") arising out of or relating to: (i) a breach of any of Your covenants, representations or warranties under the Unlock Agreement; (ii) any act or omission by You or Your agents; (iii) the Property; or (iv) the use of electronic or digital signatures and electronic methods of submission with respect to this Unlock Agreement and any documents or notices delivered pursuant to this Unlock Agreement or the related documents, including the risk of Unlock acting on unauthorized instructions, and the risk of interception and misuse by third parties. You will not, without Unlock's prior written consent, which shall not be unreasonably withheld, settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to Unlock. The indemnification provided by You herein shall be with respect to Losses involving third

parties and Losses between You and Unlock. Without limiting Your indemnification obligation, in no event will Unlock's aggregate liability arising out of or related to the Unlock Agreement or the Property exceed the Investment Payment.

21.13 Delegation of Duties. Unlock may execute any of its duties under the Unlock Agreement by or through agents. Unlock is entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of advice from counsel will be deemed to have been taken in good faith. Unlock will not be responsible for the negligence or misconduct of any agent that Unlock selects.

21.14 Relationship. Unlock shall not be deemed a partner, joint venturer, trustee, agent, representative, lender or fiduciary with, or of, You. You expressly waive any claims against any of Unlock's agents, assignees, affiliates, employees, directors or funding sources.

21.15 Applicable Law and Venue. The Agreement will be governed by the law of the state in which the Property is located. Any lawsuit or arbitration arising directly or indirectly out of the Agreement will be contested in the venue where the Property is located. EACH PARTY IRREVOCABLY APPOINTS THE INDIVIDUAL(S) IDENTIFIED IN ON EXHIBIT C TO RECEIVE NOTICES ON ITS/HIS/HER BEHALF, AS ITS AGENT FOR SERVICE OF ALL PROCESS IN ANY ARBITRATION OR LAWSUIT, WITH REGISTERED MAIL SERVICE AGREED TO BE BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

21.16 Waiver of Jury Trial. YOU AND UNLOCK HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHTS EACH MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THE UNLOCK AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH.

21.17 Further Assurances. The parties agree to correct any error or inaccuracy in the Unlock Agreement to ensure that such documents reflect the true and correct terms upon which the parties agreed to enter into and to replace any missing or misplaced documentation, to confirm and restate any authorities granted hereunder to the extent such authority is impacted by a change in any law, rule or regulation, and to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to affect the intent and purposes of the Unlock Agreement.

21.18 Severability. Each provision of the Unlock Agreement must be interpreted in a way that is valid under applicable law. If any provision is held invalid or unenforceable, such adjudication shall not affect, impair, invalidate, or nullify the remainder of the Unlock Agreement, but shall only affect that provision.

21.19 Waivers. A waiver by Unlock of a breach of any term in the Unlock Agreement by You will

not be considered (i) waiver of a further breach of the same term, or (ii) a waiver of a breach of any other term, or (iii) a waiver of Unlock's right to declare an immediate or subsequent default.

21.20 No Third-Party Beneficiaries. The Unlock Agreement is entered into for the protection and benefit of Unlock and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies or recourse under the Unlock Agreement.

21.21 Consent of Spouse/Domestic Partner. If You are married or in a civil union or registered domestic partnership on the date of the Unlock Agreement and Your spouse or domestic partner, as applicable, is not named on the title to the Property and does not have an interest in the Property under applicable law, Unlock may require Your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of the attached Exhibit D. If You should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or domestic partnership, as applicable, You and Your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner, except if that individual is added on the title to the Property or otherwise has an interest in the Property under applicable law, in which case he/she must execute, acknowledge and deliver the Unlock Agreement and all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Unlock may reasonably require (and fully cooperate, or procure cooperation with, all filings and recordings as Unlock may reasonably require) in each case to protect its rights and interest under the Unlock Agreement including, without limitation, Unlock's interest in the Property. If Your spouse or domestic partner does not execute the Unlock Agreement within the thirty (30) days after the marriage, civil union, or domestic partnership, or such other time period as mutually agreed upon in writing between You and Unlock, Your death, rather than the later of Your death or Your spouse's or domestic partner's death, shall be deemed a Settlement Event in accordance with Sections 1.8.2 and 4.

21.22 Subordination of Homestead and Waivers. If You have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subject to all of our rights under and subordinated in all respects to the Security Instrument and Exchange Agreement, and any amounts due under the Unlock Agreement, and to all extensions and modifications of the Unlock Agreement.

21.23 Injunction. Notwithstanding anything to the contrary in the Unlock Agreement or otherwise, if Unlock is stayed or enjoined from enforcing any of its rights under the Unlock Agreement, then any deadline or notice period prescribed in the Unlock Agreement is automatically stayed for the duration of such stay, injunction or legal prohibition.

21.24 Entire Agreement. The Unlock Agreement and its Exhibits and attachments and any other documents executed at the Closing contain the entire understanding between the parties.

21.25 Titles. Titles are inserted in the Unlock Agreement for reference purposes only and must not be used to interpret the Unlock Agreement.

21.26 Counterparts. The Unlock Agreement and its attachments may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same Unlock Agreement. You and Unlock intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties. You and Unlock further agree that the Unlock Agreement and any other documents to be delivered in connection herewith may be electronically signed using any electronic process or digital signature provider as specified in writing by Unlock to You, and that any electronic signatures appearing on the Unlock Agreement or such other documents are the same as handwritten signatures for the purposes of validity, enforceability and admissibility.

21.27 Survival. The indemnification provisions, obligations to pay any Unpaid Owner Obligations, obligations to pay Closing Costs, all covenants, representations and warranties of You, and all other provisions which are required by their terms to be enforceable following expiration or termination, including, without limitation, provisions prescribing monetary remedies, fees, costs and expenses owed by You in connection with any Event Of Default or any Offered Value as described in Section 3.1(d) or Section 6.6 will, in each case, survive for three years after the end of the Unlock Agreement.

## *Washington Appendix*

1. Real Estate Excise Tax (RCW 82.45). In the event that any Conversion is deemed to be subject to Washington State real estate excise tax or use tax (collectively, "Transfer Tax"), Owner shall be solely responsible for all Transfer Tax due and shall cooperate with Unlock in the preparation, execution and delivery to all appropriate taxing authorities of any tax returns or affidavits that are required to be prepared in connection with the Conversion and remittance of the appropriate Transfer Tax. Unlock and Owner further agree that, in connection with any Conversion, Unlock does not assume any liability for, and express disclaims, any obligation to pay any mortgage indebtedness on the Property. Notwithstanding the foregoing, Unlock may, in its sole discretion, advance funds necessary to pay the Transfer Tax on Owner's behalf and any such advance shall be added to the Unpaid Owner Obligations.

2. Liquidated Damages. If as a result of Owner's breach of any provision of the Unlock Agreement Unlock elects to exercise the power of sale and foreclose on the Property pursuant to the Unlock Agreement, Unlock may at its option declare any and all Liquidated Damages as Unlock's sole and exclusive remedy and relief under the Unlock Agreement, where "Liquidated Damages" is calculated as an amount equal to the sum of (i) the Settlement Payment as calculated pursuant to the Unlock Agreement , (ii) in connection with Owner's failure to make any monetary payment, the sum of all monetary obligations owed to Unlock by You under the Unlock Agreement, and (iii) any and all amounts, properly chargeable to Owner as necessary to satisfy Owner's obligations under the Unlock Agreement with respect to Owner's mortgage, tax and insurance obligations on the Property, including late fees, reinstatement fees and other amounts. UNLOCK AND OWNER ACKNOWLEDGE THAT THE ACTUAL DAMAGES TO UNLOCK WHICH WOULD RESULT FROM OWNER'S BREACH OF ANY PROVISION OF THE UNLOCK AGREEMENT WOULD BE EXTREMELY DIFFICULT TO CALCULATE OR ESTABLISH ON THE DATE OF THE UNLOCK AGREEMENT. IN ADDITION, OWNER DESIRES TO HAVE A LIMITATION PUT UPON OWNER'S POTENTIAL LIABILITY TO UNLOCK IN THE EVENT OF SUCH BREACH BY OWNER. BY PLACING THEIR INITIALS IN SPACES HEREINAFTER PROVIDED, UNLOCK AND OWNER SPECIFICALLY ACKNOWLEDGE AND AGREE, AFTER NEGOTIATION BETWEEN UNLOCK AND OWNER, THAT THE AMOUNT OF THE LIQUIDATED DAMAGES CONSTITUTES REASONABLE COMPENSATION TO UNLOCK FOR SUCH BREACH BY OWNER AND SHALL BE DISBURSED TO AND RETAINED BY UNLOCK AS LIQUIDATED DAMAGES IN THE EVENT OF SUCH BREACH BY OWNER. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY.

