THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SEUNGJAE SEONG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC., a Delaware corporation,<br><br>Defendant. | Case No. 2:26-cv-01023-JLR<br><br>**PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL ARBITRATION**<br><br>**NOTE ON MOTION CALENDAR**:<br>JUNE 26, 2026<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**JURY TRIAL DEMANDED** |

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

STATEMENT OF THE CASE ...............................................................................................2

    A.    Facing financial strain, Mr. Seong borrowed money from Unlock ...........................................................................................2

    B.    Unlock advances money in exchange for a future payment obligation secured by a mortgage .......................................................2

    C.    Unlock is guaranteed repayment, independent of the housing market ....................4

    D.    Unlock seeks to evade judicial scrutiny, including through mandatory arbitration .......................................................................5

LEGAL STANDARD ..............................................................................................................6

ARGUMENT ...........................................................................................................................6

    I.    Unlock's contract does not contain a delegation clause, and in any event this Court must adjudicate challenges to the validity of any such clause ...................6

        A.    Unlock's confusing and inconsistent contract does not clearly and unambiguously delegate arbitrability ..................................................6

        B.    This Court must adjudicate Mr. Seong's challenges to any delegation clause ....................................................................................7

    II.    The Truth in Lending Act prohibits arbitration here. ..............................................10

        A.    The transaction here was a residential mortgage loan under TILA .........................................................................................10

        B.    Unlock's arguments cannot be squared with TILA's text or Ninth Circuit caselaw .........................................................................13

    III.    Washington law also precludes arbitration of arbitrability and the merits .................................................................................19

        A.    Any purported delegation clause is unenforceable. ...................................19

        B.    The general arbitration provision is also unconscionable. ...........................22

CONCLUSION .......................................................................................................................23

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - i
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Fred Lind Manor,*
    103 P.3d 773 (Wash. 2004) ....................................................................................................19

*Attix v. Carrington Mortgage Services, LLC,*
    35 F.4th 1284 (11th Cir. 2022) ...............................................................................................9

*Bielski v. Coinbase, Inc.,*
    87 F.4th 1009 (9th Cir. 2023) ..............................................................................................8, 9

*Brookdale Senior Living Communities, Inc. v. Hardy,*
    2015 WL 13446704 (W.D. Wash. 2015) ...............................................................................20

*Buckman v. American Bankers Insurance Co. of Florida,*
    115 F.3d 892 (11th Cir. 1997) ..............................................................................................14

*Burnett v. Ala Moana Pawn Shop,*
    3 F.3d 1261 (9th Cir. 1993) ..........................................................................................*passim*

*Burnett v. Pagliacci Pizza, Inc.,*
    470 P.3d 486 (Wash. 2020) ...........................................................................................*passim*

*Caremark, LLC v. Chickasaw Nation,*
    43 F.4th 1021 (9th Cir. 2022) .................................................................................................9

*Coinbase, Inc. v. Suski,*
    602 U.S. 143 (2024) .............................................................................................6, 8, 9, 10

*Commonwealth v. Hometap Equity Partners, LLC.,*
    2025 WL 2468564 (Mass. Super. 2025) ....................................................................... 13, 17, 18

*DDK Hotels, LLC v. Williams-Sonoma, Inc.,*
    6 F.4th 308 (2d Cir. 2021) .....................................................................................................7

*Feeman v. Bridge It, Inc.,*
    2026 WL 880508 (S.D.N.Y. 2026) ............................................................................. 11, 13, 15

*Foster v. Equitykey Real Estate Investments L.P.,*
    2017 WL 1862527 (N.D. Cal. 2017) .....................................................................................18

*Fowler v. Equitable Trust Co.,*
    141 U.S. 384 (1891) .............................................................................................................10

*Fraser v. Goodale,*
    342 F.3d 1032 (9th Cir. 2003) ..............................................................................................16

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - ii
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

*Heckman v. Live Nation Entertainment, Inc.,*
    120 F.4th 670 (9th Cir. 2024) ...................................................................................................9, 21

*Honchariw v. County of Stanislaus,*
    530 F. Supp. 3d 939 (E.D. Cal. 2021), ...................................................................................16

*Honchariw v. County of Stanislaus,*
    2022 WL 522287 (9th Cir. 2022) ............................................................................................16

*In re Stone,*
    671 B.R. 752 (Bankr. D. Colo. 2025) ....................................................................................13

*In re Tristar Esperanza Properties, LLC,*
    782 F.3d 492 (9th Cir. 2015) ....................................................................................................8

*Johnson v. Ryan,*
    55 F.4th 1167 (9th Cir. 2022) ...................................................................................................6

*Knapke v. PeopleConnect, Inc,*
    38 F.4th 824 (9th Cir. 2022) ................................................................................................6, 17

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) .................................................................................................................17

*Lyons v. PNC Bank, National Association,*
    26 F.4th 180 (4th Cir. 2022) ...................................................................................................19

*Mattingly v. Palmer Ridge Homes LLC,*
    238 P.3d 505 (Wash. Ct. App 2010) .......................................................................................19

*McKee v. AT&T Corp.,*
    191 P.3d 845 (Wash. 2008).................................................................................................21, 22

*Mi Familia Vota v. Fontes,*
    129 F.4th 691 (9th Cir. 2025) .............................................................................................10, 11

*Moss v. Cleo AI Inc.,*
    799 F. Supp. 3d 1152 (W.D. Wash. 2025) .............................................................................12

*Muskal v. Point,*
    No. CV 2025-024855 (Ariz. Sup. Ct. 2025) ..........................................................................13

*Noel v. Roblox Corp.,*
    2024 WL 3747454 (N.D. Cal. 2024) .........................................................................................6

*Olson v. Unison Agreement Corp.,*
    2025 WL 2254522 (9th Cir. 2025) ...................................................................................*passim*

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - iii
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

*Orkin v. Taylor,*
    487 F.3d 734 Cir. 2007)............................................................................................19

*Orubo v. Activehours, Inc.,*
    780 F. Supp. 3d 927 (N.D. Cal. 2025) ....................................................................10

*Pandolfi v. Aviagames, Inc.,*
    2025 WL 2463742 (9th Cir. 2025) ...........................................................................20

*Revell v. Grant Money, LLC,*
    808 F. Supp. 3d 1036 (N.D. Cal. 2025)...................................................................13

*Roberts v. Unlock,*
    No. 1:24-cv-01374 (D.N.J. Dec. 2025).................................................................5, 13

*Schroeder v. Excelsior Management Group, LLC,*
    297 P.3d 677 (Wash. 2013)........................................................................................3

*State v. Kaiser,*
    254 P.3d 850 (Wash. Ct. App. 2011) .......................................................................20

*Tadych v. Noble Ridge Construction, Inc.,*
    519 P.3d 199 (Wash. 2022)......................................................................................22

*Taniguchi v. Kan Pacific Saipan, Limited,*
    566 U.S. 560 (2012) .................................................................................................10

*Teuscher v. CCB-NWB, LLC,*
    437 F. Supp. 3d 849 (E.D. Wash. 2020) .................................................................20

*Tu v. Experian Information Solutions, Inc.,*
    2025 WL 1134612 (S.D. Cal. 2025) ...........................................................................6

*United States v. Gonzales,*
    520 U.S. 1 (1997) .......................................................................................................8

*United States v. Rearden,*
    349 F.3d 608 (9th Cir. 2003) ...................................................................................13

*Westcott v. Wells Fargo Bank, N.A,*
    862 F. Supp. 2d 1111 (W.D. Wash. 2012) ..............................................................20

*Zuver v. Airtouch Communications, Inc.,*
    103 P.3d 753 (Wash. 2004).....................................................................................22

