UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SEUNGJAE SEONG,<br><br>Plaintiff,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC.,<br><br>Defendant. | CASE NO. C26-1023JLR<br><br>ORDER |

## I. INTRODUCTION

Before the court is Defendant Unlock Partnership Solutions Inc.'s ("Unlock") motion to compel arbitration. (Mot. (Dkt. # 11); Reply (Dkt. # 22).) Plaintiff Seungjae Seong opposes the motion. (Resp. (Dkt. # 20).) The court has considered the parties'

//

//

//

submissions, the relevant portions of the record, and the governing law. Being fully advised,[1] the court GRANTS Unlock's motion to compel arbitration.

## II. BACKGROUND

This putative class action arises from Mr. Seong's allegations that Unlock's "complex mortgage product" violates the Washington Consumer Protection Act ("CPA"), RCW 19.86.010, *et seq*. (*See generally* Compl. (Dkt. # 1-1).) Mr. Seong seeks injunctive relief on behalf of Washington consumers and declaratory relief for an unconscionable contract and unenforceable fee shifting provision.

### A. Factual Background

In 2018, Mr. Seong and his wife bought a house in Bothell, Washington, because Mr. Seong got a job as a senior technical designer at Amazon. (Compl. ¶ 4.51.) In 2022, Mr. Seong lost his job and ultimately found another position in his field in North Carolina. (*Id*. ¶¶ 1.3, 4.52.) Mr. Seong accepted the position and rented an apartment in North Carolina, traveling back and forth between Washington and North Carolina, while his wife and children continued living in their Bothell home. (*Id*.) The Seong family faced financial difficulties due to Mr. Seong's period of unemployment and the costs of travel and keeping multiple residences after Mr. Seong began his new job, leading Mr. Seong to look into options to support his family. (*Id*. ¶ 4.53.)

//

//

[1] Unlock did not request oral argument (*see* Mot. at 1), whereas Mr. Seong did request oral argument (*see* Resp. at 1). The court finds that oral argument would not assist it in deciding the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

In mid-2022, Mr. Seong learned about Unlock through an online advertisement that "portrayed Unlock as a flexible alternative to a home equity loan or Home Equity Line of Credit (HELOC) without any monthly payments." (*Id.* ¶ 4.54.) Mr. Seong then called Unlock and spoke with a sales representative who, on or about July 12, 2022, emailed Mr. Seong a DocuSign application that he filled out and returned with the required documents. (*Id.* ¶ 4.55.) On July 14, 2022, the Unlock sales representative emailed Mr. Seong an "Investment Estimate" which included an advance "Investment Payment" in the amount of $100,000, representing 9.36% of the value of Mr. Seong's Bothell property, in exchange for a future payment of a 15.92% of the value of the property in the future. (*Id.* ¶ 4.56.) Mr. Seong requested the maximum amount for which he would be eligible after reviewing the "Investment Estimate" and on July 31, 2022, the Unlock sales representative emailed him updated terms. (*Id.* ¶¶ 4.57-4.58.) Under the updated terms, Unlock would provide Mr. Seong an advance of $190,509 (which was equivalent to 16.57% of the appraised value of the home), and in exchange Unlock would receive 28.16% of the value of the home, or 1.7 times the value of the amount advanced. (*Id.* ¶ 4.59; *see id.*, Ex. A (Forward Sale and Exchange Agreement ("FSEA")).)

On August 16, 2022, the Unlock sales representative sent via DocuSign the "final contract" packet which included a closing statement, final application, 4506 C, disbursement instructions, and sample contract documents, but did not include a copy of the final FSEA or Performance Deed of Trust. (*Id.* ¶ 4.61.) On August 30, 2022, Mr. Seong and his wife both signed the FSEA and Performance Deed of Trust through a notary in North Carolina and a notary in Washington. (*Id.* ¶ 4.63.) Mr. Seong used the

money he received from Unlock to cover his family's expenses. (*Id.* ¶ 4.68.) Mr. Seong alleges that "[u]nder the terms of the Exchange Agreement, [he] was required to grant Unlock a mortgage on his home, secured by a deed of trust, which secured his obligations under the agreement on penalty of foreclosure[,]" that he "did not have an opportunity to negotiate the terms of the contract[,]" and that he "did not realize [ ] that he would be forced to pay Unlock far more money than he received." (*Id.* ¶¶ 4.64-4.66.)