**Initials of Owner:** ____________________

**Initials of Owner:** DS DC

**Initials of Unlock:** ____________________

BY INITIALING BELOW, OWNER EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER ANY APPLICABLE LAW TO TERMINATE AND REPURCHASE THE UNLOCK AGREEMENT, WITHOUT ANY FEE OR PENALTY, UPON ANY SUCH TERMINATION AND REPURCHASE OF THE UNLOCK AGREEMENT, AND (B) AGREES THAT IF, FOR ANY REASON, ANY TERMINATION AND REPURCHASE OF THE UNLOCK AGREEMENT IS MADE OR THE SETTLEMENT PAYMENT IS OTHERWISE DUE AND OWING, THEN OWNER SHALL BE OBLIGATED TO PAY UNLOCK THE CALCULATED SETTLEMENT PAYMENT AND OWNER AGREES THAT UNLOCK'S PAYMENT OF THE INVESTMENT PAYMENT SET FORTH IN THE UNLOCK AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION FOR THIS WAIVER AND AGREEMENT.

**Initials of Owner:** ________________

**Initials of Owner:** ________________

[Unlock Exchange Agreement signature page]

**READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ENFORCEMENT OF THE TERMS OF THE UNLOCK AGREEMENT MAY RESULT IN THE SALE AND LOSS OF YOUR PROPERTY. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH UNLOCK AND/OR UNLOCK'S AGENT(S), INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PROGRAM GUIDE ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THE UNLOCK AGREEMENT, AS APPLICABLE.**

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Unlock Forward Sale and Exchange Agreement as of the Effective Date.

**UNLOCK PARTNERSHIP SOLUTIONS INC.:**

DocuSigned by:

By: Denise Claiborne

B290A2B19304493...

Title: Vice President

Date: 8/18/2022

**Owner:**

By: ________________

Name: Seung J. Seong

**Owner:**

By: ________________

Name: Do Youn Kim

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF ~~WASHINGTON~~ North Carolina )
COUNTY OF Mecklenburg ) SS.
)

I certify that I know or have satisfactory evidence that Seung J. Seong, is the person who appeared before me, and said person acknowledged that he or she signed this instrument and acknowledged to be the free and voluntary act and deed of such individual, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed on August 30th, 2022.

Lashonda R Caldwell
NOTARY PUBLIC
Mecklenburg County, NC
My Commission Expires June 5, 2024

(Signature of Notary)

LaShonda R. Caldwell
(Print or stamp name of Notary)

My Appointment Expires:
June 5, 2024

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF WASHINGTON )

COUNTY OF ____________________ ) SS.

)

I certify that I know or have satisfactory evidence that ________________________________, is the person who appeared before me, and said person acknowledged that he or she signed this instrument and acknowledged to be the free and voluntary act and deed of such individual, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed on ________________, ____________.

________________________________________

(Signature of Notary)

________________________________________

(Print or stamp name of Notary)

My Appointment Expires:

______________________

## EXHIBIT A

## PROPERTY DESCRIPTION

The following described real estate, situated in the County of Snohomish, State of Washington:

Lot 29 of Summit Ridge, as per plat recorded under Recording No. 200702145236, records of Snohomish County Auditor.

**Parcel ID / APN:** 01066200002900

[End of legal description]

# EXHIBIT B

# UNLOCK CONVERSION AGREEMENT

This Unlock Conversion Agreement ("Agreement") is made between the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("Owner" or "You" or "Your") and Unlock Partnership Solutions Inc., a Delaware corporation, with its principal offices at 270 Madison Ave, Suite 702, New York, NY 10016, and its successors and assigns ("Unlock"), as of [Conversion Agreement Effective Date] ("Conversion Effective Date").

WHEREAS, You and Unlock entered into that certain Forward Sale and Exchange Agreement dated and effective as of August 30, 2022 ("Exchange Agreement"), secured by Your property located at 607 194th Pl SE, Bothell, WA 98012 and any improvements thereon ("Property"), whereby you sold, transferred and conveyed to Unlock the right to receive 28.16 percent ("Unlock Percentage") of the future value of the Property.

WHEREAS, under the Exchange Agreement Unlock has the right to elect to convert the Unlock Percentage to an undivided fee simple ownership percentage in the Property ("Conversion") equal to the Unlock Percentage, upon the occurrence of certain defined events, as set forth in the Exchange Agreement ("Settlement Event").

WHEREAS, a Settlement Event has occurred and Unlock has elected to exercise its right to a Conversion.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, You and Unlock agree as follows:

**1. Conversion Terms.**

(a) Unlock and You agree that the Unlock Percentage shall convert into an undivided fee simple ownership percentage in the Property, including the related oil, mineral and water rights if currently owned by Owner, equal to the Unlock Percentage ("Unlock Ownership Percentage").

(b) Within [x] days of the Conversion Effective Date, Unlock shall select an escrow agent in order to conduct the Conversion. Unlock shall provide the escrow agent with instructions for the Conversion closing. You and Unlock shall agree to a Conversion closing date not later than [x] days from the Effective Date ("Conversion Closing Date"). You agree to pay all fees, costs and charges in connection with completing the Conversion.

(c) You shall transfer and convey the Unlock Ownership Percentage to Unlock by executing a deed, the form of which is determined by Unlock, in accordance with applicable law. You agree to cooperate and execute all other documentation on or prior to the Conversion Closing Date which Unlock deems necessary to complete the Conversion.

(d) After the Conversion Closing Date and upon confirmation that Unlock's ownership has been recorded on title, Unlock will take the necessary steps to release its lien on the Property.

(e) On and after the Conversion Closing Date, You and Unlock will be co-owners of the Property, with the form of such co-ownership determined by Unlock.

Draft Do Not Sign

(f) Unlock agrees that You shall continue to have the right to remain in possession and reside in the Property until the Property is sold or transferred, as set forth in the Exchange Agreement. On and after the Conversion Effective Date, You shall not enter into a new lease, renew or extend an existing lease, or otherwise rent the Property, except in accordance with the terms and conditions of the Exchange Agreement.

(g) On and after the Conversion Effective Date, You agree that You shall remain responsible for all liabilities, costs, charges and any other amounts related to the ownership of the Property, including, without limitation, property taxes, assessments, maintenance and insurance. Unlock shall have no responsibility for payment of any of these items, and You agree that You shall not seek payment of such amounts by Unlock. You agree to defend, indemnify and hold Unlock harmless from all third-party claims directly or indirectly related in any way to such items. The indemnification provided by You herein shall be with respect to losses involving third parties and losses between You and the Unlock.

**2. Miscellaneous.**

(a) The Agreement will be governed by the law of the state in which the Property is located. Any lawsuit or arbitration arising directly or indirectly out of the Agreement will be contested in the venue where the Property is located.

(b) You understand that by entering into this Agreement you are transferring a portion of the ownership of Your Property to Unlock. You have consulted with your tax, legal, financial and estate planning advisors regarding the consequences of the Conversion.

(c) The Exchange Agreement and related Security Instrument shall remain in full force and effect in accordance with the terms and conditions thereof.

[SIGNATURE PAGE FOLLOWS]

Draft Do Not Sign

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Unlock Conversion Agreement as of the Conversion Effective Date.

| **UNLOCK PARTNERSHIP SOLUTIONS INC.:** | **OWNER:** |
|---|---|
| By: ______________ | By: ______________ |
| Title: ______________ | Title: ______________ |
| Date: ______________ | Date: ______________ |

Draft Do Not Sign

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF WASHINGTON )

COUNTY OF ____________________ ) SS.

)

I certify that I know or have satisfactory evidence that ________________________________, is the person who appeared before me, and said person acknowledged that he or she signed this instrument and acknowledged to be the free and voluntary act and deed of such individual, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed on ________________, ____________.

________________________________________
(Signature of Notary)

________________________________________
(Print or stamp name of Notary)
My Appointment Expires:
______________________

Draft Do Not Sign

## EXHIBIT C

## NOTICE ADDRESSES

Notice shall be effective when made in writing to the addresses below:

| UNLOCK: | OWNER: |
|---|---|
| Unlock Partnership Solutions Inc.<br><br>548 Market St, STE 31036<br>San Francisco, CA 94104<br><br>**Personal or Overnight Delivery**<br>Unlock Partnership Solutions Inc.<br>270 Madison Ave, Suite 702<br>New York, NY 10016<br><br>**Fax:** 844-916-4006<br><br>**Email:** support@unlock.com | Seung J. Seong and Do Youn Kim<br><br>607 194th Pl SE<br><br>Bothell, WA 98012<br><br>**Email:** seungjaeseong@gmail.com |

## EXHIBIT D

## CONSENT OF SPOUSE/DOMESTIC PARTNER

*None*, the spouse or registered domestic partner of Owner ("**Spouse**"), without assuming personal liability for the obligations under the Unlock Agreement, as an inducement to Unlock to enter into the Unlock Agreement, agrees to subject and subordinate Spouse's interest, whether arising as the result of being married to or the registered domestic partner of Owner or arising in any other manner, to the lien and security interest of the Unlock Agreement, and waives and releases all claims with respect thereto, including without limitation any claim for homestead exemption or allowance. Spouse agrees to the execution of the Unlock Agreement by Owner and agrees to be bound thereby to the extent of Spouse's interest in any assets or property of Owner and further agrees that the community assets of Owner and Spouse shall be bound thereby. This consent shall not be construed as an agreement by Spouse that Spouse's separate property is subject to the claims of Unlock arising out of enforcement of the Unlock Agreement.