**Statutes, rules, and agency commentary**

12 C.F.R. Part 226, Supplement I, Subpart A ...............................................................17

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - iv
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

15 U.S.C. § 1602 ..............................................................................................................*passim*

15 U.S.C. § 1605 ...........................................................................................................................15

15 U.S.C. § 1639c ...........................................................................................................*passim*

RCW § 61.24.020 .......................................................................................................................3, 11

Fed. R. Evid. 803 .........................................................................................................................16

Fed. R. Evid. 902 .........................................................................................................................16

## Other authorities

*All-Transactions House Price Index for Seattle-Bellevue Kent, WA (MSAD),*
     Federal Reserve of St. Louis ..................................................................................................16

*All-Transactions House Price Index for Washington,* Federal Reserve of St. Louis.......................16

*American Heritage Dictionary* (1st ed. 1969) ...........................................................................11, 17

*American Heritage Dictionary* (5th ed. 2018)..................................................................................8

*Black's Law Dictionary* (12th ed. 2024) ...................................................................... 11, 15, 18

*Comprehensive Arbitration Rules & Procedures,* JAMS .................................................................20

*Cornell Law School, Legal Information Institute* ...........................................................................8

*Issue Spotlight: Home Equity Contracts,* CFPB (Jan. 15, 2025)..........................................................4

*New Lawsuit Alleges Deceptive Home Equity "Investments" Strip Homeowners of Hard-Earned
     Equity,*
     AARP (Feb. 11, 2026) .........................................................................................................5

Flávia Furlan Nunes, *Unlock CEO Jim Riccitelli says home equity investments
     need 'purpose-built regulation,'* HousingWire (May 4, 2026) .......................................................14

*Oxford American Dictionary* (1980) ...........................................................................................11

Deborah Rankin, *Why Shared Mortgages Are Hard to Get,* N.Y. Times (Apr. 18, 1982) ............18

*Restatement (Second) of Contracts* § 25 ........................................................................................17

Truth in Lending; Official Staff Commentary,
     46 Fed. Reg. 50288-01 (Oct. 9, 1981) ......................................................................................18

*Webster's New Collegiate Dictionary* (9th ed. 1983) ..............................................................10, 11

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - v
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

## INTRODUCTION

For many Americans, their home is their financial anchor. For that reason, state and federal laws create strong protections for homeowners who use their homes as collateral for a debt in exchange for an advance of money. These laws were further strengthened after the 2008 financial crisis, which exposed the dangers of complex mortgage products with risks that homeowners don't understand. Such safeguards are critical for homeowners. But they also limit some of the most lucrative predatory practices.

As a result, companies like Unlock seek out ways to evade these rules. Unlock has designed a complex mortgage that poses greater risks than traditional mortgages, but purports to be exempt from laws protecting homeowners. Seungjae Seong, a working father with two young children, is one of the thousands of homeowners who have been ensnared by Unlock. After losing his job, Mr. Seong was facing financial difficulties and borrowed approximately $190,000 from Unlock. Unlock received a deed of trust on his home. What Mr. Seong didn't realize is that when he sold his home a few years later, he would have to pay Unlock vastly more money than he received. Just two-and-a-half years later, Mr. Seong was required to pay Unlock approximately $319,000. That amounts to an interest rate of over 25% (especially when accounting for opaque fees Unlock charges), far higher than other mortgage loans and more than Washington law allows.

Unlock cannot deny that it fails to follow federal and state mortgage laws. Instead, it claims that it didn't have to. According to Unlock, the transaction by which it advanced Mr. Seong money, required him to pay the company within 10 years, and took a mortgage on his house was somehow not a residential mortgage loan. But courts across the country, including the Ninth Circuit, have rejected the same arguments. And so have states and regulators, including in Washington.

To evade judicial scrutiny, Unlock is trying to force Mr. Seong out of court and into arbitration. But under the Truth in Lending Act, "[n]o residential mortgage loan ... may include terms which require arbitration." 15 U.S.C. § 1639c(e)(1). And, despite Unlock's claims to the contrary, the transaction here was a residential mortgage loan.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 1
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

Unlock argues that this Court lacks the power to decide whether a federal statute bars mandatory arbitration because Unlock's contract purportedly contains a "delegation clause," which is an agreement to arbitrate disputes over the validity of the contract's broader arbitration provision. But there is no such clear and unambiguous delegation. And in any event, a delegation clause is itself just a specific kind of arbitration requirement. It's therefore just as invalid under TILA as any other arbitration requirement in a residential mortgage loan.

Finally, even if the delegation clause and arbitration provision were not invalid under TILA, they are unenforceable under Washington law.

STATEMENT OF THE CASE

**A.    Facing financial strain, Mr. Seong borrowed money from Unlock.**

In 2018, Mr. Seong and his wife purchased a home in Bothell, Washington, where they lived with their two young children. Seong Decl. ECF 1-1 ¶4.51.[1] But in 2022, Mr. Seong lost his job and was only able to find employment in his field in North Carolina. Seong Decl. ¶4. To reduce the disruption for his family, his wife and children continued to live in Bothell. *Id.* ¶4-6. Mr. Seong rented an apartment in North Carolina but frequently traveled back. *Id.* The travel and multiple residences, as well as the period of unemployment between jobs, strained the family's finances. *Id.*

Mr. Seong learned about Unlock through an online advertisement and applied. *Id.* ¶8. Unlock uses a non-negotiable form contract. *Id.* ¶10-12. In total, the transaction amounted to dozens of pages across different documents, filled with complicated terms and cross-references. *Id.* ¶13; Exs. A, B.[2] As a result, Mr. Seong did not realize that he would be forced to pay Unlock vastly more money than he received, even if his house lost value. Seong Decl. ¶37.

**B.    Unlock advances money in exchange for a future payment obligation secured by a mortgage.**

Unlock advances money to homeowners in exchange for a future payment obligation, secured by a mortgage. Here's how it worked here:

---

[1] Unless otherwise noted, all quotation marks, citations, and alterations have been omitted from quotations.

[2] Unless otherwise noted, exhibits refer to exhibits to Mr. Seong's declaration.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 2
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

*First,* Unlock offered Mr. Seong an advance of $190,500, which was equivalent to approximately 16.57% of the appraised value of the home. Ex.A at 2. Mr. Seong did not actually receive this amount, however, as Unlock charged thousands of dollars in opaque fees, including a $5,715.27 "Origination Fee." *Id.*

*Second,* Unlock's contract required Mr. Seong to pay Unlock 28.16% of the home's value in 10 years or less. Under Unlock's contract, when one of four "Settlement Event[s]" occurs, Unlock receives a "Settlement Payment" consisting of 28.16% of the home's value. Ex.A at 2, §§ 1.8.1(e), 1.8.2.[3] This payment is triggered by whichever Settlement Event happens first: (1) if Mr. Seong sells his home, he must pay Unlock 28.16% of the sale price; (2) if he wants to pay off the loan without selling his home, he must pay Unlock 28.16% of its value; (3) if he and his wife were to die, this triggers payment through essentially the same mechanism as a buyout or sale; or (4) if the 10-year term expires, this triggers payment through essentially the same mechanism. *Id.* §§ 1.7.2, 1.8.2, 2.1(g), 2.3-4, 3.1(c), 4.4, 5.1.[4]

*Third,* this future payment was secured by a deed of trust on Mr. Seong's home. Ex.B at 7-8, 11-12. A deed of trust is a form of mortgage. *See* RCW § 61.24.020 ("[A] deed of trust is subject to all laws relating to mortgages on real property."). It states that Mr. Seong is "the debtor" and that it serves "to secure [his] payment to [Unlock] of the Settlement Payment." Ex.B at 2, 5. This ensures that if Mr. Seong defaulted—such as by not paying Unlock's Settlement Payment—Unlock could nonjudicially foreclose to obtain the payment. *See, e.g., Schroeder v. Excelsior Mgmt. Grp., LLC,* 297 P.3d 677, 682 (Wash. 2013) (noting "the relative ease with which lenders can forfeit borrowers' interests ... in conducting nonjudicial foreclosure sales").