In April 2025, when Mr. Seong and his family decided to relocate to North Carolina, Mr. Seong reached out to Unlock to determine what the payoff amount would be if he sold his home. (*Id.* ¶ 4.69.) On April 21, 2025, Unlock sent Mr. Seong a "payoff statement" which stated that he would owe Unlock $320,324.89 if he sold his Bothell home. (*Id.* ¶ 4.70.) Mr. Seong and his wife closed the sale of their Bothell home on May 8, 2025, for $1,140,000. (Seong Decl. (Dkt. # 21) ¶ 29.) Unlock ultimately demanded full payment in the amount of $318,898.70, and Mr. Seong paid Unlock to close the sale. (*Id.* ¶¶ 30-31.)

**B. FSEA Arbitration Provision**

The FSEA contains an arbitration agreement under a heading titled "Arbitration," which is bolded and underlined, and states, in relevant part:

> 20.1 In the event of any inconsistencies between the terms and conditions of the Unlock Agreement (or any of them) and the terms and conditions of this Section 20, this Section 20 shall control and be binding.
>
> 20.2 OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY (INCLUDING ANY AFFILIATE, EMPLOYEE, OFFICER, DIRECTOR OF BENEFICIARY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM THE UNLOCK AGREEMENT

OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES OF JAMS, THE RESOLUTION EXPERTS (THE "RULES"), AND, BECAUSE THIS AGREEMENT SUBSTANTIALLY AFFECTS INTERSTATE COMMERCE THE PARTIES AGREE THIS AGREEMENT, INCLUDING ITS ENFORCEMENT IS TO BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. § 1 ET SEQ.

20.3 Procedure. OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS, THE RESOLUTION EXPERTS ("JAMS"), AND THAT A SINGLE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH JAMS' COMPREHENSIVE ARBITRATION RULES AND PROCEDURES AND JAMS POLICY ON MINIMUM STANDARDS OF PROCEDURAL FAIRNESS FOR CONSUMER ARBITRATIONS. OWNER HAS ACCEPTED JAMS RULES AND USE OF JAMS. OWNER ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW, EXCEPT AS OTHERWISE SET FORTH IN THE UNLOCK AGREEMENT. OWNER UNDERSTANDS THAT UNLOCK WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT OWNER SHALL PAY THE FIRST $250.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION OWNER INITIATES. OWNER AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE APPLICABLE JAMS' ARBITRATION RULES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. OWNER AGREES THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING AND PROVIDE A CONCISE WRITTEN STATEMENT OF THE ESSENTIAL FINDINGS AND CONCLUSIONS ON WHICH THE AWARD IS BASED.

20.4 Remedy. EXCEPT AS PROVIDED BY THE RULES AND THE UNLOCK AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE OWNER AND BENEFICIARY. REMEDIES THAT WOULD OTHERWISE BE AVAILABLE TO OWNER UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS SHALL REMAIN AVAILABLE. THE ARBITRATOR WILL HAVE NO AUTHORITY TO AWARD PUNITIVE DAMAGES OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND

> THE UNLOCK AGREEMENT, NEITHER THE OWNER NOR BENEFICIARY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.
>
> 20.7 Class Action Waiver. ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER YOU NOR UNLOCK MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDIVIDUALS OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS.

(FSEA ¶¶ 20.1-20.4, 20.7.)