**Spouse/Domestic Partner:**

By: ________________

Name: None

Date: ________________

Draft Do Not Sign

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

STATE OF WASHINGTON )

COUNTY OF ____________________ ) SS.

)

I certify that I know or have satisfactory evidence that ______________________________, is the person who appeared before me, and said person acknowledged that he or she signed this instrument and acknowledged to be the free and voluntary act and deed of such individual, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed on ________________, ____________.

________________________________________
(Signature of Notary)

________________________________________
(Print or stamp name of Notary)
My Appointment Expires:
______________________

Draft Do Not Sign

## EXHIBIT E

## ADMINISTRATION FEE SCHEDULE

| | |
|---|---|
| **Processing changes to Title:** | **$300.00** |
| Addition or removal of **Unlock Agreement** signatory | |
| Other changes to Title including change of Title to Trust | |
| **Processing Protective Advances made by Unlock (per advance) due to:** | **$250.00** [1] |
| Non-payment of property insurance, property taxes, mortgage or other obligation | |
| Deferred maintenance | |
| **Processing Subordination Requests:** | **$300.00** |
| **Recording and Reconveyance (per document):** | **$75.00** |
| Release of lien | |
| Quitclaim deeds | |
| Other requested release documentation | |
| **Processing an Owner Buyout or Partial Buyout:** | **$500.00** |
| **Processing a Permitted Sale:** | **$500.00** |
| **Administering an Event Of Default** | **$500.00 - $3500.00 (estimated)** [2] |

In addition to the fees itemized above, other actual, necessary, bona fide, reasonable, out-of-pocket fees and costs, customary to the area, which are paid by Unlock to third parties (including persons and entities retained by Unlock) may be charged to Owner from time to time during the Term or upon a Settlement Event, including fees and costs related to title, legal, recording, and appraisal, whether incurred in connection with an Event Of Default, a Settlement Event, or otherwise.

The above listed fees are estimates based on the current costs of the service provided. These fees are subject to change as the costs of providing any such services change. If a fee has changed at the time Owner requests any one of the above services, a disclosure of the then-current charge will be provided to Owner. Please note that additional fees for expediting requests may apply.

---

[1] Plus interest on amounts advanced, in accordance with the Unlock Agreement.

[2] The range of Administrative Fees and/or Protective Advances which may be charged by Unlock in connection with an Event Of Default is an estimate only, given the difficulty of actually predicting the cost. As a result, the actual amount of such Administrative Fees and/or Protective Advances may vary depending on the duration, and difficulty of resolution, of any given Event Of Default and may significantly exceed the estimate given here. Under no circumstances, however, shall Unlock charge any Administrative Fees or Protective Advances in connection with an Event Of Default unless they are customary, reasonable, bona fide and actually incurred. Interest may be charged on such Administrative Fees and/or Protective Advances, in accordance with the Unlock Agreement.

# EXHIBIT F

## GLOSSARY OF TERMS

Administration Fees are reasonable fees that may be charged to Owner by Unlock to perform various services during the Term, as described in Section 15.1.

Annualized Cost is the annualized percentage cost of the Investment Payment over the Term, as described in Section 10.

Annualized Cost Limit is a percentage cap on the Annualized Cost, as set forth in the Table of Key Terms and described in Section 10.

Approved Existing Loans are any pre-existing loans, as of the Effective Date, known to and approved by Unlock as described in Section 11.2.

Approved Subsequent Loans are loans secured by liens on the Property that are approved by Unlock and originated after the Effective Date, as described in Section 12.4.

Closing Costs are costs incurred in connection with the origination of the Unlock Agreement, any Permitted Sale or other sale of the Property, an Owner Buyout or a Partial Buyout, including, without limitation, recording fees and costs, credit reports, reconveyance fees, escrow fees, title report and insurance fees, federal, state, local and documentary transfer taxes, and real estate broker and other sales commissions.

Deferred Fees are Administration Fees for which Unlock elects, in its discretion, to defer payment until a later date, as described in Section 15.2.

Deferred Maintenance is any repair items, defects or conditions, or damage to the Property or its title which either existed as of the Effective Date or which occurred or developed during the Term, as described in Section 7.2.

Effective Date is the date of origination of the Unlock Agreement, as set forth in the Table of Key Terms.

Ending Home Value is the value of the Property at the time of a Settlement Event or Partial Buyout. It typically equals the Gross Sale Price if the home is being sold as described in Section 2.1(g). It is determined by a Property Appraisal if the home is not being sold as described in Section 8.5.

Escrow Agent is a title company or neutral third-party settlement agent, title agent or attorney closing firm reasonably acceptable to Unlock that closes or settles any transaction contemplated under the Unlock Agreement.

Event Of Default is a breach of the terms of the Unlock Agreement by Owner, as described in Section 16.

Exchange Rate is the price of the Unlock Agreement, as set forth in the Table of Key Terms.

Expiration Date is the date upon which the Unlock Agreement expires, as set forth in the Table of Key Terms. Reaching the Expiration Date is a Settlement Event, as described in Section 5.

Gross Sale Price is the gross price agreed upon by Owner and a new third-party buyer when the Property is being sold, as described in Section 2.1(g).

Improvement Adjustment is an adjustment to Ending Home Value that may be made so that Unlock does not share in any Property value attributable to Property improvements made by Owner during the Term, as described in Section 7.1.

Investment Payment is the gross cash payment paid by Unlock and received by Owner at origination, as set forth in the Table of Key Terms.

Investment Percentage is the Investment Payment expressed as a percentage of Starting Home Value, as set forth in the Table of Key Terms.

Last Surviving Signatory is the last surviving individual who is a signatory to the Unlock Agreement, including any signatory added by addendum after the Effective Date. The death of the Last Surviving Signatory is a Settlement Event, as described in Section 4.

Maintenance Addendum is an addendum to the Exchange Agreement (see Exhibit G) whereby Unlock reserves for a Maintenance Adjustment certain Deferred Maintenance items identified as of the Effective Date, as described in Section 7.2.

Maintenance Adjustment is an adjustment to Ending Home Value that may be made so that Unlock does not share in any loss in Property value attributable to Owner's failure to properly maintain the Property during the Term, as described in Section 7.2.

Maximum Unlock Share is the greatest amount the Unlock Share can be when determining the Settlement Payment or Partial Settlement Payment, as described in Section 10.

Net Closing Proceeds is the net amount you receive from the Unlock Agreement, as described in Section 1.5.2(c).

Non-Distressed Sale is a remedy to a foreclosure action by a mortgage lender, tax authority or other lien holder that Unlock, in its discretion, may offer to Owner. It is intended to result in a non-distressed sale of the Property and protect Owner's and Unlock's interest therein, as described in Section 17.8.

Non-Owner Occupants are residents of legal age who occupy the Property but who are not signatories to the Unlock Agreement, as described in Section 11.9.

Offered Value is the gross amount of any pending written offer for the purchase of the Property, as described in Sections 3.1(d) and 6.6.

Origination Fee is a fee charged to Owner by Unlock at closing to offset some of the processing and administrative costs of the Unlock Agreement, as set forth in the Table of Key Terms.

Owner Buyout is a Settlement Event in which Owner chooses to buy Unlock out in accordance with the provisions of Section 3.

Partial Buyout is similar to an Owner Buyout in which Owner may choose to buy out only a portion of the Unlock Agreement, as described in Section 6.

Partial Settlement Payment is the payment Unlock will receive from a Partial Buyout as described in Section 6.4.

Partial Unlock Share is the portion of the Unlock Share Owner may choose to buy out in a Partial Buyout as described in Section 6.4.

Permitted Encumbrances are all licenses, easements, or other title restrictions to the Property that are approved by Unlock, as described in Section 11.2.

Permitted Sale is a Settlement Event in which Owner sells the Property in accordance with the provisions of Section 2.

Property Appraisal is an independent determination of Property value as described in Section 8.

Property Inspection is an independent determination of Property condition as described in Section 9.

Protective Advances are payments made or expenses incurred by Unlock on Owner's behalf to protect the value of the Property, as described in Section 17.12.

Secured Obligation is an obligation secured by a lien on the Property, as described in Section 11.3.

Settlement Date is the date the Unlock Agreement is terminated and settled in accordance with the Unlock Agreement.

Settlement Event is an event which leads to the termination and settlement of the Unlock Agreement, as described in Section 1.8.2.

Settlement Payment is the payment Unlock will receive from a Settlement Event, as described in Section 1.8.1.

Settlement Statement is s statement provided by Unlock to You (or Your Estate) and Escrow Agent in connection with a Settlement Event.