---

[3] The "Settlement Payment" is capped at the "Annualized Cost Limit," Ex.A at 2, calculated as the initial advance plus 21% *compound* interest using the formula for compound interest, ECF 1-1 ¶4.33 n.2. For brevity, Mr. Seong will generally refer to Unlock's payout of 28.16%, as the cap makes no substantive difference to the arguments.

[4] With death or expiration of the 10-year term, if the homeowner (or estate) doesn't pay Unlock directly or sell the home, Unlock forces the sale to get its 28.16% payment. Ex.A §§ 4.7, 5.5. Either way, it obtains its payment.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 3
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

The result of this contract was that when Mr. Seong's family needed to sell their home to relocate to North Carolina just two-and-a-half years later, he had to pay Unlock $318,898.70. Seong Decl. ¶30.[5] That represents an annual simple interest rate of over 25%—especially after accounting for the thousands in opaque fees Unlock deducted from the principal—exceeding Washington's statutory maximum, RCW 19.52.020(1), 31.04.105(1). And it's far more than other home-secured credit. *See Issue Spotlight: Home Equity Contracts*, CFPB (Jan. 15, 2025), https://perma.cc/7VPW-DVJJ.

### C.    Unlock is guaranteed repayment, independent of the housing market.

As reflected in the name "Unlock Partnership Solutions," Unlock portrays itself as "a partner in homeownership." ECF 12, Ex.E at 19. Similarly, Unlock (at 2-3) presents itself as risking a loss if the home loses value, as an actual partner would. Neither is true.

Terms buried in Unlock's contract state that "Unlock shall not be deemed a partner" of the homeowner. Ex.A § 21.14. Indeed, Unlock doesn't assume co-ownership responsibilities: Mr. Seong was required to cover all costs, including taxes, repairs, and insurance that covered Unlock. *See, e.g., id.* § 1.9. Otherwise, Unlock could foreclose or make "protective advances," which accrue interest and must be paid back. *Id.* § 17.12. And while Unlock receives a large percentage of the home's sale price, homeowners are required to cover the costs of selling the home. *Id.* § 1.8.3.

Unlock also structured the transaction to ensure it will be paid far more than it advanced, even if a home loses value. Unlock required Mr. Seong to pay far more of the value of his home (28.16%) than Unlock advanced (16.57%). ECF 1-1 ¶4.34. For Unlock's payout to drop below its advance, Mr. Seong's Bothell home would have needed to drop in value by around 41% (or even more when accounting for Unlock's thousands in opaque fees). *Id.* Federal data going back a half-century shows that average home prices in the Seattle area and Washington have never fallen nearly

---

[5] The complaint (and Unlock's exhibit) refer to Unlock's "Payoff Request Statement" seeking slightly over $320,000. ECF 1-1 ¶4.70; ECF 12 Ex. D. However, because the 21% compound interest cap applied and the sale closed earlier than anticipated, this slightly reduced the amount of interest, resulting in a final payment of $318,898.70. Seong Decl. ¶30. This small discrepancy in amount does not change the substantive analysis.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 4
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

that much. *Id.* ¶4.35. The worst drop was during the 2008 crisis, when prices still only fell 25%. *Id.* So Unlock will be fully repaid absent a catastrophic crash nearly twice as bad as 2008—a crash in which other mortgage lenders would also see devastating losses. *Id.* ¶¶4.36-37.

After locking homeowners into mortgage loans, Unlock securitizes them to sell to Wall Street investors for hundreds of millions of dollars. ECF 1-1 ¶¶4.84-87. Its 2023 security offering was awarded the "Residential Mortgage Backed Security of the Year." *Id.* ¶4.87. And while Unlock argues in court that it risks not being paid back, it reassures its investors that it will make returns independent of "housing cycles" and "broader markets." *Id.* ¶4.49.

### D.    Unlock seeks to evade judicial scrutiny, including through mandatory arbitration.

Unlock requires homeowners to sign a document stating that "[t]o the fullest extent possible," the transaction is "not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings [and] disclosures." Ex.A § 21.5. But courts across the country have repeatedly rejected the argument that mortgages like Unlock's are not subject to lending laws. *See, e.g., Olson v. Unison Agreement Corp.,* No. 23-2835, 2025 WL 2254522, at *3-5 (9th Cir. 2025). So has the Washington Department of Financial Institutions. *See, e.g., Olson,* DFI Amicus Br., Dkt. 22-1, at 5-6 (Mar. 5, 2024). And organizations like the AARP are trying to protect their members from these predatory loans. *New Lawsuit Alleges Deceptive Home Equity "Investments" Strip Homeowners of Hard-Earned Equity,* AARP (Feb. 11, 2026), https://perma.cc/H4Z9-4FFD.

So Unlock uses its arbitration provision to strategically delay litigation. In a recent case in the District of New Jersey, Unlock litigated a motion to compel arbitration for over a year—only to suddenly withdraw the motion after a hearing where the judge indicated she would deny it because TILA prohibits arbitration provisions in residential mortgage loans. *Roberts v. Unlock,* No. 1:24-cv-01374, Dkt. 106 (D.N.J. Dec. 10, 2025). The judge noted that Unlock's withdrawal didn't seem "to really be made in good faith," but rather was "done solely because the Court apparently gave an indication that... it would likely not be a favorable decision." *Id.,* Dkt. 126 at 10, 14 (Dec. 12, 2025).

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 5
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

## LEGAL STANDARD

"[T]he [Federal Arbitration Act's] procedure mirrors the three phases of federal civil lawsuits: a motion to compel arbitration akin to a motion to dismiss; followed by optional discovery before summary judgment, if the motion is denied; followed by a mini-trial, if necessary." *Knapke v. PeopleConnect, Inc*, 38 F.4th 824, 833 (9th Cir. 2022). Thus, a court first determines if the motion can be decided "as a matter of law" like "a motion to dismiss." *Noel v. Roblox Corp.*, 2024 WL 3747454, at *6 (N.D. Cal. 2024). If not, "the case moves to the next phase: [arbitration-related] discovery." *Id.*; *see also Tu v. Experian Info. Sols., Inc.*, 2025 WL 1134612, at *9 (S.D. Cal. 2025). Following that, a court must evaluate whether any genuine disputes of material fact exist, *Knapke*, 38 F.4th at 831, which requires "view[ing] the evidence in the light most favorable to the nonmoving party," *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022). And if factual disputes remain, the case proceeds to a mini-trial on arbitration, for which Mr. Seong requests a trial by jury.

## ARGUMENT

### I. Unlock's contract does not contain a delegation clause, and in any event this Court must adjudicate challenges to the validity of any such clause.

Unlock claims that this Court lacks the power to determine whether federal or state law prevent Unlock from enforcing any arbitration requirements in the contract. According to Unlock, its arbitration provision contains a so-called delegation clause, which delegates questions of "arbitrability" about the validity and enforceability of the broader arbitration provision. This is wrong twice over. *First,* Unlock's contract contains no clear and unmistakable delegation. *Second,* even if it did, Mr. Seong expressly challenges that any delegation clause is itself unenforceable under federal and state law. This Court must resolve those challenges before compelling arbitration. *Coinbase, Inc. v. Suski,* 602 U.S. 143, 151 (2024).