### C. Procedural Background

On February 5, 2026, Mr. Seong brought this action in King County Superior Court on behalf of himself and a proposed class defined as "[a]ll persons who have entered into an Exchange Agreement with Unlock on a property located in Washington." (Compl. ¶ 5.1.; *see also* NOR (Dkt. # 1) ¶ 2.) Mr. Seong raises claims against Unlock for violations of Washington's Consumer Protection Act ("CPA"), and for declaratory relief for an unconscionable contract and unenforceable fee shifting provision. (Compl. at 18-25.) He seeks: (1) an order appointing him as class representative and his counsel as class counsel; (2) declaratory relief determining that the fee-shifting provision of the Exchange Agreement is unenforceable; (3) rescission or reformation of the Exchange Agreements; (4) actual damages; (5) treble damages under the CPA; (6) injunctive relief prohibiting Unlock from selling its Exchange Agreement to Washington consumers; (7) attorneys' fees and costs; and (8) prejudgment interest. (*Id.* at 26.)

On March 25, 2026, Unlock removed the action to this court. (*See generally* NOR.) On April 17, 2026, Unlock filed its motion to compel arbitration. (*See generally*

Mot.) On April 28, 2026, the court granted the parties' stipulated motion to extend the briefing schedule for the motion. (*See generally* 4/28/26 Order (Dkt. # 15); *see also* Stip. Mot. to Am. (Dkt. # 14).) The motion is now fully briefed and ripe for the court's consideration.

## III. ANALYSIS

Below, the court sets forth the legal standard for motions to compel arbitration and then considers Unlock's motion.

### A. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, governs arbitration agreements in any contract affecting interstate commerce. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). The FAA "reflect[s] both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts . . . and must enforce them according to their terms[.]" *Id.* (citations omitted); *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable" unless invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. 9 U.S.C. § 2; *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1259 (9th Cir. 2017). Arbitration agreements may not, however, be invalidated by defenses that apply only in arbitration or that derive their meaning from the fact that an

agreement to arbitrate is at issue. *Poublon*, 846 F.3d at 1260. The party opposing arbitration bears the burden of showing that the agreement is not enforceable. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000).

A district court's authority to compel arbitration arises under Section 4 of the FAA. *In re Van Dusen*, 654 F.3d 838, 843 (9th Cir. 2011); 9 U.S.C. § 4. In deciding whether to compel arbitration under the FAA, a court's inquiry is generally limited to two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000) (citations omitted). If both conditions are met, "the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Id*. "However, these gateway issues can be expressly delegated to the arbitrator where 'the parties clearly and unmistakably provide [for it].'" *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (emphasis omitted) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 649 (1986)). If an agreement contains a delegation provision, the court's role is limited to analyzing whether: (1) a valid agreement to arbitrate exists; and (2) the agreement contains a valid delegation provision. *Id*. at 1133. If both preconditions are met, the arbitrator must resolve all further issues regarding arbitrability, including whether the arbitration agreement applies to the dispute at issue. *Id*.

**B. Motion to Compel Arbitration**

Unlock asks the court to compel arbitration pursuant to the arbitration agreement in the FSEA and stay the case pending the completion of arbitration. (Mot. at 7.) Mr.

Seong asserts that (1) the arbitration provision of the FSEA does not contain a "clear and unmistakable delegation[,]" and (2) even if it did any delegation clause is itself unenforceable under federal and state law. (*See generally* Resp.) For the reasons set forth below, the court grants Unlock's motion to compel arbitration.

1. Whether an Agreement to Arbitrate Exists

As the party seeking to compel arbitration, Unlock bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *See Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (internal quotation marks omitted)). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (citation omitted).

The court applies "ordinary state-law principles that govern the formation of contracts" to decide whether an agreement to arbitrate exists. *See id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The parties agree that Washington law governs the issue of contract formation. (*See* Mot. at 7 n.3; *see also* Compl. ¶¶ 1.6, 6.1-9.3; FSEA ¶ 21.15.) Under Washington law, to form a valid contract, the contracting parties must "objectively manifest their mutual assent." *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004). "Generally, manifestations of mutual assent will be expressed by an offer and acceptance." *Id.* (citation omitted).