Sharable Value is the adjusted Ending Home Value used to calculate the Unlock Share, as described in section 1.8.1.

Starting Home Value is the value of the Property determined by Unlock and agreed to by Owner as of the Effective Date, as set forth in the Table of Key Terms.

Term is the period of time between the Effective Date and the Settlement Date.

Total Home Finance is the total amount of financing that is secured by the Property during the Term, as described in Section 12.1.

Total Home Finance Limit is the percentage limit on the amount of financing that can be secured by the

Property, as set forth in the Table of Key Terms, described in Section 12 and subject to adjustment as provided in Section 14.8.

Unlock Percentage is the percentage of the home's future value that Unlock will share, as set forth in the Table of Key Terms.

Unlock Share is the dollar amount of Unlock's percentage share of the Sharable Value to be received from a Settlement Event, as described in section 1.8.1.

Unpaid Owner Obligations are the total of any unpaid Administration Fees, Deferred Fees, Protective Advances (and any associated interest or other charges), Appraisal Expenses, Inspection Expenses and other amounts expended by Unlock to protect its rights or the value of the Property, as described in Section 21.4.

Your Estate is the person or persons who will acquire legal title to Your interest in the Property on account of your death as described in Section 4. Depending on the terms of Your estate plan or if You do not have an estate plan, Your estate may include but is not limited to the executor(s), administrator(s) or personal representative(s) of Your estate, if Your interest in the Property will pass to such executor(s), administrator(s) or personal representative(s) on account of Your death, or the successor trustee(s) of Your revocable living trust if Your interest in the Property will pass pursuant to Your revocable living trust to such successor trustee(s) on account of Your death, or the person who is a beneficiary under a revocable transfer on death deed or its equivalent under applicable state law if Your interest in the Property will pass to such beneficiary on account of Your death.

# EXHIBIT G

## MAINTENANCE ADDENDUM TO UNLOCK AGREEMENT

Reference is made to that certain Unlock Agreement by and between Seung J. Seong and Do Youn Kim ("Owner") and [Unlock], its successors and assigns ("Unlock") in connection with the Property. Capitalized terms used herein are defined in the Unlock Agreement.

Section 7.2 of the Unlock Agreement provides for Unlock to identify, as of the Effective Date, on a Maintenance Addendum to the Unlock Agreement, certain repair items, defects or conditions on the Property (Deferred Maintenance), and expressly reserve such Deferred Maintenance items for application by Unlock of a Maintenance Adjustment in connection with the determination of the Sharable Value and the Unlock Share at the time of a Settlement Event, Partial Buyout or Event Of Default.

The following Deferred Maintenance items are so identified and reserved:

[maintenance items]

If the Deferred Maintenance items listed above have not been fully corrected or repaired by Owner at the time of any determination of the Sharable Value and the Unlock Share, Unlock will have the right under the Unlock Agreement to make, in consultation with one or more independent, third-party appraisers, property inspectors, home repair contractors and other experts not unaffiliated with Unlock, a commercially reasonable estimate of the dollar amount which is required, at that time, to repair such Deferred Maintenance, without reference to any repair estimates that may have been obtained by Owner, and to apply such dollar amount as a "Maintenance Adjustment" to Ending Home Value when calculating the Sharable Value, the Unlock Share and the Settlement Amount.

Unlock will have no liability in connection with, or for Owner's failure to cure, the Deferred Maintenance items listed above.

Draft Do Not Sign

This Addendum may be executed in counterparts.

**UNLOCK PARTNERSHIP SOLUTIONS INC.:**

By: ________________

Title: ________________

Date: ________________

**OWNER:**

______________________

Name: Seung J. Seong

**OWNER:**

______________________

Name: Do Youn Kim

Draft Do Not Sign

# - Exhibit B -

**WHEN RECORDED RETURN TO:**

Unlock Partnership Solutions Inc.
270 Madison Ave, Suite 702
New York, NY 10016

Exchange Agreement ID: 48748936044750

---

(Space Above for Recorder's Use)

# PERFORMANCE DEED OF TRUST

**Name of Grantor(s) (Owner):**

1. SEUNG J. SEONG
2. DO YOUN KIM

**Name of Grantee(s) (Beneficiary):**

1. UNLOCK PARTNERSHIP SOLUTIONS INC.

**Name of Grantee(s) (Trustee):**

1. CLEAREDGE TITLE, INC

**Abbreviated Legal Description:**

SECTION 18 TOWNSHIP 27 RANGE 05 QUARTER SW SUBDIVISION SUMMIT RIDGE BLK 000 D-00 LOT 29

Additional Legal Description Found On: Schedule A

**Property Address:**

607 194TH PL SE, BOTHELL, WA 98012

**Assessor's Property Tax Parcel Number or Account Number:** 01066200002900

**Reference Nos. of Documents Assigned or Released:** N/A

**NOTICE TO RECORDER:FOR PURPOSES OF ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE (RCW 62A.9), THIS INSTRUMENT CONSTITUTES A SECURITY AGREEMENT AND FIXTURE FILING WITH OWNER BEING THE DEBTOR AND BENEFICIARY BEING THE SECURED PARTY.**

This **PERFORMANCE DEED OF TRUST**, together with any riders hereto ("**Performance Deed of Trust**"), is made as of AUGUST 30, 2022 ("**Effective Date**"), among SEUNG J. SEONG AND DO YOUN KIM (each in his/her individual capacity and as grantor, individually or collectively,"**Owner**" or "**Grantor**"), and CLEAREDGE TITLE, INC ("**Trustee**"), and UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation, and its successors and assignees ("**Beneficiary**" or "**Unlock**").

## RECITALS

A. This Performance Deed of Trust is given in connection with the execution of that certain Forward Sale and Exchange Agreement ("**Exchange Agreement**"), which is hereby incorporated into this Performance Deed of Trust as if set forth in full, and entered into by and between Owner and Beneficiary, pursuant to which Owner (a) grants and conveys to Beneficiary the right to receive an undivided percentage interest (the "**Unlock Percentage**") in the future value of Owner's real property and the Improvements (as defined herein) thereon located in the County of SNOHOMISH, State of Washington, as more particularly described in Schedule A attached hereto and incorporated herein by this reference, and commonly known as 607 194TH PL SE, BOTHELL, WA 98012 ("**Land**"), and (b) agrees that upon the occurrence of certain events under the Exchange Agreement, Unlock has the right to convert the Unlock Percentage (the "**Conversion**") to an undivided fee simple ownership interest equal to the Unlock Percentage in and to the Real Property (as defined herein). In exchange for granting and conveying the Unlock Percentage to Beneficiary, Beneficiary paid to Owner a payment amount equal to ONE HUNDRED AND NINETY THOUSAND, FIVE HUNDRED AND NINE Dollars ($190,509.00) (the "**Investment Payment**"), subject to the terms and conditions of the Exchange Agreement.

B. Beneficiary desires to secure the rights granted to it in the Exchange Agreement and the performance of Obligations (hereinafter defined).

C. This Performance Deed of Trust is given pursuant to the Exchange Agreement, and payment, fulfillment, and performance of the obligations due under the Exchange Agreement, and certain other ancillary documents executed by Owner and Beneficiary concurrently herewith (which documents, together with this Performance Deed of Trust are collectively termed the "**Transaction Documents**") are secured by this Performance Deed of Trust in accordance with the terms set forth herein.

D. Pursuant to the Exchange Agreement, Owner has made certain covenants and promises to, or for the benefit of, Beneficiary in connection with the Real Property, all as more particularly described, and on the terms and conditions stated in the Exchange Agreement.

E. Execution of this Performance Deed of Trust is intended, among other things, to give notice, in the form set out in Schedule B attached hereto and incorporated herein by this reference, of (a) the Exchange Agreement, (b) certain rights and responsibilities of Owner as to Beneficiary, and (c) the covenants and promises set forth in the Exchange Agreement that run with the land and will be binding upon any person who acquires Owner's interest in the Real Property so long as the Exchange Agreement has not expired or been terminated.

1. **Grant in Trust.** OWNER DOES HEREBY IRREVOCABLY mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to and grant a security interest to Beneficiary and Trustee and their respective successors and assigns, with the power of sale in the following property, rights, interests and estates now owned, or hereafter acquired by Owner (collectively, the "**Property**"):

**a.** Real Property. The Land together with all improvements, replacements and additions now or hereafter erected on the Land (collectively, the "Improvements") and all easements, appurtenances and fixtures now or hereafter a part of the Land and Improvements (collectively, the "**Real Property**").

**b.** Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Real Property, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the "**Leases**") and all right, title and interest of Owner, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Owner or its agents or employees from any and all sources arising from or attributable to the Real Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Owner and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and

all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Settlement Payment. As used herein, "**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors. The assignments of Owner's interests under this clause (b) is a security interest in such interests, including the cash proceeds, cash, checks and deposit accounts relating thereto.

**c.** Insurance Proceeds. All insurance proceeds in respect of the Real Property under any insurance policies covering the Real Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Real Property (collectively, the "**Insurance Proceeds**").