#### A. Unlock's confusing and inconsistent contract does not clearly and unambiguously delegate arbitrability.

Any delegation must be "clear and unmistakable." *Coinbase,* 602 U.S. at 149. Unlock says (at 8) that standard is satisfied because the contract states that arbitration will take place under JAMS

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 6
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

rules. But even if a reference to arbitral rules may be sufficient in some cases, as with any contract interpretation, "context matters," and "other aspects of the contract [can] create ambiguity as to the parties' intent." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021).

Here, Unlock's reference to the JAMS rules is confusing and contradictory. It states that arbitration will take place "under the arbitration rules of JAMS, the resolution experts (the 'Rules')." Ex.A § 20.2.[6] But it then states that "to the extent that the applicable JAMS' arbitration rules conflict with the Rules, the Rules shall take precedence." *Id.* § 20.3. This suggests that "the Rules" are not the JAMS rules—which are supposedly the source of the delegation clause—but another unspecified set of rules that governs arbitration and displaces JAMS' rules. And the contract later says that "any party may petition a court for injunctive relief as permitted by the Rules," suggesting that these Rules—whatever they are—can permit a party to go to court. *Id.* § 20.5.

Further confusing things, the contract states that: "Except as provided by the Rules and the Unlock Agreement, arbitration shall be the sole, exclusive and final *remedy* for any dispute between the Owner and Beneficiary." *Id.* § 20.4 (emphasis added). This establishes that a "remedy" means a dispute-resolution mechanism. But the next sentence says that "[r]emedies that would otherwise be available to owner under applicable federal, state or local laws shall remain available." *Id.* That would seem to mean that other dispute resolution mechanisms—*i.e.*, courts—remain available to decide questions such as arbitrability. That's bolstered by the next sentence, which states that punitive and consequential damages do *not* remain available, suggesting that "remedies" doesn't refer to relief in the ordinary sense. *Id.* Putting these confusing provisions together, it wouldn't be clear and unambiguous to a regular person what kinds of things they have agreed to arbitrate and under what "rules." And therefore, it's not clear and unambiguous that the contract requires a homeowner to give up their right to have a court decide whether the arbitration clause is valid.

### B.    This Court must adjudicate Mr. Seong's challenges to any delegation clause.

Even if Unlock's contract did contain a delegation clause, this Court must adjudicate Mr. Seong's specific challenges to the validity of that clause before compelling arbitration.

---

[6] When text in documents is in all capital letters, capitalization is omitted from the quotation.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 7
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

1. As the Supreme Court recently explained, this follows from "the fundamental principle that arbitration is a matter of contract." *Coinbase*, 602 U.S. at 147. To "refer[] a dispute to an arbitrator," there must be some valid and enforceable arbitration agreement. *Id.* at 149. And a delegation clause "is simply an additional, antecedent agreement" to arbitrate arbitrability that is subject to the same principles as "any other." *Id.* at 148. Accordingly, "[i]f a party challenges the validity of the precise agreement to arbitrate at issue"—which here is a delegation clause—"the federal court *must* consider the challenge before ordering compliance with that arbitration agreement." *Id.* at 151. "To hold otherwise would be to impermissibly elevate a delegation provision over other forms of contract." *Id.* at 152.

"[T]o sufficiently challenge a delegation provision, the party resisting arbitration must specifically reference the delegation provision and make arguments challenging it." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1011 (9th Cir. 2023). Here, Mr. Seong expressly challenges that any delegation clause would be invalid under TILA and Washington law.

*First,* under TILA, "[n]o residential mortgage loan ... may include terms which require arbitration ... as the method for resolving *any* controversy or settling any claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1) (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). A "controversy" means broadly a "dispute." Controversy, *American Heritage Dictionary* (5th ed. 2018); Controversy, *Cornell L. Sch., Legal Information Institute*, https://perma.cc/KAT5-QEBP ("actual dispute"). And "'[a]rising out of' are words of much broader significance than 'caused by'" and include "'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with.'" *In re Tristar Esperanza Props., LLC*, 782 F.3d 492, 497 (9th Cir. 2015). Accordingly, section 1639c(e)(1) prohibits requiring arbitration to resolve disputes of any kind incident to or connected with a residential mortgage transaction.

And a delegation clause is a "term[]" that "require[s] arbitration" to resolve a "controversy" about the validity of the residential mortgage contract's broader arbitration

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 8
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

provision. 15 U.S.C. § 1639c(e)(1). It is, therefore, an agreement to arbitrate a dispute incident to or connected with a residential mortgage transaction—just what TILA forbids. Thus, Mr. Seong's argument that the transaction here is a residential mortgage loan invalidates a delegation clause just as much as any other arbitration provision. *See infra* 11-22.

*Second*, Mr. Seong specifically challenges that the delegation clause itself is procedurally and substantively unconscionable under Washington law. *See infra* 22-26.

2. Unlock suggests that a party must challenge the validity of a delegation clause on grounds that do not also apply to the arbitration provision or contract as a whole. Unlock Br. 8 n.4. The Supreme Court recently explicitly rejected that argument. *Coinbase*, 602 U.S. at 151. Where a party challenges a delegation clause on grounds that "appl[y] equally to the whole contract and to an arbitration or delegation provision, a court *must* address that challenge." *Id.* (emphasis added). And "[i]n deciding whether a delegation clause is unenforceable, [a court's] analysis is not limited to the bare text of the clause." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 680 (9th Cir. 2024).

Unlock relies on a pre-*Coinbase* decision, *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1033-34 (9th Cir. 2022). But *Caremark* itself recognized that "a court must … resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration." *Id.* at 1030. It's just that in *Caremark*, the plaintiff's argument—about a different statute with different language that didn't expressly forbid terms requiring arbitration—"d[id] not call into question the district court's authority to enforce the delegation clause." *Id.* at 1034.

Unlock also cites the Eleventh Circuit's decision in *Attix*, but *Attix* not only predates *Coinbase*, the Ninth Circuit has explicitly rejected it. *Bielski*, 87 F.4th at 1011. Further, *Attix* expressly did not reach 15 U.S.C. § 1639c(e)(1), the TILA provision at issue here, because it was not "at issue." *Attix v. Carrington Mortg. Servs, LLC*, 35 F.4th 1284, 1292 n.4 (11th Cir. 2022). Unlock also cites (at 10) a few district court decisions (only one from this circuit) that predate both *Coinbase* and *Bielski*, rely on *Attix*, and do not grapple with 1639c(e)(1)'s plain text as applied to delegation clauses.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 9
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

Mr. Seong argues that any delegation clause itself is invalid and this Court "*must* consider the challenge." *Coinbase*, 602 U.S. at 151.

## II. The Truth in Lending Act prohibits arbitration here.

Unlock's product is a residential mortgage loan under TILA's plain text. Accordingly, it may not "include terms which require arbitration"—whether of the merits or arbitrability. 15 U.S.C. § 1639c(e)(1).

### A. The transaction here was a residential mortgage loan under TILA.

TILA defines a "residential mortgage loan" broadly as "any consumer credit transaction ... secured by a mortgage [or] deed of trust ... on a dwelling." 15 U.S.C. § 1602(dd)(5). Unlock disputes only (at 11-15) that its product qualifies as "credit," but TILA's plain text shows otherwise as a matter of law.

1. Statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 712 (9th Cir. 2025). If there is any ambiguity, TILA must be "liberally construed to protect consumers." *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993). And to ensure companies can't circumvent TILA, courts must look "past the form of the transactions to their economic substance in deciding whether [TILA] applie[s]." *Id.* This reflects "Congress's concern with ensuring creditors could not evade TILA by characteriz[ing] their transactions so as to fall one step outside whatever boundary Congress attempted to establish." *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 938 (N.D. Cal. 2025). This principle has a long pedigree: "There is no more familiar rule in the law than that the [lending] laws cannot be evaded by mere pretenses, shifts, or evasions." *Fowler v. Equitable Tr. Co.*, 141 U.S. 384, 403 (1891).

TILA's definition of credit easily encompasses Unlock's mortgage loan. TILA defines the term "credit" broadly as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The term "debt" is not defined, so courts "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In ordinary English, a "debt" is "something owed." Debt, *Webster's New Collegiate Dictionary* (9th

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 10
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

ed. 1983); Debt, *American Heritage Dictionary* (1st ed. 1969) ("something owed, as money, goods, or services"); Debt, *Oxford American Dictionary* (1980) (same). Unlock appears to agree that debt includes a "state of being under obligation to pay or repay someone or something in return for something received." Unlock Br. 12 (quoting *Feeman v. Bridge It, Inc.*, 2026 WL 880508, *7 (S.D.N.Y. 2026)). Thus, "credit" broadly means the right to defer payment of "something owed."

**2.** Unlock's mortgage loan falls comfortably within this definition. Mr. Seong received an advance from Unlock. In exchange, he assumed an obligation to pay Unlock a "Settlement Payment" of 28.16% of the value of his home. Ex.A at 2, §§ 1.8.1(e), 1.8.2. Unlock gave him a right to defer that payment for 10 years—or less if a settlement event, such as sale of the home, occurred earlier. *Id.* § 1.3.4 (Unlock "waives ... its right to receive" its Settlement Payment "until the occurrence of a Settlement Event").

Not only that, Unlock secures this payment obligation with a deed of trust, a quintessential instrument for securing a debt. RCW § 61.24.020; Deed, *Black's Law Dictionary* (12th ed. 2024) (defining "deed of trust" as "[a] deed conveying title to real property to a trustee as security until the grantor repays a loan"). Unlock's deed of trust expressly states that one of Mr. Seong's "Obligations" is "the payment of the Settlement Payment" and that it "secure[s] Owner's payment to [Unlock] of the Settlement Payment." Ex.B at 5.

Thus, Mr. Seong was obligated to pay Unlock, that obligation was deferred until a Settlement Event, and it was secured by a deed of trust. That's credit.

**3.** If more were needed, it's confirmed by "read[ing] the words in their context and with a view to their place in the overall statutory scheme." *Mi Familia*, 129 F.4th at 713. TILA recognizes as "credit" a wide range of payment obligations with features akin to Unlock's, including payments that vary with the value of the collateral and balloon payments.

TILA expressly covers "nonrecourse" credit, where the lender's payment will depend on the collateral's value. 15 U.S.C. § 1602(cc); *see also* Debt, *Black's Law Dictionary* (defining "nonrecourse" as "[d]ebt for which the borrower is *not personally liable,* so that a creditor can collect *only* on the collateral securing the debt" (emphases added)). So if "the home secured by the deed of

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 11
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

trust falls significantly in value," a "nonrecourse obligation" will also fall in value. *Olson*, 2025 WL 2254522, at *3. By including nonrecourse credit, the statute "expressly contemplates that a consumer credit obligation may exist even though the actual future obligation to pay back sums may be entirely contingent upon future events, including sufficient shared appreciation or equity." *Id.*

Similarly, the Ninth Circuit has held that TILA covers pawn shops, where recovery will vary with the collateral's value. *See Burnett*, 3 F.3d at 1262. A pawn shop advances a percentage of a good's value, takes the good as collateral, and later the borrower can either buy back the good for a larger payment or the owner keeps the collateral. *Id.*

TILA also includes reverse mortgage loans. A "reverse mortgage" is a nonrecourse credit obligation where: (1) a homeowner is given an "advance[]"; (2) the company receives a "deed of trust ... against the consumer's principal dwelling"; and (3) any "any principal, interest, and shared appreciation or equity is due and payable" upon default or "only after (A) the transfer of the dwelling; (B) the consumer ceases to occupy the dwelling as a principal dwelling; or (C) the death of the consumer." 15 U.S.C. § 1602(cc). Unlock's product is a reverse mortgage: (1) Unlock gave Mr. Seong an advance, (2) received a deed of trust, and (3) Unlock receives a payment amount based on equity in the home after death, sale, or any "[d]efault" such as no longer using the property as a principal residence. Ex.A at 2, §§ 1.8.1-2, 14.3, 16.1(a); *see also Olson*, 2025 WL 2254522, at *3, 5 (holding similar product met similar state-law definition).[7]

Statutory context thus confirms that TILA's broad scope of credit obligations covers the transaction here.

**4.** That conclusion is supported by a growing body of caselaw making clear that products like Unlock's are credit under state and federal law. In *Olson*, the Ninth Circuit held that a similar product met the ordinary definition of "credit." 2025 WL 2254522 at *3. While *Olson* interpreted Washington law, because the operative language and context are analogous to TILA, courts have relied on *Olson* in holding that transactions are disguised credit under TILA. *See, e.g., Moss v. Cleo*

---

[7] The transaction doesn't have to be a reverse mortgage specifically: All kinds of residential mortgage loans are subject to the bar on mandatory arbitration. 15 U.S.C. § 1639c(e)(1).

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 12
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

*AI Inc.*, 799 F. Supp. 3d 1152, 1159 (W.D. Wash. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1049-50 (N.D. Cal. 2025); *Feeman*, 2026 WL 880508, at *8. Unlock does not mention *Olson* (even though Unlock is unquestionably aware of it), improperly saving its arguments "for the first time in reply." *United States v. Rearden*, 349 F.3d 608, 614 n.2 (9th Cir. 2003).[8]

Other courts confirm *Olson*'s conclusion. *See Muskal v. Point*, CV 2025-024855, Dkt. 005 (Ariz. Sup. Ct. 2025), https://perma.cc/4HFW-SZ9R (similar transaction was residential mortgage loan under TILA); *see also Commonwealth v. Hometap Equity Partners, LLC.*, 2025 WL 2468564, at *5-7 (Mass. Super. 2025) (Massachusetts Attorney General sufficiently alleged that similar transaction was residential mortgage under state law); *In re Stone*, 671 B.R. 752, 756-57 (Bankr. D. Colo. 2025) (same for Colorado law). And in *Roberts v. Unlock*, Unlock only avoided a ruling that its product was "credit" under TILA by unilaterally withdrawing its motion after the judge indicated she would rule against the company. 1:24-cv-01374, Dkts. 111, 126 (D.N.J. 2025).

**B.      Unlock's arguments cannot be squared with TILA's text or Ninth Circuit caselaw.**

Unlock's contrary contention that its mortgage loans are not credit is contrary to statutory text, longstanding TILA principles, and precedent.

**1.** Unlock asserts its contract "expressly states" it "is not a loan." Unlock Br. 12 (citing Ex.A § 1.4). But what matters is a transaction's "economic substance," not its label or "form." *Burnett*, 3 F.3d at 1262. Even if labels mattered, Unlock's own documents give up the game: They refer to Mr. Seong as "the debtor," Ex.B at 2, and the "borrower," and to Unlock as the "lender," Ex.C.