Here, there is no dispute that Mr. Seong entered a contract with Unlock on August 30, 2022, when he signed the FSEA and Performance Deed of Trust with a notary in

North Carolina. (Compl. ¶ 4.63.) Before signing, Mr. Seong was searching for "options for ensuring that there was enough cash flow to support his family during this transitional time[,]" reached out to Unlock after seeing an online advertisement, and asked for the maximum amount for which he would be eligible after reviewing the initial Investment Estimate. (*Id.* ¶¶ 4.53-4.57.) While Mr. Seong contends that the "final contract" packet that was sent by Unlock via DocuSign on August 16, 2022, did not include a copy of the final FSEA or Performance Deed of Trust, he concedes that it included "sample contract documents" such as a sample FSEA with an identical arbitration agreement. (*Id.* ¶ 4.61.) Furthermore, while Mr. Seong asserts that Unlock did not refer him "or his wife to an independent counseling agency prior to entering the [FSEA]," (*id.* ¶ 4.62), Unlock recommended seeking outside advice. (Riccitelli Decl. (Dkt. # 12) ¶ 8, Ex. B (Investment Closing Statement) ("You acknowledge that Unlock suggested that you review the Unlock HEA with your family and professional advisors, including your tax, legal and financial advisor and estate planner, and that Unlock was available to speak with any of them and did so upon your request"); *see id.* ¶ 7, Ex. A (Investment Estimate) (same).) Thus, the court concludes that Mr. Seong objectively manifested assent and a valid arbitration agreement exists.

2. <u>Whether the Parties Have Delegated Questions of Arbitrability to the Arbitrator</u>

The parties dispute whether the FSEA contains a delegation clause. (*See generally* Mot.; Resp.) Whether the court or an arbitrator should resolve a dispute as to arbitrability depends upon whether the parties agreed to delegate that power to the arbitrator.

*Brennan*, 796 F.3d at 1125. Unless the parties "clearly and unmistakably" delegate that power to an arbitrator, arbitrability is for the court, not the arbitrator, to decide. *First Options*, 514 U.S. at 944. The Ninth Circuit has held that an arbitration agreement "clearly and unmistakably" delegates the question of the agreement's validity to the arbitrator when it incorporates the JAMS rules. *Sandler v. Modernizing Med., Inc.*, 170 F.4th 1209, 1212 (9th Cir. 2026); *see also Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 481 (9th Cir. 2024) ("Incorporation of the JAMS arbitration rules by reference constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability.").

The court is not persuaded by Mr. Seong's assertions that the FSEA is "confusing and contradictory" and does not include a "clear and unmistakable" delegation provision. (Resp. at 6-7.) Instead, it is clear that the arbitration provision of the FSEA delegates the arbitrability question to an arbitrator by incorporating the JAMS rules. (*See* FSEA ¶ 20.2 ("OWNER AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH BENEFICIARY . . . ARISING OUT OF, RELATING TO, OR RESULTING FROM THE UNLOCK AGREEMENT OR THE PROPERTY, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER *THE ARBITRATION RULES OF JAMS*") (emphasis added); *see also id*. ¶ 20.3 (OWNER AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS . . . . *OWNER HAS ACCEPTED JAMS RULES AND USE OF JAMS*.") (emphasis added).)

Therefore, the court concludes that the parties have delegated to the arbitrator the issue of whether Mr. Seong's claims are arbitrable, and the court's analysis ends here.

*Brennan*, 796 F.3d at 1133 (limiting the court to determining whether a valid agreement to arbitrate exists and whether the agreement contains a valid delegation provision). Accordingly, the court grants Unlock's motion to compel arbitration and stays this action pending the completion of arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478-79 (2024).

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Unlock's motion to compel arbitration (Dkt. # 11) and STAYS this action pending the completion of arbitration.

Dated this 27th day of August, 2026.

JAMES L. ROBART
United States District Judge