**d.** Condemnation Awards. All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Real Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Real Property (collectively, the "**Awards**").

**e.** Easements and Rights of Way. All easements, rights of way, appurtenances and other rights used in connection with the Real Property or as a means of access thereto.

**f.** Additional Land. All additional lands, estates and development rights hereafter acquired by Owner for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Performance Deed of Trust which additional lands and estates shall, thereafter, automatically become part of the Land, as such term is used herein;

**g.** Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures, inventory and goods) and other property of every kind and nature whatsoever, owned by Owner, or in which Owner has or shall have an interest, or usable in connection with the present or future operation and occupancy of the Real Property and all building equipment, materials and supplies of any nature whatsoever owned by Owner, or in which Owner has or shall have an interest, or usable in connection with the present or future operation and occupancy of the Real Property (collectively, the "**Personal Property**"), and the right, title and interest of Owner in and to any of the Personal Property which may be subject to any security interests, as defined under the Uniform Commercial Code as in effect in the applicable jurisdiction (the "**UCC**"), superior in lien to the lien of this Performance Deed of Trust and all proceeds and products of the above; and

**h.** Other Rights. Any and all other rights of Owner in and to the items set forth in clauses (a) through (g) above.

**CONDITIONS TO GRANT:** TO HAVE AND TO HOLD the above granted and described Property

unto and to the use and benefit of Beneficiary and its successors and assigns, forever, WITH THE POWER OF SALE, to secure Owner's payment to Beneficiary of the Settlement Payment and the performance of the Obligations at the time and in the manner provided in the Transaction Documents and this Performance Deed of Trust;

**PROVIDED, HOWEVER,** these presents are upon the express condition that, if Owner shall well and truly (a) pay to Beneficiary the Settlement Payment at the time and in the manner provided in the Exchange Agreement, this Performance Deed of Trust and the other Transaction Documents, (b) perform the Obligations as set forth in the Exchange Agreement, this Performance Deed of Trust and the other Transaction Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Exchange Agreement, this Performance Deed of Trust and the other Transaction Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Owner's obligation to indemnify and hold harmless Beneficiary pursuant to the provisions hereof shall survive any such payment and release.

2. **Secured Obligations.**

**a.** Obligations. Owner makes the grant, transfer and assignment set forth in Section 1 for the purpose of securing the following "**Obligations**":

(1) the payment of the Settlement Payment;

(2) all other obligations of Owner contained herein;

(3) the payment and/or performance of all other obligations of Owner contained in the Transaction Documents;

(4) each obligation of Owner contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Exchange Agreement;

(5) any expenditures made by Beneficiary pursuant to, or under, this Performance Deed of Trust, including, without limitation, any Protective Advances; and

(6) payment of all fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively "**Attorneys' Fees**") incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Attorneys' Fees shall include, Attorneys' Fees incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Performance Deed of Trust, to the interpretation or enforcement of the parties' rights under this Performance Deed of Trust, or to the Property.

**b.** Investment Payment. Owner shall not be obligated to repay any part of the

Investment Payment; and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Owner to be paid pursuant to the Exchange Agreement.

3. **UCC Security Agreement and Fixture Filing.** This Performance Deed of Trust also is intended to be and shall constitute a "security agreement" within the meaning of the UCC for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the UCC. Owner hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

**a.** Owner agrees that Beneficiary may file either this Performance Deed of Trust, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index and/ or in the Department of Licensing of the State of Washington or other appropriate office of any state or jurisdiction, as a financing statement for any of the items specified above as part of the Property.

**b.** This Performance Deed of Trust constitutes a financing statement filed as a fixture filing pursuant to, and is effective in accordance with, the applicable provisions of Article 9 of the UCC, and any similar or successor provisions. With respect to said fixture filing (a) debtor is Owner and Owner's name and address appear in the first paragraph of this Performance Deed of Trust, and (b) the secured party is Beneficiary and Beneficiary's name and address appears in the first paragraph of this Performance Deed of Trust. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Owner. By executing and delivering this Performance Deed of Trust, Owner hereby grants to Beneficiary, as security for the Obligations, a security interest in all "accounts", "deposit accounts", "chattel paper", "equipment", "fixtures", "inventory", "general intangibles" and "goods" (as such terms are defined in the UCC) to the full extent that the foregoing may be subject to the UCC.

**c.** Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

**d.** Owner shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that Beneficiary may reasonably require.

**e.** On any default hereunder, Beneficiary shall have the remedies of a secured party under the UCC and may also invoke the remedies in Section 7. In exercising any of these remedies, Beneficiary may proceed against the items of Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the UCC or the remedies in Section 7.

4. **Assignment of Leases and Rents.** Owner hereby absolutely and unconditionally assigns to Beneficiary and Trustee all of Owner's right, title and interest in and to all current and future Leases and Rents; it being intended by Owner that this assignment constitutes a present, absolute assignment

and not an assignment for additional security only. For purposes of RCW §7.28.230 on perfection by recording, this assignment is "intended as security".

**a.** Owner hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Performance Deed of Trust, to collect the Rents, reserving unto Owner the right, prior to any default by Owner in payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

**b.** Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by appointment of a receiver, and without regard to the adequacy of any security for the Obligations secured hereby, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine. Beneficiary's rights under this clause (b) include its rights to appoint a receiver under all applicable laws, as in effect from time to time.

**c.** The collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Performance Deed of Trust, shall not cure or waive any default or notice of default under this Performance Deed of Trust or invalidate any act done pursuant to such notice.

**d.** Nothing in this section shall permit Owner to lease or rent the Property in contravention of any provision of the Exchange Agreement; nor shall anything in this section modify any provision in the Exchange Agreement relating to the use, lease or occupancy of the Property.

5. **Covenants, Representations and Warranties of Owner .** Owner hereby agrees as follows:

**a.** Owner represents and warrants that Owner has good and marketable title to the Property and has the right to grant and convey the Property.

**b.** Owner will observe and perform all of the covenants and agreements under the Transaction Documents.

**c.** To appear in and defend any action or proceeding purporting to affect the security of this Performance Deed of Trust or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' Fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Performance Deed of Trust or to collect the Obligations or to protect Beneficiary's rights under this Performance Deed of Trust; and/or (ii) in connection with the enforcement of any provisions of this Performance Deed of Trust or in connection with foreclosure upon the collateral granted under this Performance Deed of Trust (whether or not suit is filed).

**d.** To pay at least ten days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the

Property), which are prior or could obtain priority to the lien or to the rights granted under this Performance Deed of Trust, and all costs, fees and expenses of this Performance Deed of Trust.

(1) If Owner fails to make any payment or to do any act as provided in this Performance Deed of Trust, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary or Trustee to protect the security for this Performance Deed of Trust, which payments and related expenses (including Attorneys' Fees) shall also be secured by this Performance Deed of Trust.

(2) Such performance by Beneficiary or Trustee shall not require notice to, or demand on, Owner and shall not release Owner from any obligation under this Performance Deed of Trust.

(3) Beneficiary or Trustee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Performance Deed of Trust, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Performance Deed of Trust, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

**e.** To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Performance Deed of Trust; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the rate as specified in the Transaction Documents from the date of such demand (or as otherwise specified by applicable law), not to exceed the maximum rate allowed by law at the time of such demand.

**f.** To keep the Property in good condition and repair, and in a condition substantially similar to its condition on the date hereof, except for normal wear and tear and shall not remove or demolish any building thereon, and shall not materially destroy, damage or impair the Property, allow the Property to materially deteriorate or commit waste on the Property. Owner shall also comply with all laws affecting the Property or requiring any alterations or improvements to be made thereon and shall not permit any act upon the Property in violation of the law.

**g.** Not to initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.

**h.** On demand, to fully cooperate with Beneficiary in filing and recording this Performance Deed of Trust and any of the other Transaction Documents creating a lien or security interest or evidencing the lien hereof, including without limitation any financing statements, upon the Property and other collateral and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Beneficiary in, the Property.

Owner will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Transaction Documents, and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Transaction Documents or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

**i.** At the cost of Owner, and without expense to Beneficiary, to do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Beneficiary shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Beneficiary and Trustee the Property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Owner may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms of this Performance Deed of Trust or for filing, registering or recording this Performance Deed of Trust, or for complying with all legal requirements. Owner, on demand, will execute and deliver and hereby authorizes Beneficiary to file one or more financing statements or execute in the name of Owner to the extent Beneficiary may lawfully do so, one or more chattel mortgages or other instruments, to evidence more effectively the security interest of Beneficiary in the Property. Owner grants to Beneficiary an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Beneficiary at law and in equity, including without limitation such rights and remedies available to Beneficiary pursuant to this clause (i).