**2.** Next, Unlock asserts (at 12) that its loan is not "credit" because Mr. Seong had "no

---

[8] While a petition for rehearing en banc was pending, the parties in *Olson* settled. But while the Ninth Circuit granted the parties' request to dismiss the appeal, it did not vacate its opinion. *See Navajo Nation v. U.S. Dep't of the Interior*, 907 F.3d 1228, 1229 (9th Cir. 2018) (distinguishing between granting a request to "dismiss" an appeal after a decision and a "request to vacate the ... opinion"); *Olson v. Unison*, No. 23-2835, Dkt. 72.1 at 2 (Oct. 17, 2025) (Collins, J., dissenting) (noting "absence of a request to vacate an opinion," and distinguishing it from a request for dismissal that would result in a distinct mandate or "judgment"). *Olson* thus remains on the books, which is why courts keep relying on it.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 13
No. 2:26-cv-01023-JLR

obligation to pay or repay" the company. That's incorrect. As Unlock recognizes, every "Settlement Event" requires payment of the "Settlement Payment," which will be 28.16% of the home's value. *Id.* And there will always be a Settlement Event: If a homeowner has not paid off his loan when ten years is up, he must do so at that time. *See supra* 3-4. And Unlock won't release its lien after a sale if the sale proceeds don't cover its "Settlement Payment." Ex.A § 1.8.5.[9]

Unlock argues (at 14) that it has "discretion" and can choose not to be paid. But, of course, that's true of any creditor. That "election" whether to collect doesn't mean something is not a debt. *Olson*, 2025 WL 2254522, at *4. Even Unlock's CEO has admitted that there is a "payment obligation." Flávia Furlan Nunes, *Unlock CEO Jim Riccitelli says home equity investments need 'purpose-built regulation,'* HousingWire (May 4, 2026), https://perma.cc/G4CZ-2MX5 ("'[N]o interest rate' doesn't mean 'no cost,' or 'no payment obligation,' and shared-equity products are never marketed that way."). And it would come as a surprise to Unlock's Wall Street investors if Unlock did not require homeowners to pay the company. While Unlock claims that the timing of payment depends "upon the occurrence of certain contingent events," Unlock Br. 12-13, that's true of debts covered by TILA, such as reverse mortgages, 15 U.S.C. § 1602(cc).

At times, Unlock suggests that it is not receiving a payment, but "convert[ing] its investment into an ownership." Unlock Br. 14. This is merely a payment obligation under another name. *See Burnett*, 3 F.3d at 1262. For example, when Mr. Seong sold his home, he had to pay Unlock 28.16% of the sale price through one of two mechanisms. Ex.A at 2, §§ 1.8, 2.1(g). Mr. Seong could "tender[]" the "Settlement Payment" to Unlock through escrow. *Id.* § 2.4. Or, once the home was in escrow, he could deed Unlock 28.16%, which the escrow agent would then pay Unlock in dollars. *Id.* § 2.3. Unlock calls the latter "Conversion." *Id.* But either way, Mr. Seong had to pay Unlock the same amount of money. *See, e.g., Olson*, 2025 WL 2254522, at *1, 4-5 (holding transaction with similar payment mechanism was credit).

Even if Unlock were actually acquiring partial ownership of the house, however, that

---

[9] In contrast, the bail bonds in the out-of-circuit decision in *Buckman v. Am. Bankers Ins. Co. of Florida*, would never require payment "unless and until" the individual didn't appear, 115 F.3d 892, 894 (11th Cir. 1997).

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 14
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

wouldn't change the analysis, as Unlock would simply be collecting its payment from the collateral. That's how nonrecourse debt and pawn shops work, both of which TILA covers. *See supra* 13-14. And as a case that *Unlock* itself cites favorably (at 12) for the meaning of "debt" explains: "[A] person who agrees that a lender can be repaid through execution on the borrower's property is no less a debtor." *Feeman*, 2026 WL 880508, at *8.

Unlock also seems to claim (at 12) that debt must be a specific dollar amount fixed at the outset, and that this transaction doesn't qualify because the home's value might change over time. But TILA expressly includes debts with payment amounts that will vary with time and be ascertained later. *See, e.g.*, 15 U.S.C. § 1602(cc)(2) (mortgage payments in home "equity" or "appreciation"); *id.* § 1602(bb)(1)(B)(iii) (variable rate mortgages). Not only that, but even the definition on which Unlock relies includes not only "a specific sum of money," but also "contingent debt," which is "[a] debt that is not presently fixed but that may become fixed in the future with the occurrence of some event." Debt, *Black's Law Dictionary*. And it includes "nonrecourse debt," which will vary in value with the collateral. *Id.*

As to Unlock's assertion (at 3) that it doesn't require interest or periodic payments, Unlock cites nothing in TILA requiring this to constitute debt.[10] In any event, interest just means "the amount owed to a lender in return for the use of borrowed money." Interest, *Black's Law Dictionary*. But Mr. Seong was required to pay Unlock in exchange for the advance he borrowed: He paid Unlock 28.16% of his home's value and thousands in fees. And TILA expressly covers credit with a single balloon payment at maturity, 15 U.S.C. § 1602(cc)(2)—indeed, these are particularly dangerous forms of credit. ECF 1-1 ¶¶4.6-10.

3. Finally, Unlock claims there's a risk that it could be paid back less than its advance. But all creditors face a risk of nonpayment. And someone is in "debt" to someone else if they owe them money, even if it's less than they initially received. *See supra* 12, 13-14. Further, the risk that a lender can't collect full repayment if the collateral's value drops is simply a feature of a

---

[10] In determining the cost of credit, TILA covers "finance charge[s]," which are far more than just traditional, periodic interest rates. 15 U.S.C. § 1605(a).

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 15
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

"nonrecourse obligation," *Olson*, 2025 WL 2254522, at *3, which TILA expressly covers, 15 U.S.C. § 1602(cc)(2).

Even if guaranteed repayment were required, as a matter of "economic substance," *Burnett*, 3 F.3d at 1262, Unlock *is* guaranteed to recover its advance. Mr. Seong had to pay Unlock 28.16% of the value of his home, which in practice will always be higher than the 16.57% advance. *See supra* 5. Unlock was guaranteed full repayment even if the house dropped in value by 41%. *Id.* As federal government data shows, that's far more than home prices have ever dropped in Washington or the Seattle area, including during 2008, when many traditional lenders lost money. ECF 1-1 ¶4.35 & n. 3, 4.[11] Homeowners would also have the least incentive to sell, and Unlock's contract enables it to scuttle sales at a disadvantageous time. Ex.A § 2.1(i), (n). Unlock itself tells its Wall Street investors that its "product structure allows for stable returns across various housing cycles," and its "returns are uncorrelated with broader markets." ECF 1-1 ¶4.49.[12] And while Unlock emphasizes (at 1) that Mr. Seong's house dropped in value, the fact that Unlock still collected its advance plus a large return only further shows it has guaranteed repayment.

Even though Mr. Seong pointed to this evidence in his complaint, ECF 1-1 ¶¶4.35-49, Unlock doesn't address it. Instead, it baldly asserts (at 3) that it is not guaranteed repayment, citing a declaration from its CEO. But that declaration only states that it's theoretically possible Unlock could lose money—without saying this has happened or is likely to happen, despite access to all Unlock's internal data. ECF 12 ¶4. A rule that *any* possibility of losing money disqualifies a

---

[11] *All-Transactions House Price Index for Washington*, Federal Reserve of St. Louis, https://perma.cc/HRD2-K367; *All-Transactions House Price Index for Seattle-Bellevue-Kent, WA (MSAD)*, Federal Reserve of St. Louis, https://perma.cc/YVR9-KA79.