6. **Power of Attorney.** Owner hereby irrevocably appoints Beneficiary as Owner's attorney-in-fact (such agency being coupled with an interest). As such attorney-in-fact Beneficiary may, after providing notice to Owner pursuant to the Exchange Agreement (without the obligation to do so) in Beneficiary's name, or in the name of Owner, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default under this Performance Deed of Trust, take any other action required of Owner; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

7. **Default and Foreclosure and Power of Sale. Beneficiary shall give notice to Owner prior to enforcement following Owner's breach of any covenant or agreement in the Transaction Documents. The notice shall specify: (i) the default; (ii) the action required to cure the default; (iii) a date, not less than thirty (30) days from the date the notice is given to Owner, by which the default must be cured; and (iv) that failure to cure the default on or before the date specified in the notice may result in all sums secured by this Performance Deed of Trust becoming due and payable and sale of the Property. The notice shall further inform Owner of the right to reinstate after enforcement and the right to bring a court action to assert the non-existence of a default or any other defense of Owner to enforcement and sale. If the default is not cured on or before the date specified in the**

**notice, Beneficiary at its option may require immediate payment in full of all sums secured by this Performance Deed of Trust without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Beneficiary shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 7, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**In addition to all other remedies of Beneficiary and Trustee, upon the occurrence of a default, Beneficiary shall have the right to have the Property sold by the Trustee pursuant to the provisions of the laws of the State of Washington then in effect with respect to foreclosure pursuant to Trustee's sale under deeds of trust or, at Beneficiary's option, to have this Performance Deed of Trust foreclosed in judicial proceedings as a mortgage, and Beneficiary and Trustee shall have the right to exercise all other remedies provided for herein or by law, including the UCC. All rights and remedies of Beneficiary and Trustee are cumulative. Beneficiary and Trustee may exercise rights and remedies at such times and in such order as Beneficiary may elect. Subject to applicable law, in the exercise of rights and remedies, the Property, whether real or personal, and any portions thereof, may be sold, whether at Trustee's sale or execution sale after judicial foreclosure or in any other manner permitted by law, in one parcel or several parcels as Beneficiary may elect. If this Performance Deed of Trust is foreclosed as a mortgage in judicial proceedings, any judgment recovered shall bear interest at the rate applicable to Protective Advances as set forth in the Exchange Agreement upon the occurrence and during the occurrence of a default, not to exceed, however, the highest rate permitted by applicable law. Notwithstanding the foregoing, Beneficiary agrees not to foreclose on any fixtures, equipment or Personal Property prior to the expiration of the reinstatement period as provided under applicable law.**

**If Beneficiary invokes the power of sale, Beneficiary shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Beneficiary's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Beneficiary or Trustee shall mail copies of the notice as prescribed by applicable law to Owner and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Owner, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Beneficiary or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including but not limited to, reasonable Trustee's and attorneys' fees; (ii) to all sums secured by this Performance Deed of Trust, and (iii) any excess to the person or persons legally entitled to it.**

Notice provided to Owner under this Performance Deed of Trust shall be delivered to the address specified in Section 21 in accordance with the applicable terms and conditions of the Exchange Agreement unless otherwise required by applicable law.

**a.** Exercise of Beneficiary's remedies under this Performance Deed of Trust shall be in compliance with applicable law.

**b.** The power of sale under this Performance Deed of Trust shall not be exhausted by any one or more sales (or attempts to sell) as to all or any portion of the Property remaining unsold, but shall continue unimpaired until all of the Property has been sold by exercise of the power of sale herein contained and all Obligations of Owner to Beneficiary under the Performance Deed of Trust or other Transaction Documents have been paid in full.

**c.** Any proceeds of any disposition under this Section 7 shall not cure any Event of Default or reinstate any of the obligations secured under this Performance Deed of Trust for purposes of applicable law or otherwise.

**d.** Beneficiary may exercise its right to foreclose pursuant to the power of sale set forth herein, foreclose by judicial action pursuant to applicable law and/or seek any other remedy available at law or in equity to the maximum extent permitted by applicable law. Any provision of this Performance Deed of Trust which is prohibited or unenforceable in any jurisdiction, will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.

8. **Late Performance.** By accepting performance of any obligation after its due date, Beneficiary does not waive its right either to require prompt performance when due of all other obligations or to declare default for such failure to perform.

9. **Trustee's Powers.** At any time or from time to time, without liability therefor upon written request of Beneficiary and presentation of this Performance Deed of Trust, and without affecting the personal liability of any person for the performance of the Exchange Agreement secured hereby, Trustee may: (a) reconvey any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement thereon; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Performance Deed of Trust.

10. **Substitution of Trustee.** Beneficiary, or any successor in ownership of the Obligations, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named or acting under this Performance Deed of Trust, which instrument, when executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties. Such instrument must contain the name of the original Owner, Trustee and Beneficiary under this Performance

Deed of Trust, the book and page where this Performance Deed of Trust is recorded, and the name and address of the new Trustee(s). This procedure for substitution shall govern to the exclusion of all other provisions for substitution.

11. **Trustee's Compensation.** Owner shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this Trust, including Attorneys' Fees.

12. **Full Reconveyance.** Upon written request of Beneficiary stating that all Obligations have been performed or paid, and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held under this Performance Deed of Trust. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such recitals. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

13. **Reserved.**

14. **Successors.** This Performance Deed of Trust applies to, inures to the benefit of, and binds all parties to this Performance Deed of Trust, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "Beneficiary" shall include any successor or assignee of Beneficiary's rights in the Exchange Agreement and in this Performance Deed of Trust, whether or not named as Beneficiary in this Performance Deed of Trust. In this Performance Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

15. **Joint and Several Liability.** If more than one person signs this Performance Deed of Trust as Owner, the obligations of each signatory shall be joint and several.

16. **Multiple Owners.** If there are multiple Owners of the Property:

**a.** this Performance Deed of Trust must be signed by each such Owner;

**b.** all rights and powers specified for Owner in this Performance Deed of Trust must be approved and exercised unanimously by all such multiple Owners;

**c.** all such multiple Owners shall be jointly and severally liable for all liabilities and obligations specified for Owner under this Performance Deed of Trust;

**d.** notice required to be given by, or to, Owner will be deemed adequately given if given by, or to, any of Owners using the contact information set forth in Section 21; and

**e.** Beneficiary may treat any notice received from any one Owner as notice from all Owners.

17. **Revocable Trust.** If any Owner is/are the trustee(s) of a Revocable Trust (as defined herein):

**a.** all trustees of the Revocable Trust and all individuals having the power to

revoke the Revocable Trust (referred to herein as "owners of the Revocable Trust") must sign this Performance Deed of Trust in their respective capacities as trustees and/or owners of the Revocable Trust, and each trustee and owner of the Revocable Trust who signs this Performance Deed of Trust hereby represents and warrants that all trustees and owners of the Revocable Trust have been disclosed to Beneficiary;

**b.** any trustee of the Revocable Trust who is also an owner of the Revocable Trust need only sign this Performance Deed of Trust once for it to be binding on such person both as trustee and as owner of the Revocable Trust;

**c.** all rights and powers specified for, and all actions required of, Owner in this Performance Deed of Trust must be approved and exercised unanimously by all trustees of the Revocable Trust;

**d.** all trustees and all owners of the Revocable Trust shall be jointly and severally liable for all liabilities and obligations specified for Owner under this Performance Deed of Trust;

**e.** all representations and warranties by Owner in this Performance Deed of Trust are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all owners of the Revocable Trust;

**f.** notice required to be given by, or to, any Owner will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in Section 21; and

**g.** Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Owner.

As used herein, "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

18. **Acceptance by Trustee.** Trustee accepts this Trust when this Performance Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

19. **Extent of Lien. The lien granted under this Performance Deed of Trust shall encumber Owner's entire interest in the Property, notwithstanding the fact that the Exchange Agreement relates to only a fractional interest in the Property.**

20. **Miscellaneous.**

**a.** So long as any of the Obligations remain outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Owner in the Property or any part thereof (including the estate of Beneficiary after exercising the Conversion) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

**b.** Owner agrees, to the full extent that it may lawfully do so, that it will not at any time insist upon or plead or in any way take advantage of any appraisement, valuation, stay, marshalling of assets, extension, redemption or moratorium law now or hereafter in force and effect so as to prevent or hinder the enforcement of the provisions of this Performance Deed of Trust or the Obligations secured hereby, or any agreement between Owner and Beneficiary or any rights or remedies of Beneficiary. To the extent permitted by applicable law, Owner waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Obligations and marshaling in the event of foreclosure of the lien created by this Performance Deed of Trust, (iii) all rights and remedies which Owner may have or be able to assert by reason of the laws of the State of Washington pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Performance Deed of Trust or to any action brought to enforce any obligation secured by this Performance Deed of Trust, and (v) any rights, legal or equitable, to require marshaling of assets or to require foreclosure sales in a particular order, including any requirement under applicable law to require Beneficiary to resort to assets in a particular order or resort to certain assets before others. To the extent permitted by applicable law, Beneficiary shall have the right to determine the order in which any or all (i) of the Property shall be subjected to the remedies provided by this Performance Deed of Trust, and (ii) portions of the Obligations are satisfied from the proceeds realized upon the exercise of the remedies provided by this Performance Deed of Trust.