[12] Under a motion to dismiss standard, Mr. Seong amply alleged Unlock is guaranteed repayment. ECF 1-1 ¶¶4.31-49. Even under a summary judgment standard, this Court can consider the official Federal Reserve website compiling housing market data from the Federal Housing Finance Agency. *See, e.g.*, Fed. R. Evid. 803(17), 902(5); *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (courts may consider evidence so long as contents admissible); *Honchariw v. Cnty. of Stanislaus*, 530 F. Supp. 3d 939, 943 n.2 (E.D. Cal. 2021), *aff'd*, 2022 WL 522287 (9th Cir. 2022) (taking judicial notice of FHFA house price index data of undisputed authenticity and accuracy).

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 16
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

transaction as "credit" would mean that no loan is "credit." This Court can therefore conclude that Unlock's product is credit under TILA as a matter of law. However, if this Court believes more factual development is required, it should withhold ruling on the motion and grant arbitration-specific discovery—especially since data about the outcomes of Unlock's loans are in Unlock's possession. *See, e.g., Knapke*, 38 F.4th at 833.

4. Unable to prevail on TILA's text, Unlock (at 13-14) asks for an exception to the statute based on agency staff commentary. But this commentary doesn't purport to control the statutory definition: It accompanies a regulation and applies to the definition of "credit" "for purposes of [that] *regulation.*" 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt. 2(a)(14)(1) (emphasis added). Nor could commentary trump statutory text. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Even if it were relevant, neither of the commentary's exceptions to "credit" under that regulation—"option contracts" and "investment plans"—apply here.

Unlock's contract never even claims to be an "option."[13] An option contract conveys "[t]he right to buy or sell something within a specified time and at a specified price." Option, *American Heritage Dictionary* (1st ed. 1969); Restatement (Second) of Contracts § 25. Thus, an "option to purchase real estate" involves "the payment of consideration for the option itself"—that is, payment for the right to later buy the real estate—and then, for the option-buyer to exercise that right, it pays "the agreed-upon purchase price." *Hometap*, 2025 WL 2468564, at *13. Unlock's contract didn't provide Unlock the right to buy Mr. Seong's property at a specified price. It provided Mr. Seong an advance of money, then required Mr. Seong to *pay Unlock* later. That's debt, not an option. And even if Unlock had included a purported option mechanism, courts must still look to substance, and the Ninth Circuit has recognized that an "option" can be used to disguise credit. *Burnett*, 3 F.3d at 1262; *see also Olson*, 2025 WL 2254522, at *5.

Nor is Unlock's product an "[i]nvestment plan[] in which the party extending capital to the consumer risks the loss of the capital advanced." 12 C.F.R. pt. 226, Supp. I, Subpt. A, cmt.

---

[13] The word "option" only appears once in the "Forward Sale and Exchange Agreement" contract to describe Unlock's option to pursue liquidated damages. Ex.A at 42.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 17
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

2(a)(14)(1)(viii). The commentary illustrates what could qualify: "an arrangement with a home purchaser in which the investor pays a portion of the downpayment and of the periodic mortgage payments in return for an ownership interest in the property, and shares in *any* gain or loss of property value." *Id.* (emphasis added). As the example shows, an investment is "[a]n expenditure to *acquire* property or assets to produce revenue." Investment, *Black's Law Dictionary* (emphasis added). But in entering this transaction, Unlock didn't acquire the property, share ownership of it, share the burdens of ownership, ECF 1-1 ¶4.41; Ex.A § 1.9, share in *any* loss, or even genuinely risk losing its advance, *see supra* 5, 18-19.[14] And if theoretical risk of loss were sufficient to evade TILA, no debt would be covered.

This distinguishes *Foster*, the unpublished, district court case involving a different product, on which Unlock primarily relies (at 13-14). It's not clear whether *Foster* was correctly decided. It failed to attend to statutory context, such as TILA's coverage of nonrecourse debts and pawn shops. *Foster v. Equitykey Real Est. Invs. L.P.*, 2017 WL 1862527, at *4-5 (N.D. Cal. 2017). In any event, in *Foster*, the company did share a risk of loss: If "home prices decrease[d]" the homeowner would "not owe [the company] any money." *Id.* "The differences are clear" from Unlock, which always receives 28.16% of the home's value even if prices crater. *Hometap*, 2025 WL 2468564, at *7. Unlock's other cases either characterize a product in passing before being reversed on other grounds or weren't even interpreting the meaning of debt or credit. Unlock Br. 13. None of this warrants departing from the statute's text, context, and Ninth Circuit caselaw.

*    *    *

In sum, Unlock's transaction is a "residential mortgage loan." 15 U.S.C. § 1639c(e)(1). It therefore may not "include terms which require arbitration"—either of the merits or arbitrability. *Id.* Unlock argues (at 15) that section 1639c(e)(3), a *different* provision in TILA that imposes

---

[14] When this exception was added, *Truth in Lending; Official Staff Commentary*, 46 Fed. Reg. 50288-01 (Oct. 9, 1981), companies were experimenting with "partnership mortgage[s]" where "doctors or lawyers" were paired with homebuyers and "actually [became] a co-owner of the property." Deborah Rankin, *Why Shared Mortgages Are Hard to Get*, N.Y. Times, Apr. 18, 1982, https://perma.cc/HYR6-B94P.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 18
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

*different* limits on arbitration, does not apply here. Maybe so. But (e)(1) and (e)(3) are distinct provisions. *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180, 186 (4th Cir. 2022) (analyzing separately). And section (e)(1) does apply as a matter of law. If there are any relevant factual questions, however, this case should proceed to arbitration-specific discovery.

**III.     Washington law also precludes arbitration of arbitrability and the merits.**

Independently, Washington law also precludes enforcement of Unlock's arbitration and purported delegation clause. "Washington recognizes two types of unconscionability for invalidating arbitration agreements, procedural and substantive," and "[e]ither is sufficient to void the agreement." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 494 (Wash. 2020). Unconscionability is judged "at the time the contract is made." *Adler v. Fred Lind Manor*, 103 P.3d 773, 788 (Wash. 2004). "The task of a federal court in a diversity action is to approximate state law as closely as possible," *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007), and Washington courts have consistently held that contracts like Unlock's are unconscionable.

**A.     Any purported delegation clause is unenforceable.**

**1.** Even if the contract's reference to the JAMS rules were a delegation clause, it is unenforceable under Washington law as matter of lack of assent or procedural unconscionability.[15] The clause is part of an "adhesion contract"—a "form" contract presented on a "take it or leave it" basis by a drafting party with more bargaining power. *Adler*, 103 P.3d at 782 (Wash. 2004); Seong Decl. ¶¶6, 11-12.

Under Washington law, "[i]t must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms"—whether as a matter of assent or procedural unconscionability. *Pagliacci Pizza*, 470 P.3d at 492, 496. Here, the reference to the JAMS rules is also buried in a "maze of fine print," *id.* at 495, on page 34 of a 61-page document. Ex.A § 20.2; *see also Mattingly v. Palmer Ridge Homes LLC*, 238 P.3d 505, 512 (Wash. Ct. App 2010) (finding

---

[15] If, as Unlock argues (at 8), the reference to the JAMS rules constituted a clear delegation solely as a matter of federal arbitration law, it couldn't govern the distinct state law questions of procedural unconscionability and assent.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 19
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

procedural unconscionability when provisions were on "page 7 of a 32 page booklet" even "though the provisions are in bold and in a typeface slightly larger than the surrounding text"). And a homeowner would not only need to find the reference, they would need to find the JAMS rules themselves, parse dozens of different rules to find a reference to arbitrability, and then understand what that might mean. *Comprehensive Arbitration Rules & Procedures*, JAMS, https://perma.cc/R69R-XABZ. Further, as explained, the contract is not even clear whether the JAMS rules are actually "the Rules" that govern arbitration or are themselves governed by other unspecified rules. *See supra* 8-9. Unsurprisingly, Mr. Seong didn't know the terms of the JAMS rules. Seong Decl. ¶¶23-25. And the fact that JAMS rules are "subject to change" further undermines any notion that Mr. Seong knew about what the rules would be and agreed to them. *Pandolfi v. Aviagames, Inc.*, 2025 WL 2463742, at *1 (9th Cir. 2025). This renders any delegation clause unenforceable for lack of assent—or at the very least supports procedural unconscionability.