**c.** Notwithstanding Owner's obligations under Section 21.12 (Indemnification) of the Exchange Agreement, Owner agrees it will pay or reimburse Trustee and Beneficiary for all reasonable attorneys' fees, costs and expenses incurred by either of them in any suit, legal proceeding or dispute of any kind in which either of them is made a party or appears as party plaintiff or defendant, affecting the Obligations, this Performance Deed of Trust or the interest created herein, or the Property or any appeal thereof, including, but not limited to, activities related to enforcement of the remedies of Beneficiary, activities related to protection of Beneficiary's collateral, any foreclosure action or exercise of the power of sale, any condemnation action involving the Property or any action to protect the security hereof, any bankruptcy or other insolvency proceeding commenced by or against Owner, and any such amounts paid or incurred by the Trustee or Beneficiary shall be added to the Obligations and shall be secured by this Performance Deed of Trust. The agreements of this clause shall expressly survive in perpetuity satisfaction of this Performance Deed of Trust and repayment of the secured Obligations, any release, reconveyance, discharge or foreclosure of this Performance Deed of Trust, conveyance by deed in lieu of foreclosure, sale, and any subsequent transfer by Trustee's conveyance of the Property.

**d.** To the extent permitted by law, Owner hereby waives the provisions of any law prohibiting Beneficiary from making an election under any Transaction Document as to the application of proceeds.

**e.** Trustee or Beneficiary may collect a fee not to exceed the maximum amount permitted by applicable law for furnishing the statement of obligation.

**f.** In furtherance of Beneficiary's rights under the Exchange Agreement to inspect the Property, Beneficiary may: (i) obtain a court order to enforce Beneficiary's right to enter and inspect the Property in accordance with applicable law (including as to the costs relating thereto), and (ii) have a receiver appointed to enforce Beneficiary's rights to enter and inspect the Property for Hazardous Substances (as defined herein) in accordance with applicable law.

**g.** References in this Performance Deed of Trust to any statute or statutory provisions (including, without limitation, the UCC or applicable law) shall be deemed to be a reference to such statute or statutory provisions as amended or recodified from time to time.

**h.** Capitalized terms used in this Performance Deed of Trust shall have the meanings specified herein, or if not defined herein, in the Exchange Agreement. Except as expressly set out in this Performance Deed of Trust, if there is any conflict between the provisions of this Performance Deed of Trust and the provisions of the Exchange Agreement, the provisions of the Exchange Agreement shall control. In this Performance Deed of Trust, references to a Section or a Schedule shall be to a section or schedule of this Performance Deed of Trust unless otherwise stated.

21. **Notices.** All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Exchange Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

| **UNLOCK:** | **OWNER:** |
|---|---|
| Unlock Partnership Solutions Inc.<br><br>548 Market St, STE 31036<br>San Francisco, CA 94104<br><br>**Personal or Overnight Delivery**<br>Unlock Partnership Solutions Inc.<br>270 Madison Ave, Suite 702<br>New York, NY 10016<br><br>**Fax:** 844-916-4006<br><br>**Email:** support@unlock.com | Seung J. Seong and Do Youn Kim<br><br>607 194th Pl SE<br><br>Bothell, WA 98012 |

22. **Hazardous Substances.** As used in this Section 22: (a) "**Hazardous Substances**" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law (as defined herein) and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde,

and radioactive materials; (b) "**Environmental Law**" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "**Environmental Cleanup**" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "**Environmental Condition**" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Owner shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Owner shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Owner shall promptly give Beneficiary written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Owner has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Owner learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Owner shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Beneficiary for an Environmental Cleanup.

23. **Savings Clause.** This Performance Deed of Trust is subject to the express condition that at no time shall Owner be obliged or required to pay the Settlement Payment if such payment could subject Beneficiary to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate (as defined below). If, by the terms of this Performance Deed of Trust or the other Transaction Documents, Owner is at any time required or obliged to pay the Settlement Payment due hereunder which was calculated pursuant to the Exchange Agreement using amounts in excess of the Maximum Legal Rate, the Settlement Payment shall be deemed to be immediately reduced to be calculated taking into account Maximum Legal Rate. In this Section 23, "**Maximum Legal Rate**" shall mean the maximum non-usurious rate of return, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received in connection with the Settlement Payment and as provided for in the Transaction Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the provisions relating to the Transaction Documents and/or Settlement Payment.

24. **Reinstatement Pursuant to Applicable Law.** If Owner meets certain conditions, Owner shall have the right to have enforcement of this Performance Deed of Trust discontinued at any time before the earliest of: (a) five (5) days before sale of the Property pursuant to any power of sale contained

in this Performance Deed of Trust; (b) such other period as applicable law might specify for the termination of Owner's right to reinstate; or (c) entry of a judgment enforcing this Performance Deed of Trust. Those conditions are that Owner: (i) pays Beneficiary all sums which then would be due under the Transaction Documents as if no acceleration had occurred; (ii) cures any default of any other covenants or agreements; (iii) pays all expenses incurred in enforcing this Performance Deed of Trust, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Beneficiary's interest in the Property and rights under this Performance Deed of Trust; and (iv) takes such action as Beneficiary may reasonably require to assure that Beneficiary's interest in the Property and rights under this Performance Deed of Trust, and Owner's obligation to pay the sums secured by this Performance Deed of Trust, shall continue unchanged.

25. **Arbitration.**

**a.** In the event of any inconsistencies between the terms and conditions of the Transaction Documents (or any of them) and the terms and conditions of this Section 25, this Section 25 shall control and be binding.

**b.** SUBJECT TO APPLICABLE LAW, OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF BENEFICIARY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THIS AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES OF JAMS, THE RESOLUTION EXPERTS (THE "RULES"), AND BECAUSE THIS AGREEMENT SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE, THE PARTIES AGREE THIS AGREEMENT, INCLUDING ITS ENFORCEMENT, IS TO BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1 ET SEQ.

**c.** Procedure. OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, AND THAT A SINGLE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. OWNER HAS ACCEPTED JAMS RULES AND USE OF JAMS. OWNER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW, EXCEPT AS OTHERWISE SET FORTH HEREIN. OWNER UNDERSTANDS THAT UNLOCK WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND

PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED. THE ARBITRATION SHALL BE CONDUCTED IN ANY U.S. STATE WHERE THE REAL PROPERTY IS LOCATED.

**d.** Remedy. EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND BENEFICIARY. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER THE OWNER NOR BENEFICIARY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

**e.** Availability of Injunctive Relief. BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, IF BENEFICIARY ALLEGES OR CLAIMS A BREACH OF THE AGREEMENT WHERE THE VALUE OF THE PROPERTY OR THE UNLOCK SETTLEMENT PAYMENT IS AT A RISK OF MATERIAL LOSS. BOTH PARTIES UNDERSTAND THAT ANY SUCH BREACH OR THREATENED BREACH OF THE AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

**f.** Small Claims Court. NOTWITHSTANDING THE ARBITRATION AGREEMENT ABOVE, BOTH PARTIES AGREE THAT ANY PARTY MAY SEEK REMEDIES IN SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF SUCH COURT'S JURISDICTION PROVIDED THE COURT'S REQUIREMENTS ARE SATISFIED.

**g.** Class Action Waiver. ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR UNLOCK MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS.

**h.** Exchange Agreement. Notwithstanding clause (a) above, if any controversy, claim or dispute with Unlock under or in connection with the Exchange Agreement is subject to arbitration in Washington, is otherwise subject to the laws of Washington and/or if any provision of Section 20 (Arbitration) of the Exchange Agreement is not enforceable under the laws of Washington then Section 20 (Arbitration) of the Exchange Agreement will be deemed to be replaced by this Section 25.

26. **Applicable Law.** This Performance Deed of Trust will be governed by the law of the state in which the Real Property is located.

27. **Provisions Subject to Applicable Law.** All rights, powers and remedies provided in this Performance Deed of Trust may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Performance Deed of Trust invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable laws.

28. **State Specific Provisions.**

**a.** Principles of Construction. In the event of any inconsistencies between the terms and conditions of this Section 28 and the other terms and conditions of this Performance Deed of Trust, the terms and conditions of this Section 28 shall control and be binding.

**b.** No Agricultural Purposes. The Property conveyed hereby is not used principally for agricultural purposes.

**c.** Expenses During Redemption Period. If this Performance Deed of Trust is foreclosed as a mortgage and the Property sold at a foreclosure sale, the purchaser may during any redemption period allowed, make such repairs or alterations on the Property as may be reasonably necessary for the proper operation, care, preservation, protection and insuring thereof. To the fullest extent permitted by applicable law, any sums so paid together with interest thereon from the time of such expenditure at the maximum rate permitted by law, will be added to and become a part of the amount required to be paid for redemption from such sale.