Further supporting procedural unconscionability is the contract's statement that "[t]o the fullest extent possible Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit." Ex.A § 21.5. As applied to the delegation clause, there is a "distinct possibility that the provision might mislead plaintiffs into" believing they can't challenge the delegation clause or arbitrability under TILA—even if the provision is unenforceable. *Brookdale Senior Living Communities, Inc. v. Hardy*, 2015 WL 13446704, at *5 (W.D. Wash. 2015).

Unlock's assertion (at 16) that Mr. Seong could have sought funding elsewhere doesn't address the convoluted and misleading terms around delegation—distinguishing Unlock's cases. *See Westcott v. Wells Fargo Bank, N.A*, 862 F. Supp. 2d 1111, 1120 (W.D. Wash. 2012) ("written clearly and ... hardly more than two pages long"); *Teuscher v. CCB-NWB, LLC*, 437 F. Supp. 3d 849, 857 (E.D. Wash. 2020) ("relatively simple, short and clear"). A "boilerplate" disclaimer suggesting Mr. Seong consult with others doesn't cure these problems either. *State v. Kaiser*, 254 P.3d 850, 854 (Wash. Ct. App. 2011).

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 20
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

Any delegation clause is thus procedurally unconscionable and therefore "void." *Pagliacci Pizza*, 470 P.3d at 494.

**2.** It's also substantively unconscionable, an independent ground for invalidating it. This "analysis is not limited to the bare text of the clause." *Heckman*, 120 F.4th at 680-81. "A court must consider the parts of the agreement that impact the delegation provision to decide its enforceability." *Id.* Unlock's contract contains harsh, highly one-sided terms that apply to the purported delegation clause.

*First*, the contract defines "Event of Default" to include the homeowner "tak[ing] any action to ... interfere with or negatively impact Unlock's rights." Ex.A § 16.1(a). That would appear to include challenging Unlock's purported right to delegate arbitrability to the arbitrator, exposing the homeowner to foreclosure and liquidated damages. *Id.* § 17, 42. This "risk" unconscionably deters homeowners from vindicating their rights. *McKee v. AT&T Corp.*, 191 P.3d 845, 859-60 (Wash. 2008).

*Second*, the contract also purports to put homeowners on the hook for Unlock's legal expenses, including "attorneys' fees and costs," including from "any act or omission by [the homeowner]." Ex.A § 21.12. That would include costs Unlock expended litigating whether its arbitration clause was enforceable—further deterring homeowners from vindicating their rights. *McKee*, 191 P.3d at 859-60.

*Third*, under JAMS' rules, any dispute about arbitrability must be kept confidential. JAMS R. 26(a). But "[c]onfidentiality unreasonably favors repeat players" like Unlock, which will know the outcomes of its prior arbitrations over arbitrability. *McKee*, 191 P.3d at 858. While there's an exception for disclosure "required by law or judicial decision," JAMS R. 26(a), most homeowners won't know confidential arbitrations even occurred. Courts must look to a provision's actual "effect," and a confidentiality provision improperly "hampers plaintiffs in learning about potentially meritorious claims" and "tilt[s] the scales in [Unlock's] favor." *McKee*, 191 P.3d at 858, 861.

The purported delegation clause is thus substantively unconscionable. At the very least, this substantive unconscionability, "overlap[ping]" with procedural unconscionability, supports a finding

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 21
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

of unconscionability. *Tadych v. Noble Ridge Constr., Inc.*, 519 P.3d 199, 204 (Wash. 2022). And because the clause is "permeated with unconscionability," severance is inappropriate, as it would only "encourage[] those who draft contracts of adhesion to overreach." *Pagliacci Pizza*, 470 P.3d at 498.

### B.    The general arbitration provision is also unconscionable.

The contract's general arbitration provision is equally unconscionable, if not more so. It is buried on two pages in a 61-page document, which itself is only one of several complex documents that Unlock presented to Mr. Seong. Seong Decl. ¶13; Exs. A, B. The terms of arbitration and "the Rules" that would govern it are just as confusing. *See supra* 8-9. The same substantively unconscionable provisions regarding defaults, indemnification, and confidentiality apply just as much to an arbitration of the merits. *See supra* 24-25. Not only that, but there are even more additional harsh and one-sided provisions.

Homeowners are stripped of their rights to statutory remedies in arbitration, including consequential and punitive damages, Ex.A § 20.4. Further, "in no event will Unlock's aggregate liability arising out of or related to the Unlock Agreement or the Property exceed the Investment Payment." *Id.* § 21.12. But arbitration cannot "strip[] consumers of their remedies" under statutes. *McKee*, 191 P.3d at 859. The terms are also dramatically one-sided, as Unlock can receive more in liquidated damages, Ex.A at 42; *see Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 767 (Wash. 2004).

Unlock will also be immunized in arbitration by a provision stating that "Unlock may execute any of its duties under the Unlock Agreement by or through agents," but homeowners "expressly waive any claims against any of Unlock's agents [and] employees." Ex.A § 21.13-14. That limit on substantive liability is both unconscionable and one-sided, as Mr. Seong is expressly liable for the actions of anyone acting on his behalf. *Id.* § 21.12.

This raft of unenforceable provisions renders the whole arbitration provision "permeated with unconscionability" and invalid. *Pagliacci Pizza*, 470 P.3d at 498.

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 22
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006

## CONCLUSION

Unlock's motion to compel arbitration should be denied as a matter of law, but if it is not, this Court should hold the motion in abeyance for arbitration-specific discovery.

RESPECTFULLY SUBMITTED AND DATED this 1st day of June, 2026.

GUPTA WESSLER LLP

*I certify that this memorandum contains 8,398 words, in compliance with the Local Civil Rules.*

By: */s/Thomas Scott-Railton*
    Thomas Scott-Railton, *Admitted Pro Hac Vice*
    Email: thomas@guptawessler.com
    2001 K Street NW, Suite 850 North
    Washington, DC 20006
    Telephone: (202) 888-1741

    Jennifer D. Bennett, *Admitted Pro Hac Vice*
    Email: jennifer@guptawessler.com
    GUPTA WESSLER LLP
    235 Montgomery Street, Suite 629
    San Francisco, California 94104
    Telephone: (415) 573-0336

TERRELL MARSHALL LAW GROUP PLLC

By: */s/ Blythe H. Chandler*
    Beth E. Terrell, WSBA #26759
    Email: bterrell@terrellmarshall.com
    Blythe H. Chandler, WSBA #43387
    Email: bchandler@terrellmarshall.com
    Eleanor Eagan, WSBA #64463
    Email: eeagan@terrellmarshall.com
    1700 Westlake Avenue North, Suite 300
    Seattle, Washington 98109
    Telephone: (206) 816-6603

    Umar I. Gebril, WSBA #58227
    Email: umar@cascade.law
    CASCADE LAW PLLC
    2707 Colby Avenue, Suite 1420
    Everett, Washington 98201
    Telephone: (425) 998-8999

*Attorneys for Plaintiff and the Proposed Class*

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION - 23
No. 2:26-cv-01023-JLR

GUPTA WESSLER LLP
2001 K Street NW
Suite 850
Washington, DC 20006