**[Signatures on Following Page]**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS PERFORMANCE DEED OF TRUST, THE EXCHANGE AGREEMENT AND TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFICIARY AS OF THE EFFECTIVE DATE.

The undersigned Owner requests that a copy of any notice of default and any notice of sale under this Performance Deed of Trust be mailed to Owner and the address set forth in the Performance Deed of Trust.

IN WITNESS WHEREOF, each undersigned Owner has executed this Performance Deed of Trust as of the date set forth above.

**OWNER:**

________________________

Name: Seung J. Seong

**OWNER:**

________________________

Name: Do Youn Kim

## ACKNOWLEDGMENT

STATE OF WASHINGTON )

COUNTY OF __________________ ) SS.

)

I certify that I know or have satisfactory evidence that ______________________________, is the person who appeared before me, and said person acknowledged that he or she signed this instrument and acknowledged to be the free and voluntary act and deed of such individual, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed on _______________, ___________.

____________________________________
(Signature of Notary)

____________________________________
(Print or stamp name of Notary)
My Appointment Expires:
____________________

## ACKNOWLEDGMENT

STATE OF WASHINGTON )

COUNTY OF ___________________ ) SS.

)

I certify that I know or have satisfactory evidence that _______________________________, is the person who appeared before me, and said person acknowledged that he or she signed this instrument and acknowledged to be the free and voluntary act and deed of such individual, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed on ________________, ___________.

______________________________________
(Signature of Notary)

______________________________________
(Print or stamp name of Notary)
My Appointment Expires:
_____________________

## SCHEDULE A

## LEGAL DESCRIPTION

The following described real estate, situated in the County of Snohomish, State of Washington:

Lot 29 of Summit Ridge, as per plat recorded under Recording No. 200702145236, records of Snohomish County Auditor.

**Parcel ID / APN:** 01066200002900

[End of legal description]

## SCHEDULE B

**Notice of certain matters agreed in relation to the Real Property in the Exchange Agreement**

1. The initial term of the Exchange Agreement shall commence on the date of the Exchange Agreement and shall expire on **August 29, 2032 at 11:59:59PM EDT**.

2. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Real Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Exchange Agreement and this Schedule to the Performance Deed of Trust ("**Schedule**"), whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Exchange Agreement or this Schedule is contained in the instrument conveying such interest in the Real Property to such person or entity.

3. The Exchange Agreement covenants are deemed to be covenants running with the land, and include, without limitation, requirements that Owner:

   (a) not transfer the Real Property without giving prior written notice to Beneficiary and comply with specific sale procedures set forth in the Exchange Agreement;

   (b) maintain insurance on the Real Property against certain hazards and risks;

   (c) not increase the amount of debt to third parties secured by liens on the Real Property as specified in the Exchange Agreement;

   (d) pay all taxes and assessments accruing on the Real Property;

   (e) occupy the Real Property in accordance with the Exchange Agreement and not use the Real Property for commercial or other non-residential purposes;

   (f) keep the Real Property free of liens not approved by Beneficiary; and

   (g) protect and maintain the Real Property and ensure that use of the Real Property complies with all applicable state, federal and local laws and regulations.

4. The purpose of this Schedule is to give notice of the existence of Beneficiary's rights under the Exchange Agreement. If there is an inconsistency between the terms of this Schedule and the Exchange Agreement, the provisions of the Exchange Agreement shall control.

5. This Schedule shall remain in full force and effect until released by a written termination or quitclaim deed executed and notarized by Beneficiary and recorded in the real property records for the county where the Real Property is located, or until extinguished by operation of law.

6. Capitalized terms used in this Schedule shall have the meaning specified in this Schedule (including the Performance Deed of Trust) or if not defined in this Schedule shall have the meaning specified in the Exchange Agreement.

FILED
2026 MAR 16 03:48 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

The Honorable E. Rania Rampersad

SUPERIOR COURT OF THE STATE OF WASHINGTON
KING COUNTY

| | |
|---|---|
| SEUNGJAE SEONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation,<br><br>Defendant. | No. 26-2-04910-6 SEA<br><br>**NOTICE OF APPEARANCE**<br><br>***[Clerk's Action Required]*** |

TO: CLERK OF THE COURT

AND TO: PLAINTIFFS AND PLAINTIFFS' COUNSEL OF RECORD

PLEASE TAKE NOTICE that Fred B. Burnside of Davis Wright Tremaine LLP hereby appears in this action as counsel of record for Defendant Unlock Partnership Solutions Inc. and request that all further papers and pleadings, except original process, be served upon the undersigned attorney at the below stated address.



Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

DATED this 16th day of March, 2026.

Davis Wright Tremaine LLP
*Attorney for Unlock Partnership Solutions Inc.*

By *s/ Fred B. Burnside*
Fred B. Burnside, WSBA #32491
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: 206-622-3150
Email: fredburnside@dwt.com

.

# CERTIFICATE OF SERVICE

On March 16, 2026 I served a copy of the foregoing document on all counsel of record in the manner indicated:

***Attorneys for Plaintiffs***

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
206.816.6603 (Tel)
Beth E. Terrell, WSBA #26759
bterrell@terrellmarshall.com
Blythe H. Chandler, WSBA #43387
bchandler@terrellmarshall.com
Elizabeth A. Adams, WSBA #49175
eadams@terrellmarshall.com
Eleanor Eagan, WSBA #64463
eeagan@terrellmarshall.com

☐ Messenger
☐ U.S. Mail, postage prepaid
☐ Federal Express
☐ Fax
☒ ECF and/or EMAIL

**CASCADE LAW PLLC**
2707 Colby Avenue, Suite 1420
Everett, Washington 98201
425.998.8999 (tel)
Umar I. Gebril, WSBA #58227
umar@cascade.law

☐ Messenger
☐ U.S. Mail, postage prepaid
☐ Federal Express
☐ Fax
☒ ECF and/or EMAIL

**GUPTA WESSLER PLLC**
2001 K Street NW, Suite 850 North
Washington, DC 20006
202.888.1741 (Tel)
Thomas Scott-Railton, *PHV forthcoming*
thomas@guptawessler.com

☐ Messenger
☐ U.S. Mail, postage prepaid
☐ Federal Express
☐ Fax
☒ ECF and/or EMAIL

Executed March 16, 2026, at Seattle, Washington.

*s/ Fred B. Burnside*
Fred B. Burnside, WSBA #32491



Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

FILED
2026 MAR 17 04:04 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-04910-6 SEA

THE HONORABLE RANIA RAMPERSAD
Department 11

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
COUNTY OF KING

| | |
|---|---|
| SEUNGJAE SEONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation,<br><br>Defendant. | NO. 26-2-04910-6 SEA<br><br>**NOTICE OF ADDRESS CHANGE**<br><br>**(CLERK'S ACTION REQUIRED)** |

TO: THE CLERK OF COURT; and

TO: ALL COUNSEL OF RECORD

PLEASE TAKE NOTE that effective March 18, 2026, Terrell Marshall Law Group PLLC, counsel for Plaintiff, will relocate to new offices at the following address:

TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109

//

//

//

//



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

RESPECTFULLY SUBMITTED AND DATED this 17th day of March, 2026.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Blythe H. Chandler, WSBA #43387
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com
Blythe H. Chandler, WSBA #43387
Email: bchandler@terrellmarshall.com
Elizabeth A. Adams, WSBA #49175
Email: eadams@terrellmarshall.com
Eleanor Eagan, WSBA #64463
Email: bchandler@terrellmarshall.com
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
Telephone: (206) 816-6603

Umar I. Gebril, WSBA #58227
Email: umar@cascade.law
CASCADE LAW PLLC
2707 Colby Avenue, Suite 1420
Everett, Washington 98201
Telephone: (425) 998-8999

Thomas Scott-Railton, *PHV forthcoming*
Email: thomas@guptawessler.com
GUPTA WESSLER LLPC
2001 K Street NW, Suite 850 North
Washington, DC 20006
Telephone: (202) 888-1741

*Attorneys for Plaintiff and the Proposed Class*

## DECLARATION OF SERVICE

I, Blythe H. Chandler, hereby certify that on March 17, 2026, I caused true and correct copies of the foregoing to be served via the means indicated below:

| | |
|---|---|
| Fred B. Burnside, WSBA #32491<br>Email: fredburnside@dwt.com<br>DAVIS WRIGHT TREMAINE LLP<br>920 Fifth Avenue, Suite 3300<br>Seattle, Washington 98104-1610<br>Telephone: (206) 622-3150<br>Facsimile: (206) 757-7700 | ☐ U.S. Mail, postage prepaid<br>☐ Hand Delivered via Messenger Service<br>☐ Overnight Courier<br>☐ Facsimile<br>☐ Electronic Mail<br>☒ Via King County Electronic Filing Notification System |

*Attorneys for Unlock Partnership Solutions, Inc.*

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 17th day of March, 2026.

By: /s/ Blythe H. Chandler, WSBA #43387
Blythe H. Chandler, WSBA #43387



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com